Kevin Cassidy, D.C. Bar No. MA0021
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
Telephone: (781) 659-1696
Email: cassidy@lclark.edu

Tarah Heinzen, D.C. Bar No. 1019829
Food & Water Watch
1616 P St. NW, Suite 300
Washington, DC 20036
Telephone: (202) 683-2457
Email: theinzen@fwwatch.org

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| **FOOD & WATER WATCH**, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE**, an agency of the United States Government;<br>**FARM SERVICE AGENCY**, an agency of the United States Government;<br>**DEANNA DUNNING**, in her official capacity as Farm Loan Officer, Farm Service Agency<br><br>Defendants | Civil No. 17-1714<br><br>COMPLAINT FOR VACATUR OF ILLEGAL AGENCY DECISIONS, DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Pursuant to the Administrative Procedure Act and the National Environmental Policy Act) |

1.     This is a civil action brought by Food & Water Watch (FWW) for vacatur of illegal agency decisions, as well as declaratory and injunctive relief, under the Administrative Procedure Act (APA) (5 U.S.C. §§ 551 *et seq*.). Plaintiff challenges Defendants Farm Service

Agency's (FSA) and United States Department of Agriculture's (USDA) Environmental

Assessment and Finding of No Significant Impact (EA/FONSI), dated July 22, 2015, and their

approval of One More Haul Farm's (OMH) application for a guaranteed loan to construct and

operate a poultry concentrated animal feeding operation (CAFO).

2.      Upon information and belief, the challenged decisions enabled OMH to construct

and operate a CAFO along Maryland's Eastern Shore within the Choptank River watershed. The

CAFO facility includes four poultry houses, a manure storage structure, and a mortality

composting area. The CAFO has the capacity to house 192,000 birds. This CAFO's operation

threatens to degrade the groundwater quality in the surrounding area, pollute nearby surface

waters and the downstream Chesapeake Bay, harm wildlife and its habitat, reduce air quality,

and reduce the quality of life for surrounding neighbors.

3.      The EA/FONSI and loan guarantee violated the APA, the National Environmental

Policy Act (NEPA) (42 U.S.C. §§ 4321-4370), and NEPA's implementing regulations.

Specifically, Defendants violated NEPA by relying on an inadequate and flawed analysis and

public disclosure to conclude that this CAFO would not have a significant impact on the

environment. Defendants failed to consider an adequate range of reasonable alternatives and

failed to address the potential for impacts on wildlife and other biological resources, including

migratory birds that utilize the area surrounding the CAFO. Defendants also failed to consider

groundwater quality and failed to adequately address surface water quality and air pollution and

odors. Further, Defendants neglected to provide the necessary analysis of "cumulative impacts"

from other "past, present, and reasonably foreseeable future activities." As a result of their

failure to conduct an adequate EA, Defendants also improperly determined that their action

would have no significant impact and that they did not need to prepare an environmental impact

statement (EIS).

4.      Defendants have facilitated the industrialization and concentration of the broiler

chicken industry on Maryland's Eastern Shore and elsewhere in the Chesapeake Bay watershed,

which has had significant adverse impacts on surface and groundwater quality, air quality, and

rural quality of life. FSA issues loans and loan guarantees to "contract" chicken growers who

build industrial-scale confinement operations like OMH, and then sell the chickens under

contract to an "integrator" company like Allen Harim, OMH's integrator. This industry model is

based around maximizing production efficiency for the integrator corporations, which often seek

to contract with producers in close proximity to their other production infrastructure, such as

hatcheries, feed mills, and slaughterhouses. The resulting concentration of chicken production

also concentrates vast quantities of waste and a range of harmful environmental impacts in

certain communities and watersheds. As explained *infra*, FSA has exacerbated this harmful

concentration of environmental and community impacts by prioritizing the interests of

integrators over an analysis of environmental impacts when making its loan determinations.

5.      Plaintiff seeks an order and judgment:

a.      Vacating and setting aside the EA/FONSI and final approval of OMH's

loan guarantee as illegal agency actions under the APA;

b.      Declaring that Defendants violated NEPA by failing to consider

reasonable alternatives, failing to address biological resources (including migratory birds

that utilize the area surrounding the CAFO), failing to consider groundwater quality and

quantity, failing to adequately address surface water quality, failing to adequately address

air pollution effects and odors, improperly relying on mitigation measures, failing to

consider cumulative impacts, determining the project would have no significant impact,

and failing to prepare an EIS prior to approving OMH's loan;

    c.      Enjoining implementation of Defendants' loan guarantee.

    d.      Awarding Plaintiff its reasonable attorneys' fees and costs pursuant to the

Equal Access to Justice Act, 28 U.S.C. § 2412; and

    e.      Awarding such further relief as the Court deems just and equitable.

### JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 2412 (costs and fees) and 28 U.S.C. § 1346 (United States as defendant).

Plaintiffs have exhausted all required administrative remedies. Plaintiffs seek judicial review of

final administrative actions of the UDSA and FSA, as defined by 5 U.S.C. § 704 (actions

reviewable).

7.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e)(1) because

Defendant agencies USDA and FSA reside in this district. Both agency Defendants maintain

their principal offices in the District of Columbia. Plaintiff FWW also is headquartered in the

District of Columbia.

### PARTIES

8.     Plaintiff FOOD & WATER WATCH (FWW) is a non-profit corporation that

champions healthy food and clean water for all by standing up to corporations that put profits

before people and advocating for a democracy that improves people's lives and protects the

environment. FWW is engaged in numerous campaigns to reduce CAFO pollution, which is one

of its priority issues. FWW is headquartered in the District of Columbia. FWW has thousands of

members who reside in Maryland, including a member who resides next door to the OMH

CAFO. This FWW member lives in such close proximity to the CAFO that it is decreasing the

enjoyment and privacy of her home and causing her concern over potential adverse health impacts. This member owns property and lives in the area that is directly impacted by the CAFO's dust, dander, noise, smell, ventilation fans, truck traffic, manure storage facilities, and mortality composting area. Residing in such close proximity to the facility subjects this FWW member to loud noises at all hours of the day, bright lights that remain on all night, foul odors, and large numbers of flies in and around her residence. In addition to these harms, she is concerned that she and her visitors will experience adverse health effects from the CAFO's pollution; she is now fearful to allow family members with asthma to visit because they may be more susceptible to air pollution. She is further concerned that the facility will contaminate and/or deplete her well water, and that it will pollute Watts Creek and the downstream Choptank River and Chesapeake Bay. Another FWW member regularly fishes for bass in Watts Creek— which is in the vicinity of the CAFO—and the downstream Choptank River. He has invested significant time and resources into creek stocking and restoration projects, and he is concerned about the CAFO's likely water pollution impacts and the general impacts of industrial development on the character and aesthetic beauty of the areas where he fishes. The inadequate EA has exacerbated all of these negative effects.

9.     Defendant UNITED STATES DEPARTMENT OF AGRICULTURE (USDA) is a federal cabinet department with its principal offices located at 1400 Independence Avenue, S.W., Washington, D.C. 20250, and it is legally responsible for the final actions and decisions of the agencies within the USDA.

10.    Defendant FARM SERVICE AGENCY (FSA) is an agency within the USDA. FSA's principal office is located at 1400 Independence Avenue, S.W., Washington, D.C. 20250. FSA signed the EA/FONSI and, based on information and belief, approved the guaranteed loan

at issue in this case. These decisions constituted final agency actions of the FSA and USDA.

11.     Defendant DEANNA DUNNING is a Farm Loan Officer employed by Defendant FSA, in FSA's Caroline County, Maryland office. This FSA office is located at 9194 Legion Road, Suite 2, Denton, Maryland 21629. Ms. Dunning is responsible for reviewing farm loan guarantee applications and preparing environmental assessments, including the assessment for OMH farm. Plaintiff sues Ms. Dunning in her official capacity only.

## SUMMARY OF THE LAW

### *National Environmental Policy Act*

12.     Congress enacted the National Environmental Policy Act (NEPA) in 1969. NEPA seeks to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. To this end, NEPA directs all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment.

13.     NEPA obligates agencies to make available to the public high-quality information, including accurate scientific analyses, expert agency comments, and public comments, "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). NEPA's public disclosure goals are twofold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to review (and challenge if necessary) the agency's action. *Id*.

14.     NEPA requires all federal agencies to prepare a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement (EIS).

15.     The Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. Parts 1500–1508.

16.     To determine the significance of a federal action, CEQ regulations require agencies to look to both the context and the intensity of the action. 40 C.F.R. § 1508.27. Context refers to the significance of the action in regards to society as a whole, the affected region, the affected interests, and the locality. Both short- and long-term effects are relevant to the action's context. *Id*. § 1508.27(a). The intensity of the action is evaluated based on several factors, including, but not limited to, the degree to which the action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, and the degree to which the possible effects on the human environment are highly uncertain or involve unknown characteristics. *Id*. § 1508.27(b).

17.     The scope of NEPA review of environmental effects is broad, including consideration of direct, indirect and cumulative impacts on "ecological . . . aesthetic, historic, cultural, economic, social, or health" interests. *Id.* § 1508.8.

18.     An environmental assessment (EA) can be created to aid the agencies in determining whether or not a proposed activity will significantly affect the quality of the human environment. 40 C.F.R. § 1501.4(b). An EA is "a concise public document for which a Federal agency is responsible." *Id*. § 1508.9. The role of the EA is to determine whether an EIS or a finding of no significant impact (FONSI) is required. *Id*.

19.     Agency actions taken pursuant to NEPA are reviewable by this Court under the APA. 5 U.S.C. §§ 702, 704, 706.

### FSA NEPA Regulations

20.     The CEQ regulations require federal agencies to adopt procedures to implement

NEPA that supplement the CEQ regulations, 40 C.F.R. §1507.3, and FSA had such procedures in

place in 2015 when Defendants made the agency decisions at issue here. 7 C.F.R. §§ 1940.301-

1940.350 (2015).

21.     Under FSA's applicable NEPA regulations, the approval of the loan guarantee in

this case triggered the NEPA requirement to complete an EA. The applicable FSA regulations

required a complete EA for any action deemed a "Class II action" and a partial EA for any action

deemed a "Class I action." *Id*. § 1940.302(b)(2)-(3) (2015). CAFO actions requiring a Class II, or

complete, EA included financial assistance for a livestock-holding facility having a capacity in

excess of 100,000 broilers regardless of the type of manure handling or watering system used.

U.S. Dep't of Agric., FSA Handbook: 1-EQ (Revision 2) ¶ 34 OMH's chicken capacity of

192,000 significantly exceeds this regulatory threshold.

22.     In August of 2016, after Defendants made the decisions at issue here, the FSA

updated its EA regulations, 7 C.F.R. §§ 1940.301-1940.350 (2015), and issued new regulations,

7 C.F.R. §§ 799.1-799.59 (2016). 81 Fed. Reg. 51,274 (Aug. 3, 2016). The new regulations have

eliminated the Class I and Class II distinction, and instead simply require a complete EA for

certain actions (such as the FSA loan guarantee at issue) and no EA for other actions.[1] The new

regulations do "not have retroactive effect," 81 Fed. Reg. 51,274, 51,283 (Aug. 3, 2016), and

therefore, the Class II EA requirements dictate FSA's obligations with regard to the OMH loan

---

[1] The revised rule requires an EA for loans to operations that meet EPA's definition of a "large
CAFO," in this case dry litter broiler facilities with a capacity of at least 125,000 chickens. *See* 7
C.F.R. § 799.41(a)(9) (2016). *See also* 40 C.F.R. § 122.23(b)(4) (defining "large CAFO" for
purposes of Clean Water Act regulation).

guarantee.[2]

### *Contents of an EA*

23.     All EAs must "provide sufficient evidence and analysis for determining whether to prepare an [EIS]," including "brief discussions of the need for the proposal, of alternatives . . ., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9(a)(1), (b).

24.     In completing an EA, Defendants are further required to consider "all potential impacts associated with the construction of the project, its operations and maintenance, the operation of all identified primary beneficiaries, and the attainment of the project's major objectives." 7 C.F.R. pt. 1940, subpt. G, Exhibit H (2015).

25.     The agency must consider both direct and indirect effects. 40 C.F.R. § 1508.8 (defining the term "effects" and explaining that it includes indirect effects and is synonymous with "impacts"). Effects include impacts that are "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id. See also* 7 C.F.R. § 1940.302(e) (2015).

### 1.     Analysis of Alternatives.

26.     NEPA requires that all agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This

---

[2] Nonetheless, the update in FSA's regulations did not change the EA process for actions that were previously characterized as Class II. The primary change was to eliminate the Class I EA category, not to change the requirements of the complete EA: "This [new] regulation has only one category of Environmental Assessment, which makes the FSA NEPA process consistent with the CEQ regulations and less complex than previously. This is a substantive change in the regulation, but not in the existing process." 81 Fed. Reg. 51,274, 51,278 (Aug. 3, 2016).

requirement "extends to all such proposals, not just . . . [environmental] impact statements." 40

C.F.R. § 1507.2(d). Specifically, EAs must "provide sufficient evidence and analysis for

determining whether to prepare an environmental impact statement or a finding of no significant

impact" and must also "include brief discussions . . . of alternatives as required by [NEPA]." *Id.*

§ 1508.9(a)(1), (b).

27.     To satisfy NEPA's requirement to take a "hard look" at an action's impacts, a

federal agency must present the environmental impacts of the proposed action and the alternative

in comparative form, thus sharply defining the issues and providing a clear basis for choice

among the options by the decisionmaker and the public. *Id.* § 1502.14.

28.     USDA regulations dictate that "[t]he objective of the environmental review will

be to develop a feasible alternative with the least adverse environmental impact." 7 C.F.R. §

1940.303(c) (2015). Alternatives should include "(a) alternative locations, (b) alternative

designs, (c) alternative projects having similar benefits, and (d) no project." *Id.* pt. 1940, subpt.

G, Exhibit H(XVIII) (2015).

**2.     Assessment of Environmental Impacts.**

29.     One of the primary objectives of the rules requiring NEPA analysis and disclosure

is "for the Agency to make better decisions by taking into account potential environmental

impacts of proposed projects." *Id.* § 1940.301(d) (2015). "To accomplish these objectives, the

identification of potentially significant impacts on the human environment is mandated to occur

early in the Agency's planning and decisionmaking processes." *Id.* The severity of impact, or

"intensity," as well as the "context" of the action, jointly determine its significance. 40 C.F.R. §

1508.27. An agency must consider "[u]nique characteristics of the geographic area such as

proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and

scenic rivers, or ecologically critical areas" when evaluating intensity. 40 C.F.R. §§ 1508.27(b), (b)(3).

30.     USDA regulations require that the FSA "[d]iscuss, in terms of the amounts and types of emissions to be produced, all aspects of the project including beneficiaries' operations and known indirect effects (such as increased motor vehicle traffic) which will affect air quality." 7 C.F.R. pt. 1940, subpt. G, Exhibit H(IV)(1) (2015). The regulations further require Defendants to "[d]iscuss how impacts resulting from the project such as changes in land use, transportation changes, air emissions, noise, odor, etc. will affect nearby residents and users of the project area and surrounding areas." *Id*., subpt. G, Exhibit H(IV)(7) (2015).

31.     FSA also must "[d]iscuss, in terms of amounts and types of effluents, all aspects of the project including primary beneficiaries' operations and known indirect effects which will affect water quality," "[i]ndicate the existing water quality of surface and/or underground water to be affected," evaluate adverse impacts on the "withdrawal capabilities of other present [groundwater] users," and "[e]valuate the impacts of the project on this existing water quality" when completing a Class II EA. *Id*. pt. 1940, subpt. G, Exhibit H(IV)(2) (2015).

32.     FSA must consider the project's impacts, including "all known indirect effects," on "the natural environment including wildlife, their habitats, and unique natural features." *Id*. pt. 1940, subpt. G, Exhibit H(IV)(6) (2015). The scope of the EA "is broadened even further when there are related activities involved," the impacts of which "must also be assessed." *Id*. pt. 1940, subpt. G, Exhibit H (2015).

33.     The rules require the agency to contact appropriate experts, including Federal agencies, for their views. *Id*. § 1940.318(b) (2015). When FSA receives comments from both

experts and the public on the Class II action within the applicable time frame, they will be

included in the EA and will be considered. *Id*. § 1940.318(k) (2015).

34.     FSA regulations require the agency to attached to the EA and respond to all

comments of State, regional and local agencies that relate to issues in the EA or are otherwise of

an environmental nature and "[d]iscuss any negative comments or public views raised about the

project and the consideration given to these comments." *Id*. pt. 1940, subpt. G, Exhibit H(XIII)

& H(XV) (2015).

### 3.     Consideration of Mitigation.

35.     FSA regulations require that "[m]itigation measures which will be taken must be

documented in the assessment . . . , and include an analysis of their environmental impacts and

potential effectiveness." *Id*. § 1940.318(g) (2015). Pursuant to CEQ regulations, "mitigation"

means methods to avoid, minimize, rectify, or compensate for the impact of a potentially harmful

action. 40 C.F.R. § 1508.20(a)–(e). Agencies must discuss mitigation measures with sufficient

detail to ensure that environmental consequences have been fairly evaluated.

### 4.     Consideration of Cumulative Impacts.

36.     An adequate analysis of environmental impacts of a project must also include a

consideration of the direct, indirect, and cumulative impacts resulting from all past, present, and

reasonably foreseeable future actions. *Id*. §§ 1508.7, 1508.8, 1508.25(c). Cumulative impacts are

impacts to the environment resulting from the incremental effects of the present action,

combined with other past, present, and reasonably foreseeable future actions, regardless of what

agency or person undertook, undertakes, or will undertake those actions. *Id*. § 1508.7.

"Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

§ 1508.7.

37.     FSA regulations state that "[a]t the earliest possible stage in the [EA] process, the preparer [of the EA] will identify the Federal, State, and local parties which are carrying out related activities . . . . If there is a potential for cumulative impacts, the preparer will consult with the involved agencies to determine the nature, timing, and results of their environmental analysis." 7 C.F.R. § 1940.318(c) (2015). FSA's cumulative impacts analysis must "[g]ive particular attention to land use changes and air and water quality impacts." *Id*. pt. 1940, subpt. G, Exhibit H(XVI) (2015).

### 5.     Preparation of a FONSI or an EIS.

38.     After completing an adequate EA, the agency shall prepare either an EIS or a FONSI. An agency must prepare an EIS when it makes a finding that the action has the potential to significantly affect the quality of the human environment. *Id*. §§ 1940.318(i); 1940.320 (2015). However, if the action does not have this potential, the agency must prepare a FONSI. *Id*. §§ 1940.318(i); 1940.318(k) (2015).

### *Administrative Procedure Act*

39.     Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

40.     Under section 704 of the APA, 5 U.S.C. § 704, only "final agency actions" are reviewable. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow.

41.     Under section 706 of the APA, 5 U.S.C. § 706, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

## SUMMARY OF THE FACTS

42.     OMH applied for a loan guarantee through the Farm Loan Programs, administered by FSA, in order to purchase land and construct and operate a poultry CAFO on it, consisting of four broiler chicken houses, a manure structure, and a mortality composting structure. Upon information and belief, FSA approved the loan guarantee on July 23, 2015. Also, upon information and belief, OMH's total loan amount was approximately $1,217,000, of which FSA guaranteed 90 percent, or approximately $1,095,300.

43.     Defendants prepared an inadequate EA/FONSI describing the environmental impacts of the CAFO. The EA was 70 pages long, with a majority of this being attachments of various other documents. The actual discussion of the project's impacts consisted of only 14 pages. On July 20, 2015, Plaintiff and one of Plaintiff's members submitted timely and extensive comments on the May 22, 2015 draft EA/FONSI, which FSA made available for public comment. On July 21, 2015, Maryland Department of Agriculture Secretary Joe Bartenfelder sent a letter to the FSA Administrator on behalf of OMH, expressing concern about the FSA's environmental review for the facility, and urging FSA to act favorably and quickly on the loan application. He further expressed worry over "additional scrutiny on future cases." Just two days after receiving Plaintiff's public comment and one day after the Maryland Department of Agriculture's letter, Defendants finalized the EA/FONSI on July 22, 2015, with no substantive changes. They approved the loan guarantee the following day.

44.     FSA initially failed to make many key documents available to Plaintiff and the

public during the comment period for the EA/FONSI, and Plaintiff was forced to file a Freedom

of Information Act (FOIA) request to obtain them. The FOIA process proved time consuming

and burdensome, as a result of FSA denying the initial request and the fee waiver request.

Although Plaintiff considered appealing this decision, it decided instead to narrow the scope of

the request to certain documents referenced in the EA. FSA did then provide this subset of the

documents, but with key information redacted.

45.     Plaintiff has had further difficulty obtaining relevant records from Defendants in

later FOIA requests. Plaintiff sought additional information, specifically regarding the loan

guarantee to OMH. Defendants again initially denied the fee waiver, but after Plaintiff appealed,

Defendants in effect granted the request by determining it could respond within the free allotted

search time. However, in their response, Defendants withheld the vast majority of responsive

documents in full, releasing only the 70-page EA, which was already public. Plaintiff was

required to appeal the response, which resulted in Defendants partially granting the appeal by

releasing more than 600 pages of heavily redacted records relating to the CAFO and the loan

guarantee. Plaintiff did not receive the records until February 14, 2017, more than eight months

after submitting its initial FOIA request.

46.     The CAFO is located in Caroline County, at 26750 Anthony Mill Road, Denton,

Maryland, on a 114.9-acre parcel. Upon information and belief, the CAFO houses 192,000 birds

at one time, and will have an average of 5.6 flocks per year, producing more than 1,000,000 birds

and their waste each year.

47.     The CAFO's broiler houses and manure structure have been constructed, and the

houses have been stocked with birds. But although the facility is currently operational, it could

operate in a way that causes less harm to the environment and public health, which Defendants'

EA failed to consider and, on information and belief, their loan guarantee failed to require.

48.     CAFOs pose substantial risks to both the environment and public health by creating surface water, groundwater, and air pollution problems. They also harm quality of life and property values of those living and recreating in close proximity.

a.     CAFOs are responsible for widespread water pollution problems as a result of both practices at facilities and the disposal of large quantities of manure via land application on cropland as fertilizer. The OMH CAFO handles dry litter, which often pollutes surface waters through the stockpiling of uncovered waste, runoff from exposed pollutants in the CAFO production area, and excessive application of waste beyond what crops can utilize. Improper composting of "mortalities"—the dead chickens that inevitably result from intensive confinement of animals in CAFOs—can also lead to leaching of contaminants into groundwater or runoff into surface waters, posing threats to both water quality and public health.

b.     Broiler CAFOs also degrade air quality as a result of their emissions of various pollutants. Two of the primary pollutants emitted from broiler CAFOs are ammonia and particulate matter, but chicken house ventilation fans also blow feathers, particles of poultry litter, dust and other allergens, and pathogens into the air surrounding the facility. These emissions can substantially affect the health and well-being of those most exposed, such as neighbors or CAFO workers, with members of sensitive populations, such as children and the elderly, at the highest risk.

c.     Neighbors of CAFOs often also suffer from significant losses in property value and declines in quality of life. CAFO odors frequently prevent neighbors from using their yards, hanging their clothes on a line to dry, having visitors to their homes, or even opening their windows. CAFOs and their massive quantities of manure also often lead to pest infestations,

including flies.

49.     Agriculture is the single largest source of pollution to the Chesapeake Bay and Maryland waters. CAFOs are responsible for a significant percentage of this agricultural pollution. The Chesapeake Bay Total Maximum Daily Load (TMDL), an unprecedented watershed clean-up plan, depends on increased regulation of CAFO pollution to meet its pollution reduction goals and restore the Bay's water quality.

50.     A recent U.S. Geological Survey water report found some rivers and groundwater on Maryland's Eastern Shore have concentrations of nitrogen and phosphorus that are among the "highest in the nation" due primarily to agricultural operations.

51.     On January 28, 2015, the Maryland State Clearinghouse provided Defendants input on the OMH project from various Maryland state agencies. Two state agencies, the Maryland Department of the Environment ("MDE") and the Maryland Department of Natural Resources ("DNR"), made their findings that the project would be consistent with state and local plans, programs, and objectives contingent on the applicant taking certain actions related to water quality. MDE noted that animal feeding operations can threaten waterways through their construction and management of poultry litter. It further discussed the fact that the project could degrade the high quality of Watts Creek and exacerbate existing impairments in the Choptank River and Chesapeake Bay, and stated that the applicant should adopt practices needed to address these risks based on the potential for project-specific impacts.

52.     The OMH CAFO is near Watts Creek and is in the Watts Creek, Choptank River, and Chesapeake Bay watersheds. Both the Choptank River and the Chesapeake Bay are impaired as a result of pollution, a status that requires consideration when new potential pollutant sources, such as CAFOs, are proposed. Watts Creek is designated as a "Tier II" stream, which grants it

special protections by the State of Maryland. The CAFO's manure is initially stored at the facility but eventually transported off-site to a third-party farmer and applied to land in Centreville, Maryland, which is near the Corsica River. The Corsica is also an impaired waterway; it is polluted by fecal coliform, among other things. Fecal coliform is often associated with CAFO and other animal wastes, and can wash off of CAFO sites and land application fields into waterways. Defendants' EA did not consider the potential water quality impacts on the Corsica River due to the land application of waste from OMH.

53.     The EA relied on the fact that the CAFO would operate under a Nutrient Management Plan (NMP), Stormwater Management Plan (SMP), and Conservation Plan (CP), concluding that these plans would mitigate adverse effects of the CAFO. But the EA did not analyze these plans or the likelihood of their effectiveness. In fact, the NMP was not finalized until September 9, 2015, more than a month after the EA was finalized. The July 2015 EA relied on this incomplete plan for most of its mitigation measures.

54.     The EA states that the CAFO will conform to the industry standard of 0.75 birds per square foot. However, with four buildings with 60' x 560' dimensions and 192,000 birds, the actual ratio is 1.43 birds per square foot. This is almost double the density of the industry standard. The EA misstated, and therefore failed to address, the unusual density of chicken production at the site, and the fact that it dramatically exceeds the average density of the region's numerous other broiler chicken CAFOs. This facility's extreme density will result in higher-than-average waste concentration, and potentially higher-than-average air emissions and odors, for a typical CAFO facility of this size on the Eastern Shore, none of which was considered in the EA.

55.     Although CAFOs use large quantities of water, the EA states that no Water

Appropriation and Use Permit was required for OMH because the CAFO uses groundwater at a volume of less than 10,000 gallons per day, qualifying for an exemption for agricultural use. But the fact that no permit was required does not mean the water withdrawals are insignificant or that they have no potential to impact groundwater quantity and availability for neighbors and other users. The EA failed to consider the effects of OMH's water withdrawals independent of the state's standard for requiring a Water Appropriation and Use Permit.

56.     In a December 23, 2014 letter from the United States Fish and Wildlife Service ("FWS") to FSA, FWS informed FSA that 27 migratory birds of concern might be affected by the proposed project. The EA does not include any discussion of these identified potential effects on biological resources.

57.     Although broiler chicken CAFOs are well-known for causing foul odors and emitting air pollution, such as ammonia and fine particles, associated with adverse health impacts, the EA provided only a cursory consideration of air impacts. The EA appears to have relied on the NMP—a plan designed to maximize crop uptake of nutrients that is unrelated to air pollution—to mitigate the facility's odor and dust emissions during and after land application of waste. Upon information and belief, OMH does not use any ventilation fan filters to mitigate air pollution from the facility. Moreover, the EA incorrectly stated, without support, that vehicle traffic would only increase slightly and would only do so temporarily during the CAFO construction period.

58.     Broiler chicken CAFOs are abundant in Maryland, particularly in the State's Eastern Shore counties. MDE's animal feeding operation permitting database currently lists approximately 760 facilities in the "Chicken (other than laying hens) with dry manure handling" category. It lists 42 dry litter chicken facilities within the town of Denton alone, where OMH is

located. According to USDA, in 2016, Maryland CAFOs and farms produced 303,500,000 broiler chickens.

59.     FSA has promoted this proliferation and concentration through its CAFO loans and loan guarantees, and in its EA emphasized that OMH's close proximity to integrator Allen Harim's slaughterhouse and other facilities, and its proximity to numerous other Allen Harim contract producers, would economically advantage the integrator. The EA did not, however, address the cumulative impacts of this proliferation and concentration.

## CLAIMS FOR RELIEF

### *Defendants' Violations of NEPA and APA*

### CLAIM ONE
### (Failure to Consider an Adequate Range of Alternatives)

60.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

61.     NEPA mandates that an agency "shall to the fullest extent possible" use the NEPA process "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the environment." 40 C.F.R. § 1500.2(e). Reasonable alternatives include those that substantially meet the agency's purpose and need. CEQ regulations specifically require agencies to examine alternatives to the proposed action in conducting an EA. *Id*. § 1508.9(b). FSA regulations further require that "[t]he objective of the environmental review will be to develop a feasible alternative with the least adverse environmental impact." 7 C.F.R. § 1940.303(c) (2015). The emphasis must be on what is feasible, rather than on whether the applicant likes or is capable of a particular alternative. *See id*.

62.     Defendants improperly defined the purpose and need of the project by focusing only on the benefits to the applicant and a third-party integrator corporation, relying on speculative and conclusory assumptions about the benefits of the project, and improperly relying

on, then misstating, the USDA's purpose of the Farm Loan Programs. This narrow statement of purpose and need improperly constricted the range of reasonable alternatives to be considered.

63. The EA defined the purpose and need as allowing the applicant to construct and operate an Allen Harim-compliant facility that will allow the integrator, Allen Harim, to operate conveniently and efficiently. The EA explained that the proposal is economical for the integrator because of the CAFO site's proximity to its processing facilities and other contract producers. However, it was improper for Defendants to restrict the range of alternatives considered to accommodate the financial interests of a particular poultry integrator; the integrator was not the loan applicant or the facility owner, the applicant was not required to contract with this or any integrator, of which there are several active in the market, and the regulations did not allow Defendants to omit alternatives based on increased costs. In prioritizing the interests of Allen Harim, Defendants improperly narrowed the purpose and need of the action, and therefore impermissibly narrowed the alternatives considered.

64. The EA's purpose and need statement also relied on wholly unsupported claims that the CAFO would lead to Allen Harim creating additional poultry industry jobs and benefit American consumers by contributing to the food supply. By defining the purpose and need of the project around these assumptions, the EA improperly foreclosed consideration of virtually any real alternatives to the proposed project. None of these presumed benefits of the project were supported by any evidence, and all are so attenuated and speculative that almost any agricultural endeavor could have similar or greater benefits if properly considered.

65. The purpose and need statement also improperly relied on the purpose of the farm loan program, when only the purpose and need of the project were relevant. An EA must include a "brief discussion[] of the need for the *proposal*," not the need for the federal program that the

action is taken pursuant to. 40 C.F.R. § 1508.9 (emphasis added). Thus, the fact that the federal

action of issuing a loan guarantee may fall within the scope of the FSA farm loan program does

nothing to articulate the purpose and need of the proposed project itself. In fact, the guarantee at

issue does not squarely serve the expressed purposes of USDA's farm loan programs, which

emphasize promoting non-traditional and family-scale farming, rather than industrial-scale

contract operations. *See* USDA FARM SERVICE AGENCY, FARM LOAN PROGRAMS,

https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/ (last visited Aug. 23,

2017)

      66.    The EA listed five alternatives: no action, proposed action, relocate on current

property, relocate on different property, and engage in different form of agriculture production.

But, the EA only reviewed two of these: no action and proposed action. The other three were

dismissed by Defendants as not "feasible," largely because the applicant had already made

certain decisions—entering into a contract to purchase a specific parcel of land in a rural

residential community—with the intention of using it to construct a broiler CAFO.

      67.    FSA regulations require the range of alternatives to include "alternative designs,"

as well as alternative sites. 7 C.F.R. pt. 1940, subpt. G, Exhibit H(XVIII) (2015). Defendants

failed entirely to consider alternative designs such as a smaller facility, a lower density facility, a

facility with different plans and specifications than those required by integrator Allen Harim, a

facility with protective ventilation filters, a facility with design measures to minimize flies and

other pests, a facility with enhanced water quality protections, or any number of potential and

feasible design alternatives that would have better mitigated the CAFO's environmental and

health risks.

      68.    FSA regulations further require the range of alternatives to include "alternative

locations" to the proposed action. *Id.* The fact that the CAFO is located on an open area of the

property was not a reasonable or adequate basis for determining that it was the lowest impact

location on the property to site it. Defendants' rejection of other potential sites on the property

because they speculated there "may" be wetlands in other areas fell short of a reasonable

consideration of alternatives to the chosen location.

69.     Defendants also improperly dismissed the alternative of relocating on a different

property. Although the applicant was in contract for purchase of land in this specific location,

this independent action of the loan guarantee applicant should not have limited the scope of the

alternatives analysis. The test for whether an alternative is practicable "is not limited by the

temporary unavailability of sufficient financial resources to implement an alternative. That is,

alternatives cannot be rejected solely on the basis of moderately increased costs." *Id.* §

1940.302(h) (2015). Defendants' rationale for limiting this alternative was inadequate.

70.     Defendants' dismissal of the final alternative project—an alternative form of

agricultural production—was also improper. Their conclusory statement that any other form of

agricultural production would not be as economically viable as a CAFO, and in fact would be

"nominal" in comparison, was unsupported in the EA and not a legitimate basis for rejecting this

alternative.

71.     Finally, the Defendants' assessment of the "no action alternative" was superficial

and inadequate. The EA stated "[t]his alternative would not allow the applicant to generate the

farm income required to support their family and debt service." But without the guaranteed loan

for the project there would be no debt incurred, therefore, this rejection is based on circular logic

that falls short of "sufficient evidence and analysis." 40 C.F.R. § 1508.9(a)(1). Further, the "no

action alternative" does not discuss the existing uses of the land or the impacts of those uses,

establishing an inadequate baseline for the alternatives analysis. 46 Fed. Reg. 18,027 (March 23, 1981).

72.     Defendants were required to develop a feasible alternative with the least environmental impact, 7 C.F.R. § 1940.303(c) (2015), but instead they focused on impermissible factors and ignored environmental impact when dismissing alternatives to the project. This failure to fully consider all reasonable and feasible alternatives throughout its analysis was arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM TWO
### (Failure to Address Relevant Biological Resources)

73.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

74.     NEPA's implementing regulations require Defendants to discuss "the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). Impacts include ecological impacts, and effects on the function of ecosystems. *Id*. § 1508.8; *see also* 7 C.F.R. pt. 1940, subpt. G, Exhibit H(IV)(6) (2015) (requiring consideration of known indirect effects that will affect the natural environment including wildlife, their habitats, and unique natural features).

75.     The EA purportedly addressed impacts on "biological resources," which it defined as including "vegetation, wildlife, and protected species including threatened and endangered species and their designated critical habitat." However, the EA itself only addressed protected species and critical habitat and failed to address the presence of Birds of Conservation Concern that had been specifically identified by U.S. Fish and Wildlife Service (FWS) as being located in the project area.

76.     The EA did not mention any species that could be adversely affected by the CAFO despite the December 23, 2014 letter from the FWS indicating that 27 species of

migratory birds of concern might be affected.

77.     Migratory birds are wildlife and should have been considered by Defendants. The EA attachments included the FWS list of 27 migratory bird species of concern that might be affected by the proposed CAFO. However, the EA failed to make a single mention of any of these species or impacts on them.

78.     FWS is an expert agency with regard to wildlife. FWS fulfilled its duty to comment, but the Defendants neglected their duty when they did not consider FWS's comment. 40 C.F.R § 1503.2; 7 C.F.R. § 1940.318(k) (2015).

79.     The presence of birds protected by the Migratory Bird Treaty Act and listed as Birds of Conservation Concern indicated that this is an ecologically critical area. Even if Defendants believed the project would have no impact on the identified Birds of Conservation Concern, they were required to include analysis supporting that determination in the EA because, in evaluating significance, an agency must consider "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3).

80.     In the absence of such analysis, Defendants conclusion that biological resources will not be affected in the project area was arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM THREE
### (Failure to Consider Groundwater Quality and Quantity)

81.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

82.     FSA's regulations require Defendants, when completing a Class II EA, to "[d]iscuss, in terms of amounts and types of effluents, all aspects of the project including primary beneficiaries' operations and known indirect effects which will affect water quality." 7

C.F.R. pt.1940, subpt. G, Exhibit H(IV)(2) (2015). Additionally, Defendants are required to

"[i]ndicate the existing water quality of surface and/or *underground* water to be affected,"

"[e]valuate the impacts of the project on this existing water quality," and "evaluate the potential

for the project to exceed the safe pumping rate for the aquifer to the extent that it would . . .

adversely affect the pumping capability of present users." *Id.* (emphasis added).

83.     Despite these requirements, Defendants did not consider groundwater quality or

the potential adverse effects on the pumping capability of present users of the aquifer in the EA

or obtain and disclose baseline data regarding the current groundwater quality. The EA

mentioned floodplains, wetlands, sole source aquifers, wild and scenic rivers, and surface water

quality, but failed to consider and disclose the current groundwater quality and impacts from the

proposed action on that existing groundwater quality and quantity.

84.     Groundwater is an extremely important source of drinking water and irrigation

water in the project area, and excluding the disclosure of current groundwater quality and

consideration of potential impacts to the existing groundwater quality and quantity in the EA was

arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM FOUR
### (Failure to Adequately Address Surface Water Quality)

85.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

86.     Defendants are required to consider effects of the action on water resources, *see*

40 C.F.R. § 1508.8, and specifically must "[i]ndicate the existing water quality of surface . . .

water to be affected," "[e]valuate the impacts of the project on this existing water quality," and

"[d]iscuss the project's consistency with applicable State water quality standards to include a

discussion of whether or not the project would either impair any such standard or fail to meet

antidegradation requirements for point or nonpoint sources," including "how surface runoff is to

be handled and the effect of erosion on streams." 7 C.F.R pt. 1940, subpt. G, Exhibit H(IV)(2)

(2015). The EA failed to adequately consider surface water quality impacts and improperly relied

on assumptions that nutrient management and conservation plans would prevent all significant

water quality impacts.

87.     The CAFO is located in the watershed of a Tier II Stream, Watts Creek, which is

subject to special protections by the State of Maryland. It is also in the watershed of the impaired

Choptank River and the Chesapeake Bay, which is a vital economic and environmental resource.

The draft EA failed to mention the Bay entirely. After Plaintiffs pointed out this critical omission

in their public comments, the final EA was amended to provide a cursory mention of it. But it

still failed to consider the effects that agriculture, and chicken CAFOs in particular, have on the

watershed or the extensive, costly TMDL clean-up program underway to address the Bay's

current impairments resulting from agricultural and other pollution. The EA also failed to

address MDE's findings that the applicant would have to take certain actions to protect water

quality from project-specific risks before State recommendation of the project.

88.     The EA at no point acknowledged or analyzed the disposal method of manure

from the CAFO or its possible impacts. The NMP, which was finalized and released after the

EA/FONSI was concluded, stated that the manure would be disposed of on agricultural land

located near the Corsica River. Since this information was not included in the EA, the EA

contained no evaluation of the land application of the manure and the impacts this may have on

the Corsica River, which is already an impaired water for fecal coliform.

89.     A central problem regarding the Defendants' cursory surface water analysis was

their assumption that permits and conservation plans being in place meant there would be perfect

compliance and no significant pollution impacts. The EA contained no analysis to support this

assertion, nor was there an independent analysis of the adequacy or effectiveness of the permits or plans themselves.

90.     Defendants further erred by excluding any consideration of manure runoff resulting from precipitation because it is considered "nonpoint source" pollution for purposes of a Clean Water Act analysis. The fact that this nonpoint source pollution is not regulated by the Clean Water Act is irrelevant for the purposes of an EA analysis of all potential impacts. Further, nonpoint source pollution is in fact addressed by other Maryland laws and regulations necessary to meet state water quality standards and the Chesapeake Bay TMDL goals.

91.     Defendants clearly failed to conduct a thorough investigation into the CAFO's impacts on water quality, and made their determination of no significant impact on water quality without providing the required substantive analysis or supportive evidence.

92.     In the absence of such an investigation, Defendants' conclusion of no significant impact was arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM FIVE
### (Failure to Adequately Address Air Quality)

93.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

94.     Defendants' regulations require that the EA "[d]iscuss, in terms of the amounts and types of [air] emissions to be produced, all aspects of the project including beneficiaries' operations and known indirect effects (such as increased motor vehicle traffic) which will affect air quality." 7 C.F.R. pt. 1940, subpt. G, Exhibit H(IV)(1) (2015). The regulations further require Defendants to "[d]iscuss how impacts resulting from the project such as changes in land use, transportation changes, air emissions, noise, odor, etc. will affect nearby residents and users of the project area and surrounding areas." *Id*. pt. 1940, subpt. G, Exhibit H(IV)(7) (2015).

95.     The EA omitted any discussion of the amounts of emissions the OMH CAFO

would emit, either from the facility or from the land application activities, and it did not assess

the potential effects of specific harmful contaminants, such as ammonia gas, that broiler CAFOs

emit. Defendants acknowledged that the CAFO will cause foul odors, but concluded without

analysis that these effects would be rare and insignificant. The EA also failed to consider the fact

that CAFOs such as OMH lead to fly infestations such as that already adversely affecting

Plaintiff's member.

96.     The EA only considered the increase in traffic during the CAFO's construction

period, determining without support that this traffic would be temporary despite the need for the

facility to use trucks to ship birds, manure, feed, and other materials during its ongoing

operations.

97.     Odor, air pollution, and flies are some of the most common, expected, and

harmful effects associated with broiler CAFOs, and Defendants' failure to adequately consider

these impacts on nearby residents was arbitrary and capricious and not in accordance with

NEPA, in violation of 5 U.S.C. § 706(2)(A).

### CLAIM SIX
**(Improper Reliance on Mitigation Measures)**

98.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

99.     Defendants' regulations governing the preparation of a Class II EA specify that

mitigation measures that will be taken must be documented in the assessment and include an

analysis of their environmental impacts and potential effectiveness. 7 C.F.R. pt. 1940, subpt. G,

Exhibit H(XIX) (2015). Pursuant to 40 C.F.R. § 1508.20(a)–(e), "mitigation" means methods to

avoid, minimize, rectify, or compensate for the impact of a potentially harmful action. Agencies

must discuss mitigation measures with sufficient detail to ensure that environmental

consequences have been fairly evaluated.

100.    While the EA mentioned the NMP, SMP, and CP as mitigation measures, these documents were not provided with the EA. As previously noted, the NMP was not even finalized until after the Defendants concluded the EA process.

101.    The EA lacked substantive discussion of how the mitigation measures would apply and merely listed various engineering controls and best management practices that *may* be included. The Defendants concluded that there would be no significant impact based on proposed permits, plans, and standards that had not yet been developed, so Defendants clearly did not analyze these mitigation measures' ability to effectively mitigate water pollution and other impacts. Defendants made no mention of the extent to which they assume the measures will minimize or mitigate impacts.

102.    The EA's improper reliance on mitigation measures was arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM SEVEN
### (Failure to Consider Cumulative Impacts)

103.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

104.    CEQ regulations require a federal agency to analyze the cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c)(3). In the cumulative impacts analysis, "the analyst must attempt to identify and characterize effects of other actions" on the concerned resources. *See* COUNCIL ON ENVIRONMENTAL QUALITY, CONSIDERING CUMULATIVE EFFECTS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT, Chapter 3 at 23 (1997). Cumulative impacts are those "impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

105.    Defendants failed to properly address cumulative impacts because they

considered the impacts of the loan guarantee to OMH CAFO in isolation. Their analysis was limited to the "subject property" and was "localized." They made no attempt to consider related actions that did previously, currently do, or foreseeably will promote growth and concentration of the CAFO industry in the area, and that are having or will have significant cumulative impacts on local waterways, the Chesapeake Bay, groundwater quality and quantity, air quality, wildlife, and other aspects of the human environment. A proper cumulative impacts analysis must consider both Defendants' other related actions to promote the broiler industry and its concentration and actions by others that similarly may lead to cumulatively significant effects.

106.   FSA has issued dozens of direct loans and loan guarantees to chicken farm operators and other livestock producers in Maryland. Public data obtained through FOIA indicates that FSA issued approximately 64 million dollars of ownership and operating loans and loan guarantees to Maryland farms between 2009 and 2015, and more than 47 million dollars of those loans were to chicken operations. Over the same time period, FSA issued 29 loans and loan guarantees in Caroline County, totaling approximately seven million dollars; 21 of these loans were for chicken operations, totaling nearly six million dollars. FSA did not issue any conservation loans in Maryland during this time. Despite the facts that it targets its loan assistance towards growing and concentrating the chicken industry in Maryland, and that this industry has well-documented, significant, adverse environmental impacts in Maryland and the Chesapeake Bay, FSA did not consider the cumulative impacts of these actions in the EA.

107.   FSA's consideration of cumulative impacts must also include those impacts from CAFOs that did not receive FSA loans or loan guarantees. *See* 40 C.F.R. § 1508.7. Maryland's animal feeding operation database lists 161 animal feeding operation permits issued or pending for "Chicken (other than laying hens) with dry manure handling" facilities in Caroline County,

and 41 such operations in the small town of Denton, where OMH is located. In fact, even just in

the immediate vicinity of OMH, several other facilities that, upon information and belief, are

broiler operations or other animal feeding operations, are clearly visible:



This large number and intense concentration of CAFOs near OMH, including one just on the

other side of Watts Creek, was never considered in the EA, nor was there any analysis of the

environmental impacts these CAFOs may cumulatively have on the project area.

108.    Defendants' failure to address the cumulative impacts of CAFO concentration

also was incompatible with their stated purpose and need and proposed alternatives. These

sections of the EA expressly focused on the fact that the OMH CAFO would be in close

proximity to other Allen Harim contract producers and the integrator's hatcheries, feed mills, and

processing facilities. Thus, Defendants highlighted the benefits to the integrator of OMH being

near its facilities, yet the cumulative impacts analysis did not address the adverse impacts of

prioritizing the close proximity of CAFOs to processing facilities and other CAFOs in area.

Defendants cannot consider density of facility siting when it supports the asserted purpose and need of a project, but ignore the impacts of density when considering cumulative impacts.

109.    FSA regulations also require that the agency at the earliest stage possible "identify the Federal, State, and local parties that are carrying out related activities . . . [and] [i]f there is a potential for cumulative impacts, the preparer will consult with the involved agencies to determine the nature, timing, and results of their environmental analysis." 7 C.F.R. § 1940.318(c) (2015).

110.    The EA made the determination of no adverse impact on the Caroline County environment based on a purported review of information from various federal, state, and local agencies and various websites. However, Defendants did not explain what information they obtained from their website review, how they used whatever information they obtained in their cumulative impacts analysis, or what process they used to solicit feedback from the various federal, state, and local parties regarding cumulative impacts, if any solicitation of feedback occurred at all.

111.    Additionally, because the EA failed to adequately address the "no action alternative," there was an insufficient baseline from which to establish the significance of any cumulative impacts.

112.    Defendants' failure to provide an analysis of the cumulative impacts from the proposed action and all the "past, present, and reasonably foreseeable future activities" in the Project area was arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM EIGHT
### (Improper Assessment of a Finding of No Significant Impact)

113.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

114.     A FONSI can be prepared if the Defendants determine on the basis of the EA that an EIS is not required because there will be no significant effects to the human environment from the proposed action. 40 C.F.R. § 1501.4(e).

115.     The FONSI prepared in this case was inadequate because the EA on which it was based was plainly inadequate and did not provide adequate support for a finding of no significant impact as a result of the Defendants' action.

116.     Defendants' FONSI was arbitrary and capricious and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM NINE
### (Failure to Prepare an EIS)

117.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

118.     NEPA requires that Defendants prepare an EIS "in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1502.3. These agencies must complete an EIS if (1) the proposed project "is a major federal action" and (2) the proposed project may "significantly affect the quality of the human environment." *Id*. § 4332; *see also* 40 C.F.R. § 1508.18.

119.     Although NEPA regulations allow an agency to avoid preparing a complete EIS by first preparing an EA and then issuing a FONSI, 40 C.F.R. § 1508.9, the inadequate EA and underlying record here did not support the Defendants' FONSI and failure to prepare an EIS.

120.     Contrary to FSA's flawed determinations, the OMH CAFO may significantly affect "the quality of the human environment" in the Caroline County, MD area, including impacts on air quality, water resources, land, fish, wildlife, and the quality of life of surrounding community members.

121.    Given the impacts that a CAFO can have on the environment and the surrounding community and the inadequacy of the EA, Defendants' failure to prepare an EIS was arbitrary, capricious, and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for an order and judgment:

a.      Vacating and setting aside the EA/FONSI and loan guarantee as illegal agency actions under the APA;

b.      Declaring that Defendants violated NEPA by failing to consider reasonable alternatives, failing to address biological resources, failing to consider groundwater quality and quantity, failing to adequately address surface water quality, failing to adequately consider air pollution and odor, improperly relying on mitigation measures, failing to consider cumulative impacts, issuing an inadequate FONSI, and failing to prepare an EIS prior to approving OMH's loan guarantee;

c.      Enjoining implementation of Defendants' loan guarantee;

d.      Awarding Plaintiff its reasonable attorneys fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.      Awarding such further relief as the Court deems just and equitable.


Respectfully submitted this 23rd day of August, 2017.

/s/ Kevin Cassidy
Kevin Cassidy, D.C. Bar No. MA0021
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
Telephone: (781) 659- 1696
Email: cassidy@lclark.edu

/s/ Tarah Heinzen
Tarah Heinzen, D.C. Bar No. 1019829
Food & Water Watch
1616 P St. NW, Suite 300
Washington, DC 20036
Telephone: (202) 683-2457
Email: theinzen@fwwatch.org


Attorneys for Plaintiff