# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FOOD & WATER WATCH**, a non-profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 1:17-cv-01714-BAH |
| v. | ) ) | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, an agency of the United States Government; **FARM SERVICE AGENCY**, an agency of the United States Government; **DEANNA DUNNING**, in her official capacity as Farm Loan Officer, Farm Service Agency | ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| Defendants | ) ) | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL BACKGROUND .................................................................................................... 5

    The National Environmental Policy Act ............................................................................ 6

    Administrative Procedure Act ............................................................................................ 8

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ..................................................................................................................... 11

    A.      Plaintiff's Claims Are Not Moot ........................................................................ 11

          1.      Federal Defendants Have Continuing Authority, Control and
                Obligations Related to the Ongoing Loan Guarantee .............................. 11

          2.      Completed Construction of the CAFO Does Not Moot
                Plaintiff's Claims ................................................................................... 15

    B.      Plaintiff's Injuries Are Redressable by an Order from the Court ........................ 21

          1.      An Order from the Court Vacating or Otherwise Enjoining FSA's
                Loan Guarantee Will Likely Affect the CAFO's Operations ................... 21

          2.      Third Party Case Law Cited by Federal Defendants is
                Easily Distinguishable ............................................................................ 25

    C.      Plaintiff's Alleged Health, Environmental, and Aesthetic Harms are
          Well Within the Zone of Interest Protected by NEPA and Plaintiff
          can Legally Challenge the Loan Guarantee Based on the Federal
          Defendants' Alleged Multiple NEPA Violations. ................................................ 31

          1.      Plaintiff has only alleged claims under NEPA and Plaintiff's
                alleged Health, Environmental and Aesthetic Harms are
                within the Zone of Interests Protected by NEPA ..................................... 32

          2.      Plaintiff Can Challenge the Loan Guarantee by Alleging
                that Federal Defendants Failed to Comply With NEPA
                when Deciding to Approve that Loan Guarantee ..................................... 34

CONCLUSION ................................................................................................................. 37

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426 (10th Cir. 1996) ............ 15, 17, 18

*Ashley v. U.S. Dep't. of Interior*, 408 F.3d 997 (8th Cir. 2005) .................................. 24

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ........................................................................... 8, 35

*Bauman v. District of Columbia*, 744 F. Supp. 2d 216 (D.D.C. 2010) ........................... 33

*Buffalo River Watershed Alliance v. Dept. of Agriculture*, 2014 WL 6837005
    (E.D. Ark., Dec. 2, 2014) ................................................................. passim

*CBD v. U.S. Dept. of Housing and Urban Dev.*, 541 F. Supp.2d 1091 (D. Ariz. 2008) ........ 28, 29

*Cf. Byrd v. EPA*, 174 F.3d 239 (D.C. Cir 1999) ................................................... 15

*Church of Scientologyof Cal. v. United States,* 506 U.S. 9 (1992) ........................... 10, 16

*City of Waukesha v. EPA,* 320 F.3d 228 (D.C. Cir. 2003) .......................................... 10

*Clark v. Colvin*, 187 F. Supp. 3d 76 (D.D.C. 2016) ................................................ 9

*Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388 (1987) ............................................... 11

*Cloud Found. v. Salazar*, 738 F. Supp. 2d 42 (D.D.C. 2010) ...................................... 9

*Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) .................................... 22

*Greater Yellowstone Coalition v. Bosworth,* 209 F. Supp. 2d 156 (D.D.C. 2002) ............... 36

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015) ............................... 32, 34

*Haynesworth v. Miller,* 820 F.2d 1245 (D.C. Cir. 1987) ........................................... 9

*Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C. Cir. 1988) .................... 11

*Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348 (D.D.C. 2016) ......................... 32

*Humane Society v. Johanns,* 520 F. Supp. 2d 8 (D.D.C. 2007) .................................... 36

*In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*,
    627 F. Supp. 2d 16 (D.D.C. 2009) ......................................................... 9

*In re Polar Bear ESA Listing*, 818 F. Supp. 2d 214 (D.D.C. 2011) .............................................. 36

*Knaust v. City of Kingston*, 157 F.3d 86 (2d Cir. 1998) ............................................................. 19

*Lechliter v. Univ. of Del.*, 2015 WL 12827782 (D. Del. Jan. 16, 2015) ................................ 18, 19

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ......................................................... 11, 32, 33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................................... 10

*Motor & Equip. Mfr's. Ass'n. v. Nichols*, 142 F.3d 449 (D.C. Cir. 1998) ..................................... 10

*Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228 (D.C. Cir. 1996) ........................ 34

*Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523 (10th Cir. 1993) ............................... 18

*Nat'l Parks Conservation Ass'n v. Manson,* 414 F.3d 1 (D.C. Cir. 2005) ........................... passim

*Nat'l Wrestling Coaches Ass'n*, 366 F.3d 930 (D.C. Cir. 2004) ............................................ 27, 28

*Native Ecosystems Council*, 649 F. App'x 614, (9th Cir. 2016) .................................................... 20

*Nebraska v. Rural Elec. Admin.,* 1978 U.S. Dist Lexis 20440 (D.NE 1978) .............................. 36

*Neighborhood Transp. Network, Inc. v. Pena* 42 F.3d 1169 (8th Cir. 1994) .............................. 19

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ................... 17, 21

*One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890 (8th Cir. 2004) ................................... 20

*PEER v. Salazar*, 189 F. Supp. 3d 1 (D.D.C. 2016) ................................................................... 36

*Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483 (D.C. Cir. 1992) ........................................ 9

*Reed v. Salazar,* 744 F. Supp. 2d 98 (D.D.C. 2010) .................................................................... 36

*Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935 (5th Cir. 1982) ................. 19, 20

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989) ............................................ 7

*Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 59 (D.C. Cir. 2016) ......................... 22

*Sierra Club v. Federal Energy Regulatory Commission,* 867 F.3d 1357
    (D.C. Cir. 2017) .......................................................................................... 8, 9, 35, 36

*Sierra Club v. United States Army Corps of Eng'rs,* 803 F.3d 31

(D.C. Cir. 2015) ................................................................................................... passim

*Sierra Club v. USDA*, 777 F. Supp. 2d 44, 53 (D.D.C. 2011) ...................................... 14

*Sierra Club v. U.S. Dept. of Energy,* 825 F. Supp. 2d 14, 155 (D.D.C. 2011) ............................ 35

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...................................... 27, 28

*St. John's United Church of Christ v. FAA,* 520 F.3d 460, 463 (D.C. Cir. 2008) ............. 11, 23, 24

*Talenti v. Clinton*, 102 F.3d 573 (D.C. Cir. 1996) ................................................. 26, 27

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ................................. 10

**Statutes**                                                                 **Page(s)**

5 U.S.C. § 702 ...................................................................................................... 8

5 U.S.C. § 704 ...................................................................................................... 8

5 U.S.C. § 706 .............................................................................................. 1, 8, 9

5 U.S.C. § 706(2) ................................................................................................. 6

5 U.S.C. § 706(2)(A) ........................................................................................... 35

5 U.S.C. § 706(2)(D) ........................................................................................... 35

7 U.S.C. § 1921 ......................................................................................... 5, 31, 32

7 U.S.C. § 1983 .................................................................................................. 12

7 U.S.C. § 1983(1) ......................................................................................... 23, 25

7 U.S.C. § 1983(2)(A) .................................................................................... 25, 29

7 U.S.C. § 1983(2)(B) ......................................................................................... 25

7 U.S.C. § 1983(4) .................................................................................... 12, 13, 25

7 U.S.C. § 1998 .................................................................................................. 13

42 U.S.C. § 4321 ............................................................................................ 1, 6

42 U.S.C. § 4332(2)(c)..................................................................................... 6

**Federal Regulations**                                                            **Page(s)**

7 C.F.R.§ 762 ................................................................................................. 5

7 C.F.R.§ 762.120 ....................................................................................... 25

7 C.F.R. § 762.120(h) ................................................................................. 23

7 C.F.R. § 762.128 ....................................................................................... 25

7 C.F.R. § 762.129 ....................................................................................... 13

7 C.F.R. § 762.130(d)(2).............................................................. 12, 25, 29

7 C.F.R. § 799.1 .............................................................................................. 7

7 C.F.R. § 799.45(c).................................................................................... 14

7 C.F.R. § 1940.301 ......................................................................... 6, 7, 36

7 C.F.R. § 1940.302(b)(2)-(3) ............................................................. 7, 29

7 C.F.R. § 1940.309(c)................................................................................. 7

7 C.F.R. § 1940.318(k) ................................................................................ 8

7 C.F.R. § 1940.318(g) .............................................................................. 13

7 C.F.R. § 1970.6 ......................................................................................... 12

40 C.F.R. Parts 1500-1508......................................................................... 6

40 C.F.R. § 1500.1(b) .................................................................................. 7

40 C.F.R. § 1500.1(c)............................................................................. 8, 35

40 C.F.R. § 1501.4(b) .................................................................................. 7

40 C.F.R. § 1507.3 ........................................................................................ 7

40 C.F.R. § 1508.8 ........................................................................................ 7

40 C.F.R. § 1508.9 ................................................................................................................. 7

40 C.F.R. § 1508.18 ............................................................................................................. 29

**Federal Register**                                                                                           **Page(s)**

Environmental Policies and Procedures; Compliance With the National Environmental
    Policy Act and Related Authorities, 81 Fed. Reg. 51,274 (Aug. 3, 2016)......................... 8

## INTRODUCTION

This case involves a legal challenge under the Administrative Procedure Act (APA), 5 U.S.C. § 706, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., to an agency action—the issuance of a federal loan guarantee to enable the construction and operation of a concentrated animal feeding operation (CAFO)—that is the direct cause of Plaintiff Food and Water Watch's (FWW) members' injuries. The complaint alleges, and a complete Administrative Record will show, sufficient facts that demonstrate the loan guarantee, which is still in operation and in force, was necessary for the construction and operation of the CAFO. Plaintiff also sufficiently alleges that Federal Defendants approved the loan guarantee based on a legally flawed NEPA process. Without that illegally approved guarantee, One More Haul (OMH) farm could not have obtained a loan and there would be no CAFO. Accordingly, an order from this Court vacating the guarantee, or, at a minimum, enjoining it until the Farm Service Agency (FSA) completes a legal and sufficient environmental assessment will remedy Plaintiff's actual injuries caused by Defendants' NEPA violatons. It is that simple.

Federal Defendants attempt to sidestep Plaintiff's straightforward allegations by ignoring the ongoing nature of the guarantee and FSA's own regulations spelling out its continuing authority and obligations related to the guarantee, disregarding controlling D.C. Circuit case law holding that courts can order effective relief in cases like this one alleging procedural violations under NEPA that cause a plaintiff an actual injury, exaggerating the causal chain between their action and Plaintiff's harms, and finally, inventing claims that do not exist in the complaint and then knocking down their own straw man arguments. None of Defendants' arguments have merit.

Plaintiff's injuries are caused by the construction *and continued operation* of the CAFO. *See, e.g.*, ECF No. 1 (Complaint), ¶ 2 ("This CAFO's *operation* threatens to degrade the groundwater quality in the surrounding area, pollute nearby surface waters and the downstream Chesapeake Bay, harm wildlife and its habitat, reduce air quality, and reduce the quality of life for surrounding neighbors.") (emphasis added). Although the construction of the CAFO is complete, the Court can still order effective relief to remedy violations to Plaintiff's procedural rights and thereby redress Plaintiff's substantive injuries. Thus, Federal Defendants cannot meet their heavy burden, a burden they fail to even acknowledge, to show the Court cannot order *any* meaningful relief related to the CAFO's continued operations.

Moreover, despite Federal Defendants' attempted abdication via their motion, the agencies have undisputed continuing statutory and regulatory authority and control over the ongoing loan guarantee. The presence of third party actors does nothing to diminish Federal Defendants' control given the direct causal connection—a traceability that Federal Defendants do not seriously challenge in their motion—between the loan guarantee and the CAFO's construction and operation. In fact, as Federal Defendants know well, in a recent case nearly identical to this one, a federal court ordered these same agencies to revisit their flawed NEPA analysis while the court enjoined any payments on the loan guarantee, redressing the plaintiffs' concrete injuries caused by Defendants' procedural violations in that case in the same way Plaintiff seeks here.

Another ill-conceived argument by the government is that Plaintiff's claims do not fall within the zone of interest of the Consolidated Farm and Rural Development Act. This is nothing short of an attempt to rewrite Plaintiff's complaint. The complaint as written contains no claims under that Act—in fact, it does not mention it at all—and any inquiry as to whether Plaintiff's

claims fall with that Act's zone of interest is irrelevant on its face. Federal Defendants do not

challenge, nor could they, that Plaintiff's claims fall squarely within the zone of interest of

NEPA, and that is the only relevant question before the Court on this issue.

The Court should deny Federal Defendants' motion and order the agencies to complete

the administrative record, pursuant to Plaintiff's Motion to Complete the Administrative Record

filed concurrently with this response (ECF No. 18), so this case may proceed to summary

judgment briefing as expeditiously as possible.

## FACTUAL BACKGROUND

Federal Defendants guaranteed a private loan for the OMH CAFO in 2015. As

Defendants admit, OMH's total loan amount was approximately $1,217,000, of which FSA

guaranteed approximately 90 percent, or $1,095,300. *See* ECF No. 1, ¶ 42; ECF No. 12, ¶ 42.

Now built and operating, the CAFO houses up to 192,000 birds at one time, has an average of

5.6 flocks per year, and has the capacity to annually produce more than 1,000,000 birds and their

waste. *Id.*, ¶ 46; ECF No. 12, ¶ 46.

CAFOs pose substantial risks to both the environment and public health, and can have

significant adverse impacts on surface and groundwater quality, air quality, and rural quality of

life. ECF No. 1, ¶ 48. Plaintiff has thousands of members who reside in Maryland, including a

member who resides next door to the OMH CAFO. This FWW member lives in such close

proximity to the CAFO that it is decreasing the enjoyment and privacy of her home and causing

her concern over potential adverse health impacts. *Id.*, ¶ 8. Residing in such close proximity to

the facility subjects this FWW member to loud noises at all hours of the day, bright lights that

remain on all night, foul odors, and large numbers of flies in and around her residence. *Id.* She is

further concerned that the facility will contaminate and/or deplete her well water, and that it will

pollute Watts Creek and the downstream Choptank River and Chesapeake Bay. *Id*. Another

FWW member regularly fishes for bass in Watts Creek—which is in the vicinity of the CAFO—

and the downstream Choptank River. *Id*. He has invested significant time and resources into

creek stocking and restoration projects, and he is concerned about the CAFO's likely water

pollution impacts and the general impacts of industrial development on the character and

aesthetic beauty of the areas where he fishes. *Id*.

Agriculture is the single largest source of pollution to the Chesapeake Bay and Maryland

waters, and CAFOs are responsible for a significant percentage of this agricultural pollution. *Id*.,

¶ 49. There are hundreds of broiler chicken CAFOs in Maryland, and the industry is particularly

concentrated in the State's Eastern Shore counties, which is where OMH is located. *Id*., ¶¶ 46,

58. Among the many alleged deficiencies of Federal Defendants' EA/FONSI, Defendants did not

even consider the water pollution risks from OMH's plans to ship waste off site, where it will be

applied to land near the already-polluted Corsica River. *Id*. ¶ 52. Federal Defendants also

assumed that the CAFO would operate in accordance with various plans and mitigation practices,

concluding that these plans would adequately mitigate adverse effects of the CAFO such that it

would have no significant impact. But the EA did not analyze these plans or the likelihood of

their effectiveness. In fact, the key plan that the environmental assessment relied on for most of

its mitigation measures—the nutrient management plan—was not finalized until September 9,

2015, more than a month after Federal Defendants finalized the EA/FONSI and issued the loan

guarantee. *Id*., ¶ 53.

Federal Defendants' EA/FONSI also glossed over the cumulative harms from the

proliferation and concentration of CAFOs in the area of OMH, which Defendants have promoted

through their loans and loan guarantees. FSA issues loans and loan guarantees to "contract"

chicken growers who build industrial-scale confinement operations like OMH, and then sell the

chickens under contract to an "integrator" company like Allen Harim, OMH's integrator. *Id*., ¶ 4.

Integrators often seek to contract with producers in close proximity to their other production

infrastructure, such as hatcheries, feed mills, and slaughterhouses. *Id*. The resulting concentration

of chicken production also concentrates vast quantities of waste and a range of harmful

environmental impacts in certain communities and watersheds. *Id*. Federal Defendants'

environmental assessment did not even address the cumulative impacts of this proliferation and

concentration. *Id*., ¶ 59. Defendants did, however, improperly rely on the integrator's economic

interests in asserting the need for the project. *Id*.

In an effort to highlight likely environmental impacts from the facility and encourage a

more rigorous environmental review and a decision not to issue the loan guarantee, or at least to

adopt more protective loan guarantee provisions, Plaintiff and one of Plaintiff's members

submitted comments on the draft EA/FONSI during the public comment period. *Id*., ¶ 43. Just

two days after receiving Plaintiff's public comment, Federal Defendants finalized the EA/FONSI

with no substantive changes. *Id*. They approved the loan guarantee the following day. *Id*.

## LEGAL BACKGROUND

All of the claims in Plaintiff's complaint allege violations of NEPA and the APA. See

ECF No. 1, ¶¶ 60-121, and this legal background section therefore focuses on those statutes and

their implementing regulations. The loan guarantee at issue in this case, *see id.* ¶¶1-3, 5, Prayer

for Relief ¶(a), was issued by Federal Defendants under the authority of the Consolidated Farm

and Rural Development Act ("CONACT"), 7 U.S.C. § 1921, et seq., and its implementing

regulations, see 7 C.F.R. § 762, *et seq*.; however, Plaintiff asserts no claim alleging a substantive

violation of that statute. Instead, Plaintiffs challenge the legal validity of the Federal Defendants'

NEPA analysis documents and the loan guarantee because the required environmental analysis underlying that guarantee violated NEPA in multiple respects making Federal Defendants' NEPA documents and their loan guarantee arbitrary and capricious and contrary to law under Section 706(2) of the APA. *See, e.g.,* ECF No. 1, ¶¶ 1, 3, 5, 72, Prayer for Relief ¶(a). Federal Defendants admit that their NEPA regulations, 7 C.F.R. §§ 1940.301-350 (2015), required FSA to comply with NEPA "prior to making a commitment to issue a loan guarantee." *See* ECF No. 17-1, at 2. Plaintiff's NEPA claims include alleged violations of the FSA's NEPA regulations. *See, e.g.*, ECF No. 1, ¶¶ 61, 74, 82.[1]

**The National Environmental Policy Act**

Congress enacted the National Environmental Policy Act (NEPA) in 1969. NEPA seeks to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. To this end, NEPA directs all federal agencies to assess the environmental impacts of proposed major federal actions that significantly affect the quality of the human environment in an environmental impact statement ("EIS"). 42 U.S.C. § 4332(2)(c). The Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. Parts 1500–1508. Those CEQ regulations provide that an environmental assessment (EA) can be created to aid the agencies in determining whether or not a proposed activity will significantly affect the quality of the human environment. 40 C.F.R. §

---

[1] When responding to the Federal Defendants arguments regarding the purported mootness and lack of redressability for Plaintiff's injuries, *see infra* pp. 11-31, Plaintiff does cite to a number of statutory and regulatory provision regarding CONACT. Those citations are offered solely to establish that Plaintiff's claims are not moot and Plaintiff's injuries are redressable because the statutory provisions and regulations in fact give the Federal Defendants the legal authority to exercise continuing control over the loan guarantee, as well as set forth Federal Defendants' ongoing obligations related thereto, and allow the Court to order at least some effective relief for the alleged NEPA violations and Plaintiff's injuries that flow therefrom.

1501.4(b). An EA is "a concise public document for which a Federal agency is responsible." *Id*.

§ 1508.9. The role of the EA is to determine whether an EIS or a finding of no significant impact

(FONSI) is required. *Id*.

NEPA obligates federal agencies to make available to the public high-quality information

in the required analysis of environmental impacts, including accurate scientific analyses, expert

agency comments, and public comments, "before decisions are made and before actions are

taken." 40 C.F.R. § 1500.1(b). NEPA's public disclosure goals are twofold: (1) to ensure that the

agency has carefully and fully contemplated the environmental effects of its action; and (2) to

ensure that the public has sufficient information to review (and challenge if necessary) the

agency's action. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, (1989).

The scope of NEPA review of environmental effects is broad, including consideration of direct,

indirect and cumulative impacts on "ecological . . . aesthetic, historic, cultural, economic, social,

or health" interests. *Id.* § 1508.8.

The CEQ regulations require federal agencies to adopt their own procedures to

implement NEPA that supplement the CEQ regulations, 40 C.F.R. § 1507.3, and FSA had such

procedures in place in 2015 when Defendants made the agency decisions at issue here. 7 C.F.R.

§§ 1940.301-1940.350 (2015). Under FSA's applicable NEPA regulations, the approval of the

loan guarantee in this case triggered the NEPA requirement to complete an EA. The applicable

FSA regulations required a complete EA for any action deemed a "Class II action" and a partial

EA for any action deemed a "Class I action." *Id*. § 1940.302(b)(2)-(3) (2015); *see also id*. §

1940.309(c) (2015). The loan guarantee at issue in this case is a Class II action. ECF No. 1, ¶

21.[2]

"Congress did not enact NEPA, of course, so that an agency would contemplate the environmental impact of an action as an abstract exercise. Rather, Congress intended that the "hard look" [at environmental impacts required by NEPA] be incorporated as part of the agency's process of deciding whether to pursue a particular federal action." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 100 (1983). NEPA specifically states that its purpose is to require federal agencies to consider environmental consequences when they make their substantive decisions, 40 C.F.R. § 1500.1(c), and Federal Defendants' NEPA regulations required that "[t]he environmental documents, *i.e.*, the assessment, related correspondence… and the finding of no significant impact will be included with the approval documents which are assembled for review and clearance within the approving office." 7 CFR 1940.318(k) (2015).

**Administrative Procedure Act**

Agency actions taken pursuant to NEPA are reviewable by this Court under the APA. 5 U.S.C. §§ 702, 704, 706; *see Sierra Club v. Federal Energy Regulatory Commission,* 867 F.3d 1357, 1367 (D.C. Cir. 2017). Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Under Section 706 of the APA, 5 U.S.C. § 706, a court must "hold unlawful and set aside agency action, findings, and

---

[2] In August of 2016, after Defendants made the decisions at issue here, the FSA updated its EA regulations, 7 C.F.R. §§ 1940.301-1940.350 (2015), and issued new regulations, 7 C.F.R. §§ 799.1-799.59 (2016). 81 Fed. Reg. 51,274 (Aug. 3, 2016). The new regulations have eliminated the Class I and Class II distinction, and instead simply require a complete EA for certain actions (such as the FSA loan guarantee at issue here) and no EA for other actions. The new regulations do "not have retroactive effect," 81 Fed. Reg. 51,274, 51,283 (Aug. 3, 2016), and therefore, the Class II EA requirements dictate FSA's obligations with regard to the OMH loan guarantee at issue in this case.

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." If the required NEPA analysis is deficient, "the agency action it undergirds is arbitrary and capricious [in violation of the APA]." *Sierra Club,* 867 F.3d at 1368, (vacating Federal Energy Regulatory Commission orders because of legally deficient EIS).

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(c), a motion for judgment on the pleadings shall only be granted "if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992). The standard of review for a 12(c) motion for judgment on the pleadings is the same that would apply for a 12(b)(6) motion to dismiss for failure to state a claim. *In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*, 627 F. Supp. 2d 16, 21 (D.D.C. 2009). When a court considers a 12(c) motion, it must "accept as true the allegations in the opponent's pleadings" and "accord the benefit of all reasonable inferences to the non-moving party." *Clark v. Colvin*, 187 F. Supp. 3d 76, 80 (D.D.C. 2016). .

"Because a Rule 12(c) motion 'would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation,' the district court must approach such motions 'with the greatest of care' and deny it 'if there are allegations in the complaint which, if proved, would provide a basis for recovery.'" *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore,* 547 U.S. 250 (2006). Further, a court "must not make any judgment about the probability of the plaintiff's success." *Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*, 627 F. Supp. 2d at 21; *see also Cloud Found. v. Salazar*, 738 F. Supp. 2d 42, 44 (D.D.C. 2010) ("The Court may thus

only grant relief if it appears that, even accepting as true all inferences from the complaint's factual allegations, the plaintiff cannot prove any set of facts entitling him to relief.").

A case is moot only when it becomes "impossible for the court to grant *any* effectual relief whatever." *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992) (internal quotation marks omitted) (emphasis added). "The burden of establishing mootness rests on the party that raises the issue." *Motor & Equip. Mfr's. Ass'n. v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998). "It is a heavy burden." *Id.* (internal quotations omitted); *see also Sierra Club v. United States Army Corps of Eng'rs,* 803 F.3d 31, 43 (D.C. Cir. 2015) ("the court has the power to 'effectuate a partial remedy,' and that 'is sufficient to prevent this case from being moot.'") (citing *Church of Scientology of Cal.,* 506 U.S. at 12-13).

The standard of review for redressability and causation is relaxed in a NEPA case alleging a violation of procedural rights. When there is a procedural right to protect a concrete interest, this right can be asserted without meeting normal standards for redressability and immediacy. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). To create a chain of causation sufficient for redressability, petitioner needs to demonstrate that a procedural violation is connected to a "substantive government decision that may have been wrongly decided" because of this violation and that the wrongly-decided substantive decision is connected to the "plaintiff's particularized injury." *City of Waukesha v. EPA,* 320 F.3d 228, 234 (D.C. Cir. 2003) (*quoting Florida Audubon Soc'y v. Bentsen* 94 F.3d 658, 668 (D.C. Cir. 1996)). Once this connection is made between the procedural violation and the substantive result, the Plaintiff does not have to show that, had the procedural error not been made, the agency would have reached a different substantive result. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

When a plaintiff alleges that government financial assistance to a third party has caused that party to injure the plaintiff, then a plaintiff must satisfy normal redressability standards as to the third party whose actions are directly causing the plaintiff's injuries. *See St. John's United Church of Christ v. FAA,* 520 F.3d 460, 463 (D.C. Cir. 2008) (holding that where plaintiffs alleged that agency funding to a third party was authorized in violation of the plaintiff's procedural rights, redressability standards were relaxed only as to the agency and not the third party); *see also Nat'l Parks Conservation Ass'n v. Manson,* 414 F.3d 1, 5 (D.C. Cir. 2005) ("The relaxation of procedural standing requirements would excuse [Plaintiffs] from having to prove the causal relationship regarding the [agency] action, but its burden regarding the action of the [third party] would not change."). A "'significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered' will suffice for standing." *Nat'l Parks Conservation Ass'n,* 414 F.3d at 7 (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Finally, a plaintiff has standing under the zone of interest test if Congress intended for the plaintiff to be a beneficiary of the relevant statute. *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 282 (D.C. Cir. 1988). "The relevant statute … is the statute whose violation is the gravamen of the complaint . . ." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990). The zone of interest test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 400 (1987).

## ARGUMENT

**A.     Plaintiff's Claims Are Not Moot**

     **1.     Federal Defendants Have Continuing Authority, Control and Obligations Related to the Ongoing Loan Guarantee**

An "order wholly or partially enjoining operation of the [loan guarantee], pending further analysis of the [guarantee's] environmental impact, would provide some degree of 'effectual relief.'" *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d at 43. Accordingly, this case is not moot. *See id.* (holding case not moot even though construction of oil pipeline complete because "[m]ore extensive environmental analysis could lead the agencies to different conclusions, with live remedial implications").

It is axiomatic that FSA's loan guarantee is a continuing obligation of the federal government. Despite their protestations otherwise, Defendants have authority to exercise, if they choose, continuing control over the financial assistance they authorized. USDA is authorized to exercise continuing supervision of a borrower's operations "[i]n connection with loans made *or insured*" under 7 C.F.R. Ch. 50. *See* 7 U.S.C. § 1983 (emphasis added). In doing so, USDA's governing statute specifically states that the Secretary of Agriculture "shall require . . . such provision for *supervision of the borrower's operations* as the Secretary shall deem necessary to achieve the objectives of the loan and to protect the interests of the United States." *Id.* § 1983(4) (emphasis added).

As such, contrary to Defendants' portrayal, the federal financial assistance provided to OMH is not an ephemeral action taken in the distant past with no ongoing and future impacts or federal obligations. Defendants' financial assistance is a commitment on the part of the government to participate in a loan directly should the borrower default. *See* 7 C.F.R. § 1970.6 (defining "loan guarantee" as "[t]he circumstance in which the Agency guarantees all or a portion of payment of a debt obligation to a lender"). USDA regulations specifically contemplate that FSA can play a role in monitoring and supervising the project for which it authorizes a farm loan guarantee even after the guarantee has been issued. *See, e.g.*, 7 C.F.R. § 762.130(d)(2)

("The lender must notify the Agency of any scheduled inspections during construction *and after the guarantee has been issued*. [FSA] may attend these field inspections. Any inspections or review performed by the Agency, including those with the lender, are solely for the benefit of the Agency.") (emphasis added). Federal Defendants' continuing post-guarantee control is consistent with Congress' statutory mandate that USDA "shall require . . . such provision for *supervision of the borrower's operations* as the Secretary shall deem necessary to achieve the objectives of the loan." 7 U.S.C. 1983(4). USDA's continuing commitment extends even to providing advances on the guarantee: "[T]he Secretary [of Agriculture] shall ensure that farm loan guarantee programs . . . are designed so as to be responsive to borrower and lender needs and to include provisions under reasonable terms and conditions for advances, before completion of the liquidation process, of guarantee proceeds on loans in default." 7 U.S.C. § 1998.

Importantly, the government's continuing commitment throughout the life of the loan *is essential* to the loan's existence, as the loans were provided on the premise of Defendants' guarantee commitment. *See* ECF No. 1, ¶ 42 ("OMH applied for a loan guarantee through the Farm Loan Programs, administered by FSA, *in order to purchase land and construct and operate a poultry CAFO on it*") (emphasis added); *see also id.* (alleging FSA guaranteed approximately 90 percent of OMH's total loan); *see also* 7 C.F.R. § 762.129 ("The percent of guarantee will not exceed 90 percent based on the credit risk to the lender and the Agency *both before and after the transaction*.") (emphasis added).

Specifically with respect to environmental conditions, FSA regulations mandate that when the environmental analysis includes mitigation measures they "must be documented in the assessment . . . *and placed in the offer of financial assistance as special conditions*." 7 C.F.R. § 1940.318(g) (2015) (emphasis added); *see also* ECF No. 1, ¶ 35. FSA's new NEPA regulations

carried over this requirement for "an enforceable commitment to implement [mitigation] measures on the part of FSA" and holding "any applicant or other party responsible for implementing the measures" also responsible for those commitments. 7 C.F.R. § 799.45(c). These regulations conclusively establish FSA's ongoing authority and obligation to ensure mitigation measures are implemented, which would directly redress Plaintiff's harms. Plaintiff's complaint alleges that FSA's FONSI was conditioned on the implementation of several state pollution control plans that FSA determined "would mitigate adverse impacts of the CAFO." ECF No. 1, ¶ 53; *see also* ECF No. 17-1, at 1 ("The farm was permitted by, and is subject to, the continuing regulatory authority of the Maryland Department of the Environment.").[3] Per its own regulations, it is FSA's duty to ensure that the pollution control plans put in place—even if required by other governmental entities—are implemented to ensure impacts will be held (future tense) to a nonsignificant level.[4] *See Sierra Club v. USDA*, 777 F. Supp. 2d 44, 53 (D.D.C. 2011) (noting that "the ability of a court to grant effective relief in the context of a NEPA action involving a non-federal party can depend on whether the agency has maintained authority to impose mitigation measures"). Thus, although Defendants claim that they have "no authority to regulate the farm or its operations," ECF No. 17-1, at 1, FSA *already is required* to exercise

---

[3] Indeed, the incompleteness and insufficiency of the various pollution prevention plans underlies the arbitrary and capricious nature of the EA/FONSI and loan guarantee *See* ECF No. 1, ¶ 53 ("In fact, the NMP was not finalized until September 9, 2015, more than a month after the EA was finalized. The July 2015 EA relied on this incomplete plan for most of its mitigation measures.").

[4] Along with continuing government commitment are the ongoing impacts of OMH, which continue to injure Plaintiffs—impacts that Defendants failed to adequately review in violation of the law, and impacts that could have been eliminated altogether or at least mitigated had Defendants complied with the law.

Page 14: RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION

control over OMH's operations to ensure that the pollution control plans and other mitigation measures are being "effectively implemented" to "reduce adverse environmental impacts."[5]

### 2.   Completed Construction of the CAFO Does Not Moot Plaintiff's Claims

In light of Defendants' unfulfilled obligations to adequately assess environmental impacts of OMH's construction and operations, their failure to condition the guarantee accordingly, and their continuing ability to take these steps in a meaningful way, this Court can provide effective relief to Plaintiff. The key question in considering mootness is not whether "the action challenged is complete," as Defendants would have the Court believe, ECF No. 17-1, at 5-7, but rather, whether the court can "fashion an appropriate remedy." *See Sierra Club*, 803 F.3d at 43 ("Even though it is now too late to prevent or to provide a fully satisfactory remedy for the harms Sierra Club identifies, the court has the power to effectuate a partial remedy, and that is sufficient to prevent this case from being moot.") (internal quotations omitted); *see also Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 428-29 (10th Cir. 1996) ("[C]ourts still consider NEPA claims after the proposed action has been completed when the court can provide *some remedy* if it determines that an agency failed to comply with NEPA.") (emphasis added); *Cf. Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir 1999) ("[E]ven the availability of a partial remedy is sufficient to prevent a case from being moot.") (internal quotation marks omitted). As the D.C. Circuit has noted:

> If the fact that projects are built and operating were enough to make a case nonjusticiable, agencies and private parties could merely ignore the requirements of NEPA as well as other statutes requiring pre-construction authorization or review, build their structures before a case gets to court, and then hide behind the mootness doctrine. But such a result is not acceptable.

---

[5] The problem is that FSA failed to identify and consider those impacts in the first instance, so it is difficult to see how, without a proper NEPA review, it could meaningfully monitor implementation of pollution control plans to reduce those impacts.

Page 15: RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION

*Sierra Club*, 803 F.3d at 44.

Federal Defendants know well that a court can order effective relief in a case like this where the CAFO is complete and operational—because it has happened before under almost identical facts. In the Eastern District of Arkansas, several plaintiff groups challenged the construction and operation of a hog CAFO in the Buffalo River watershed that was financed, like here, by an FSA loan guarantee. *See Buffalo River Watershed Alliance v. Dept. of Agriculture*, No. 4:13–cv–450–DPM, 2014 WL 6837005, *1 (E.D. Ark., Dec. 2, 2014). The government in that case raised mootness and redressability challenges, but the court concluded that USDA and FSA "through guaranty conditions, have control over [the CAFO's] case-relevant behavior," and that it could order effectual relief. Even though the CAFO construction was complete, the court found "[t]he Agencies can still take the hard look at C & H's environmental consequences that they should have in the beginning." *Id.* at *3. The court further concluded that "if that hard look requires the Agencies to put conditions on their guaranties, then it's likely that [the CAFO] will comply with those conditions" because "[o]therwise the farm will risk its relationship with its lender." *Id.* The facts of the Buffalo River case are indistinguishable from this case, and Judge Marshall's straightforward logic applies here with equal force.

Largely and conspicuously absent from the government's mootness argument are citations to D.C. Circuit case law. Indeed, in the one D.C. Circuit case the Federal Defendants cite, *Sierra Club v. U.S. Army Corps of Eng'rs* (ECF No. 17-1, at 6-7), the court held that even though the challenged action—in that case, an oil pipeline—was "now complete," the case was "not moot because an order wholly or partly enjoining operation of the pipeline, pending further analyses of the pipeline's environmental impact, would provide some degree of 'effectual relief.'" *Sierra Club*, 803 F.3d at 43 (citing *Church of Scientology of Cal.*, 506 U.S. at 12-13).

The Court of Appeals observed "[i]f the NEPA analysis were legally inadequate, we could order

the pipeline be closed or impose restrictions on its use . . . until the agencies complied with

NEPA." *Id.* (internal quotations omitted). Finally, the *Sierra Club* court noted that "[e]ven

assuming claims relating to the *construction* of the pipeline were moot, we still may consider

whether the agencies complied with NEPA by adequately addressing the environmental impacts

resulting from enhanced *use* of it." *Id.* (emphasis in original) (citing *Airport Neighbors All.*, 90

F.3d at 429) (internal quotations omitted).

      The excerpt from the case the Federal Defendants quote in its parenthetical citation (ECF

No. 17-1, at 6-7) actually comes from a portion of the D.C. Circuit's opinion where it is

*distinguishing* a Third Circuit case of the same name. The D.C. Circuit found the oil pipeline

case, which is factually similar to the instant case, to be distinguishable from the facts of the

Third Circuit case where construction of a sports complex was fully completed "because it was

undisputed that the wetlands could not be restored, and the wetlands were the only resource in

which the plaintiffs claimed an interest." *Sierra Club*, 803 F.3d at 43. That is not this case.

Tellingly, the quote in Federal Defendants' brief (ECF No. 17-1, at 7) comes from the Third

Circuit case, which does not control here, and which the D.C. Circuit nonetheless easily

distinguishes.

      Other courts reviewing NEPA claims have similarly provided relief despite completion of

the offending project when it was possible, as in the present case, to mitigate harm to plaintiffs

from ongoing operation of the completed project. *See Ocean Advocates v. U.S. Army Corps of

Eng'rs*, 402 F.3d 846, 871 (9th Cir. 2005) (finding that requiring an EIS would remedy

plaintiffs' harm even when the underlying project—an addition to an existing oil refinery dock—

had already been constructed, because plaintiffs were concerned about the dock extension's

*operation* and the Corps was authorized to "impose conditions on the operation of permitted terminals"); *Airport Neighbors Alliance*, 90 F.3d at 429 (similarly finding a NEPA case not moot even though it challenged the upgrade of an airport runway that had already been completed because "[t]he majority of environmental concerns" related not to the "actual physical construction of the enlarged runway, but rather to the new patterns of commercial jets using the runway," which could still be altered).

In *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523 (10th Cir. 1993), for instance, petitioners challenged an order of the Federal Aviation Administration (FAA) approving the construction, operation, and funding of an airport, and the actions of the Bureau of Land Management (BLM) in amending a land management plan in order to allow the conveyance of public land for the site of the airport. *Id.* at 1525. At the time of the court's decision, BLM had already amended its land plan, conveyed the land, and the airport had already been built, but the court noted that mootness was not an issue because "the land could be reconveyed to the BLM or certain restrictions could be placed on the use of the airport." *Id.* n.3. In reviewing the record, the Tenth Circuit concluded that FAA's NEPA review for the airport was arbitrary and capricious *Id.* at 1531. The court reversed and remanded FAA's NEPA review, noting that the fact that the airport has already been built "does not mean that a remand would be meaningless" because FAA could take steps "to mitigate the damage or adverse impact." *Id.* at 1533-34.

The government cites several out of circuit cases for the proposition that "NEPA claims based on completed projects are moot." ECF No. 17, at 6. None of them involved federal loan guarantees and all are distinguishable. In *Lechliter v. Univ. of Del.*, the court dismissed plaintiff's NEPA claims as moot after it found the agency's "involvement in the [challenged] project [was]

finished." *Lechliter v. Univ. of Del.*, No. CV 12-16-GMS, 2015 WL 12827782, at *4 n.7 (D. Del. Jan. 16, 2015). That is clearly not the case here where the Federal Defendants involvement as the guarantor of the loan continues. The government's cite to *Neighborhood Transp. Network, Inc. v. Pena* (ECF No. 17-1, at 6) is unavailing for the same reason. There, "[i]n their complaint, plaintiffs sought to enjoin construction on the [highway] project." *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). The court found the case moot because "construction on the [highway] project is now finished" and "[a]n order enjoining defendants from *further construction* on the [highway] project would serve no purpose and afford plaintiffs no relief." *Id*. (emphasis added). Here, Plaintiff is not seeking to enjoin the construction of the CAFO but rather to vacate or otherwise enjoin the implementation of the loan guarantee, which is continuing to finance the CAFO's ongoing operations.

Likewise, the *Knaust v. City of Kingston* case cited by the government (ECF No. 17-1, at 6) involved a grant, as opposed to a loan guarantee, and by the time the appeal was heard, "all federal funds allocated to the project were dispersed and expended." *Knaust v. City of Kingston*, 157 F.3d 86, 87 (2d Cir. 1998). The court specifically noted "there [were] no pending applications for additional federal financing." *Id*. at 88. Here, of course, the federal financing, in the form of the loan guarantee, never ceased, is ongoing, and will continue in force for the length of the loan. Finally, in *Richland Park Homeowners Ass'n, Inc. v. Pierce* case (ECF No. 17-1, at 6), the Fifth Circuit found the case moot when "the complex [had] been built and the construction company [had] been paid." *Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935, 942 (5th Cir. 1982). Notably, the Fifth Circuit acknowledged that "the mere completion of the project might not, technically, moot a claim for injunctive relief based on NEPA violations" and found that plaintiffs' request to enjoin HUD from making further rent

subsidy payments to the developer "at least until alleged NEPA deficiencies are cured" was not

moot. *Id*. at 942-43.

Even the court in *One Thousand Friends of Iowa v. Mineta* (ECF No. 17-1, at 6),

recognized that a NEPA claim is moot only "when the proposed action has been completed and

*no effective relief is available*." *One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 893 (8th

Cir. 2004) (emphasis added). Effective relief is still available where, as here, Defendants can

modify the actions that they took and take further action that could meaningfully minimize

adverse impacts to Plaintiff. Similarly, in *Native Ecosystems Council v. Krueger* (ECF No. 17-1,

at 6), the court found mootness where "all remaining activities associated with the [Forest

Service] project were completed or deemed unnecessary." *Native Ecosystems Council*, 649 F.

App'x 614, (9th Cir. 2016). Importantly, the Ninth Circuit distinguished another case involving a

Forest Service project that was not found to be moot because the court was being asked "to

counteract *ongoing* . . . effects of Forest Service actions." *Id*. at 615. In finding mootness in

*Native Ecosystems Council*, the court found "there are no ongoing effects to counteract." *Id*.

Here, of course, Plaintiff has alleged ongoing effects caused by the loan guarantee—the

operation of the CAFO and all of its attendant harms. *See* ECF No. 1, ¶¶ 4, 8, 47-52.

Plaintiff continues to suffer injury from a 192,000-poultry CAFO operating without

proper consideration of impacts and appropriate mitigation, such as, for instance, ventilation fan

filters to reduce air pollution, waste management practices shown to prevent water pollution,

adequate disposal methods for waste generated by the CAFO, and mortalities management

practices that will reduce flies and other vermin. A serious inquiry into the impacts of OMH's

operation on, among other things, air quality, water quality, public health, and migratory birds,

and consideration of appropriate enforceable mitigation measures and plans for their

implementation could still provide Plaintiffs meaningful relief.[6] Accordingly, Plaintiff's claims are not moot.

**B.      Plaintiff's Injuries Are Redressable by an Order from the Court**

**1.      An Order from the Court Vacating or Otherwise Enjoining FSA's Loan Guarantee Will Likely Affect the CAFO's Operations**

For many of the same reasons that this case is not moot, an order from this Court vacating or otherwise enjoining the loan guarantee "at least until alleged NEPA deficiencies are cured" will redress Plaintiff's injuries.[7] The Federal Defendants concede, "this Court has the power to remand the EA/FONSI for reconsideration or further explanation and to vacate the loan guarantee." ECF No. 17-1, at 10. This is precisely the relief Plaintiff seeks and that would redress its members' ongoing injuries. *See* ECF No. 1, ¶ 5. The government's contention that such relief, if granted by the Court, "would [not] prevent the continuing operation of the poultry farm" (ECF. No. 17-1, at 10), both ignores the essentialness of the loan guarantee to the farm's operation and misstates Plaintiff's burden. Federal Defendants' further contention that they have no ability "to influence, direct or control the third-party poultry farm," *see* ECF No. 17-1, at 8, is belied by the agencies' ongoing statutory and regulatory control and authority over the loan guarantee, *see supra* pp. 11-14, and through that guarantee the actions of the CAFO operator.

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc.*

---

[6] Plaintiffs who "assert[] inadequacy of a government agency's environmental studies under NEPA need not show that further analysis by the government would result in a different conclusion. It suffices that, as NEPA contemplates, the [agency's] decision *could* be influenced by the environmental considerations that NEPA requires an agency to study." *Ocean Advocates*, 402 F.3d at 860 (quoting *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001)).

[7] Federal Defendants do not, at this stage, challenge Plaintiff's Article III standing other than redressability. *See* ECF No. 17-1, at 8, n.1. Accordingly, Plaintiff limits its response to the challenge raised in the government's motion on the pleadings.

*v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc). "Where, as here, a party alleges deprivation of its procedural rights, courts relax the normal standards of redressability and imminence." *Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 59, 65 (D.C. Cir. 2016) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009)). Where third parties not before the court are involved, "the plaintiff must show a 'causal link' between the agency's decision and the third party's action." *Nat'l Parks Conservation Ass'n*, 414 F.3d at 6–7. A "'significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered' will suffice for standing." *Id.* (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

There is an indisputable causal link between FSA's loan guarantee and construction and operation of the CAFO. *See Buffalo River Watershed Alliance*, 2014 WL 6837005, *2 ("Without the guaranties, there would've been no loans. Without the loans, no farm."). Federal Defendants do not even seriously contest causation in their motion. *See* ECF No. 17-1, at 8, n.1 (acknowledging the motion's focus on the redressability prong of standing). Given the clear causal link and the formal legal relationship existing between FSA, the lender and the CAFO operator, an order from the Court vacating or otherwise enjoining the loan guarantee "at least until alleged NEPA deficiencies are cured" significantly increases the likelihood that the CAFO will either cease operating or "operate in a way that causes less harm to the environment and public health" (ECF No. 1, ¶ 47), either of which results will redress Plaintiff's injuries. *See* ECF 17-1, at 8 (acknowledging Plaintiff's complaint alleges in several paragraphs—allegations, which at this stage must be taken as true— that additional environmental review will redress Plaintiff's injuries).

Moreover, although redressability clearly does not hinge on a showing that vacatur of the guarantee would likely result in the CAFO ceasing or limiting its operations, the government's contention that an order from the Court to vacate the loan guarantee "would [not] prevent the continuing operation of the poultry farm" (ECF No. 17-1, at 10) also ignores FSA's own regulations, which require an applicant to be "unable to obtain sufficient credit elsewhere without a guarantee to finance actual needs at reasonable rates and terms." *See* 7 C.F.R. § 762.120(h); *see also* 7 U.S.C. § 1983(1).[8] Given this, it is likely that vacating the loan guarantee would result in the withdrawal of the loan. Without the continued financing that was made possible by the guarantee, it is likely the farm would discontinue operations, which would redress Plaintiff's injuries. It is the government, not Plaintiff, that engages in "unadorned speculation" (ECF No. 17-1, at 11) that the CAFO would continue operating if the Court were to vacate the loan guarantee.

The complaint's allegation, which was admitted by the agencies in their answer, that the guarantee covered 90 percent of the total loan makes it clear that the guarantee was necessary for securing the loan.[9] *See* ECF No. 12, ¶ 42. This is unlike the *St. John's United Church v. FAA* case cited by Defendants (*see* ECF No. 17-1, at 10-11), where the D.C. Circuit found no redressability relating to the FAA's reimbursement to the City of Chicago for expansion of O'Hare Airport. *See St. John's United Church v. FAA*, 520 F.3d 460, 461 (D.C. Cir. 2008). There, the court had already determined in a previous related challenge that the full amount of

---

[8] Presumably, a certification to this effect exists in the loan guarantee documents; however, because Federal Defendants have not made those documents a part of the administrative record, Plaintiff is unable, at this point, to cite to it. *See generally* Plaintiff's Motion to Compel the Complete Administrative Record (ECF No. 18).
[9] Again, the loan guarantee related documents currently improperly withheld from the administrative record will further demonstrate the necessity of the guarantee for the CAFO's existence.

federal funding—$337 million—was a "mere fraction of the cost of the overall project," and the challenge to the first grant installment of $29.3 million was an even smaller fraction of the overall federal funding. *Id*. at 462. Thus, the court reasoned the petitioners lacked standing because Chicago could complete the project without the federal assistance. *Id*. That is not the case here where the loan guarantee is essential to the CAFO and, in order to even qualify for such assistance, an applicant must prove that they cannot find the funds elsewhere.[10]

Likewise, Federal Defendants' claim that they have *no* "statutory or regulatory authority *to influence, direct or control* the third-party poultry farm" (*see* ECF No. 17-1, at 8-9 (emphasis added)), is undermined by the "formal legal relationship" that exists between the FSA, the lender and the CAFO operator in the form of the loan guarantee. *Nat'l Parks Conservation Ass'n*, 414 F.3d at 6. The absence of FSA's loan guarantee—if this Court were to vacate it—"doubtless would significantly affect" the existence of the loan and the continued operation of the CAFO. *Id*. at 7. Likewise, an order enjoining payments on the loan guarantee until NEPA compliance was achieved would redress Plaintiff's procedural rights because the CAFO would be unlikely to risk losing the federal guarantee ignoring its NEPA obligations. *See Buffalo River Watershed Alliance*, 2014 WL 6837005, *3 (finding it likely CAFO operator would comply with conditions resulting from additional NEPA review rather than risk relationship with lender).

---

[10] For the same reason, Federal Defendants' cite to *Ashley v. U.S. Dep't. of Interior* (*see* ECF No. 17-1, at 8) is distinguishable. There, the Eighth Circuit found the rescission of a government bond agreement would not redress plaintiffs' injuries—allegedly the misuse of Tribal trust money—"because it would not be likely to prevent the Tribe from spending trust money on a new bond deal of the same sort." *Ashley v. U.S. Dep't. of Interior*, 408 F.3d 997, 1000 (8th Cir. 2005). Notably, the *Buffalo River* court, which is located in the Eighth Circuit where *Ashley* is controlling precedent, had no trouble finding redressability on facts that are virtually identical to the facts of this case. *See Buffalo River Watershed Alliance*, 2014 WL 6837005, *3-4 (citing *Ashley* for the proposition that the federal agencies, including FSA, "through guaranty conditions, have control over [the CAFO's] case-relevant behavior").

Page 24: RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION

The fact that FSA interacts with the lenders as well as the loan applicants does not, as the government argues, completely sever FSA's ability to influence or control the loan applicants. The Federal Defendants' statement that "FSA's only control is over the lender" (ECF No. 17-1, at 9) is both incomplete and inaccurate, and the government fails to cite to several FSA regulations setting forth its control over the borrower. *See, e.g.*, 7 C.F.R.§ 762.120 (entitled "Applicant eligibility" and describing several tests an applicant for a loan guarantee must meet to qualify, including the inability to obtain sufficient credit without a guarantee); *id*. § 762.130(d)(2) (describing inspections and reviews FSA may perform "during construction and *after the guarantee has been issued*") (emphasis added); *id*. § 762.128 (describing information necessary for FSA's "determination of whether an environmental problem exists," including "[o]ther information supplied by the lender *or applicant upon Agency request*") (emphasis added); *see also* 7 U.S.C. § 1983(1); 7 U.S.C. § 1983(2)(A) & (B) (requiring USDA to conduct annual reviews of the *borrower's* "credit history and business operation" and "continued eligibility" for the loan); 7 U.S.C. § 1983(4).

**2.     Third Party Case Law Cited by Federal Defendants is Easily Distinguishable**

Defendants cite several cases in which courts have found redressability lacking; however, the causal chains in those cases are far more attenuated than in this case, where formal legal relationships exist between FSA and the lender and between the lender and the CAFO in the form of the loan guarantee and loan. The facts of this case make it more aligned with the D.C. Circuit's *Nat'l Parks Conservation Ass'n v. Manson* case than the cases cited by Federal Defendants. In *Nat'l Parks Conservation Ass'n*, a power company sought permission from a state agency to construct a plant in Montana. *Nat'l Parks Conservation Ass'n*, 414 F.3d at 111. The state agency issued the permit after receiving a letter from the Department of Interior

withdrawing an earlier federal finding that the plant would have an adverse environmental impact. *Id*. at 113. Conservation plaintiffs challenged the Interior's withdrawal letter, and the district court dismissed the case for lack of standing. *Id*.

The Court of Appeals reversed, finding that although a third-party—the Montana Department of Environmental Quality—retained discretionary permitting authority, the federal agency's letter "was virtually dispositive on the state permitting decision." *Id*. at 115. Likewise, here, FSA's decision to guarantee 90 percent of the CAFO's loan was "virtually dispositive" of the lender's decision to make the loan. Moreover, the D.C. Circuit specifically concluded "[a]s to redressability, although a federal district court ruling in favor of [plaintiffs] would not directly determine whether the [power plant] will get its permit, the effect of such a ruling would not be far removed." *Id*. Similarly, here, a decision by the Court to vacate or otherwise enjoin the loan guarantee until NEPA compliance is achieved "would significantly affect" the ongoing loan and operations of the CAFO, which "is enough to satisfy redressability." *Id*. at 116 (citing *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

In cases cited by Federal Defendants, the causal chains are far more attenuated. For example, in *Talenti v. Clinton* (cited by Defendants at ECF No. 17-1, at 8), plaintiff sought an order directing the U.S. Executive Branch to withhold federal aid to Italy to redress his injury, which was the alleged expropriation and rezoning of his property in Italy without just compensation. *See Talenti v. Clinton*, 102 F.3d 573, 577 (D.C. Cir. 1996). The court found the causal chain too attenuated for many reasons, including the "the improbable scenario of a [Presidential] decision to withhold assistance from Italy," which, even if it occurred would still require the court, in order to find standing, "to assume that the Italian government would respond to the suspension of aid by negotiating a resolution of [plaintiff's property] claim." *Id*. at 578.

Thus, the independent third-party actor in *Talenti* was a sovereign nation, not, as in this case, a lender that has formal legal relationships with FSA and with the borrower.

Likewise, in both the *Nat'l Wrestling Coaches Ass'n v. Dep't. of Educ.* and the *Simon v. E. Ky. Welfare Rights Org.* cases (cited by Defendants at ECF No. 17-1, at 9 and 10, respectively), the courts found redressability lacking based on highly attenuated causal chains. In *Nat'l Wrestling Coaches Ass'n*, plaintiffs "assert[ed] injuries arising from decisions by educational institutions to eliminate or reduce the size of men's wrestling programs to comply with the Department's interpretive rules implementing Title IX." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d 930, 936 (D.C. Cir. 2004), abrogated on other grounds, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). The court found no redressabilty because plaintiffs were unable to show the Department's interpretive rules caused independent educational institutions to eliminate or reduce the size of men's wrestling teams because nothing in the rules "require[d] schools to eliminate or cap men's wrestling or any other athletic program." *Id*. at 939. Thus, a decision by the court vacating the rules would not change the behavior of the educational institutions because other regulations would still be in place requiring those schools "to provide athletic opportunities in a manner that equally accommodated both genders." *Id*. at 939-40.

In this case, the complaint alleges facts establishing causation, a standing element Defendants do not challenge in their motion. *See, e.g.*, ECF No. 1, ¶ 42 (FSA guaranteeing approximately 90 percent of OMH's total loan). These facts combined with FSA's regulation that requires borrowers to certify that they cannot obtain sufficient credit elsewhere without the guarantee satisfies the causation prong of standing. As the *Nat'l Wrestling Coaches Ass'n* court observed, "[w]ith such [causation] evidence, the court is easily able to discern redressability." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 942.

In *Simon*, a class of indigents sued the Internal Revenue Service, claiming that an IRS ruling reduced tax incentives for hospitals offering free health care to indigents, and therefore would result in indigents being deprived of free hospital services. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28 (1976). There, however, the allegation was that the IRS ruling simply "encouraged" hospitals to deny services to indigents. *Id.* at 26. Therefore, a court decision vacating the IRS ruling would simply remove that encouragement, but it would remain speculative as to whether hospitals would then provide plaintiffs the services they desired. *Id.* at 27 ("It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' "encouragement" or instead result from decisions made by the hospitals without regard to the tax implications."). Here, however, the federal guarantee of 90 percent of OMH's loan was not simply "encouragement" for the lender and OMH, it was necessary for the CAFO's construction and operation. Thus, it is not "unadorned speculation" as to what would happen if the Court were to vacate the loan guarantee. *See Buffalo River Watershed Alliance*, 2014 WL 6837005, *2 ("Without the guaranties, there would've been no loans. Without the loans, no farm.").

The government also relies heavily on the *Ctr. for Biological Diversity v. U.S. Dept. of Housing and Urban Dev.* (*CBD*) case from the District of Arizona. *See* ECF No. 17-1, at 10.[11] This is a curious case to cite for the argument that this Court should dismiss this case for lack of standing since in the *CBD* case, the district court held the plaintiffs had standing to challenge the agencies' loan guarantees because "it [was] likely, not merely speculative, that the injury will be redressed by a favorable decision." *CBD v. U.S. Dept. of Housing and Urban Dev.*, 541 F.

---

[11] It is worth noting that while Federal Defendants are willing to cite to out-of-circuit district court cases to support their position, they fail again to cite to the *Buffalo River* case—a case directly on point both factually and legally with this case.

Supp.2d 1091, 1095 (D. Ariz. 2008). This Court, like the *CBD* court, should find Plaintiff's injury would be redressed by a favorable decision.

Ignoring the *CBD* court's redressability holding, however, Defendants quote portions of the opinion analyzing whether federal authority or control continued so as to render the loan guarantees major federal actions, triggering NEPA's requirements. *See* ECF No. 17-1, at 10. However, in this case, there is not a dispute that the FSA loan guarantee is a major federal action requiring NEPA analysis. *See* 7 C.F.R. §§ 1940.302(b)(2)-(3) (2015); *see also* ECF No. 12 (Defendants' Answer), ¶ 21 (admitting "that the requirement to complete a NEPA analysis in this case was triggered by the application for guaranteed loan assistance"); *see also* 40 C.F.R. § 1508.18 (defining "major federal action" broadly).

Further, because the *CBD* case involved loan guarantees by agencies other than USDA and FSA, the court had no opportunity to analyze *FSA* regulations and loan guarantee documents to determine the extent of ongoing agency control. *See CBD*, 541 F. Supp. 2d at 1094 (analyzing federal financial assistance from U.S. Department of Housing and Urban Development, Small Business Administration and U.S. Department of Veterans Affairs). As discussed above, *supra* pp. 11-14, the statutory and regulatory schemes governing USDA's and FSA's loan guarantees and NEPA compliance establish such ongoing control and obligations. *See, e.g.*, 7 C.F.R. § 762.130(d)(2); *see also* 7 U.S.C. § 1983(2)(A) & (B).

Finally, the *CBD* case involved thousands of loan guarantees and other forms of federal financial assistance for widespread commercial and residential development projects, and there was no indication that the developers could not have continued with the individual projects absent the federal assistance. In stark contrast, this case involves one federal loan guarantee for

almost the entire loan amount for a single project, and as discussed *supra*, it is highly unlikely that OMH could have secured the loan but for the guarantee.

In the *Buffalo River* case, which involved an FSA loan and where the court did analyze the agencies' ongoing regulatory control—and thus is far more applicable to this case than the *CBD* case cited by the government—Judge Marshall had no trouble finding plaintiffs' injuries were redressable and distinguishing the *CBD* case:

> The two federal Agencies, [the CAFO operator], and [the lender] are bound together for the loans' duration. This is not a case where agencies with no oversight guaranteed loans to a host of borrowers, sometimes automatically if criteria were met. These federal agencies [including FSA], through guaranty conditions, have control over C & H's case-relevant behavior.

*Buffalo River Watershed Alliance*, 2014 WL 6837005, *4. The court further and correctly reasoned:

> Given the *essentialness of the federal Agencies' guaranties* and their continuing authority to monitor compliance with any conditions placed on those guaranties, it's likely that more environmental review will change how [the CAFO operator] operates its farm. Standing doctrine requires no more.

*Id*. (emphasis added). Indeed, FSA's 90 percent loan guarantee in this case is even more essential to the continued operation of OMH than the FSA guarantee in *Buffalo River*, which only guaranteed approximately one third—$1.17 million of the total $3.6 million—of the loans obtained for the CAFO in that case. *See id*. at 1-2.

As in the *Buffalo River* case, here the agencies "can still take a hard look at [OMH's] environmental consequences . . . [a]nd if that hard look requires the Agencies to put conditions on their guaranties, it's likely that [OMH] will comply with those conditions . . . [o]therwise, the farm will risk its relationship with its lender." *Id*. at *3. Thus, "it's likely that more environmental review will change how [OMH] operates its farm," *id*. at *4, thereby redressing Plaintiff's injuries.

Page 30: RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION

C.     **Plaintiff's Alleged Health, Environmental, and Aesthetic Harms are Well Within the Zone of Interest Protected by NEPA and Plaintiff can Legally Challenge the Loan Guarantee Based on the Federal Defendants' Alleged Multiple NEPA Violations.**

It is difficult for Plaintiff to respond to the Federal Defendants' "zone of interest" argument, ECF No. 17-1, at 11-14, because it is completely unmoored to the actual NEPA claims alleged in Plaintiff's complaint and to the zone of interest case law that clearly applies to those NEPA claims. Plaintiff believes there are two possible ways to interpret the Federal Defendants' "zone of interest" arguments in support of their motion for judgment on the pleadings, and both potential interpretations completely lack merit.

 First, Federal Defendants may be arguing that the allegations in Plaintiff's complaint somehow can be interpreted as attempting to state claims under the substantive law, the Consolidated Farm and Rural Development Act (CONACT), that authorizes such guarantees, 7 U.S.C. § 1921, *et seq.*, and Plaintiff is outside the "zone of interest" protected by that statute. *See* ECF No. 17-1, at 11 ("To the extent Plaintiff contends FSA improperly guaranteed the loan-separate from the alleged NEPA violations-it lacks standing to pursue that claim because it falls outside the "zone of interests" regulated by the CONACT, 7 U.S.C. § 1921, *et seq*."). If that is in fact Federal Defendants' argument, it must fail because Plaintiff's complaint on its face does not allege any claim under that substantive law. Moreover, Plaintiff's interests fall well within the zone of interests for the NEPA claims Plaintiff does allege in its Complaint.

Second, it is possible the Federal Defendants are arguing that Plaintiff cannot legally challenge their loan guarantee under NEPA and the APA, and can only challenge that agency action under the substantive law authorizing such guarantees. ECF No. 17-1, at 14 ("Plaintiff's Complaint focused on alleged deficiencies with the NEPA process and environmental harms allegedly stemming from the farm. . . . These alleged harms do not demonstrate that Plaintiff is a

suitable challenger to the loan guarantee-a contract between FSA and the lender."). If that is Federal Defendants' argument, Defendants ignore literally decades of case law upholding legal challenges under NEPA and the APA to substantive federal agency decisions based solely on agency violations of NEPA's procedural requirements.

1.      **Plaintiff has only alleged claims under NEPA and Plaintiff's alleged Health, Environmental and Aesthetic Harms are within the Zone of Interests Protected by NEPA**

Federal Defendants' zone of interests argument first fails because it focuses exclusively on a statute that Plaintiff does not cite even once in its complaint, CONACT, 7 U.S.C. § 1921, *et seq. Compare* ECF No. 17-1, at 11 *with* ECF No. 1, ¶¶ 1-121. Federal Defendants correctly note that "Plaintiff must present facts that demonstrate that its members are adversely affected 'within the meaning of a relevant statute.'" Mot. at 13. However, they ignore the requirement that "[t]he relevant statute, of course, is the statute whose violation is the gravamen of the complaint . . ." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990). Put another way, a plaintiff must show that its interests "fall within the zone of interests *protected by the law invoked*." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) (emphasis added). Federal Defendants acknowledge that the zone of interests "test is not meant to be especially demanding," Mot. at 11,[12] and although they insist "the test still must be met," *id.,* Federal Defendants cannot prevail on a zone of interests challenge by relying upon the zone of interests for a statute that Plaintiff does not cite in its complaint.

Although Federal Defendants argue at length that Plaintiff's interests do not fall within the zone for interests for CONACT, Federal Defendants fail to cite to a single claim brought by

---

[12] "The zone of interests test 'is not meant to be especially demanding,' however because Congress intended to 'make agency action presumptively reviewable' when enacting the APA." *Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348, 368 (D.D.C. 2016).

Page 32: RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION

Plaintiff alleging a violation of that law or even a single citation to that law anywhere in Plaintiff's complaint. In fact, as Federal Defendants seem to acknowledge elsewhere in their motion, ECF No. 17-1, at 14, all of Plaintiff's claims allege violations of NEPA. ECF No. 1, ¶¶ 60-121, Prayer for Relief, ¶ (b) (seeking declaration that Federal Defendants violated NEPA in multiple respects).[13] Federal Defendants cannot rewrite Plaintiff's complaint or ignore its specific allegations in order to have it dismissed for purportedly failing to allege interests that fall within the zone of interest for a statute "whose violation is [*not*] the gravamen of the complaint." Indeed to do so would violate the standard of review for a motion under FRCP 12(c), which requires the Court to "construe the complaint in a light most favorable to plaintiff." *Bauman v. District of Columbia*, 744 F. Supp. 2d 216, 221 (D.D.C. 2010).

Federal Defendants cite multiple cases dismissing claims for failing to fall within the applicable statutory zone of interests, *see* ECF No. 17-1, at 11-14, but only one of those cases, *Lujan*, is actually relevant and addresses a zone of interest challenge regarding NEPA claims. *Lujan* specifically holds that a plaintiff's interests regarding "recreational use and aesthetic enjoyment" are within NEPA's zone of interests. 497 U.S. at 886.[14] As the D.C. Circuit Court more recently explained, "the 'zone of interest' under NEPA encompasses environmental values, read, of course, very broadly." *Gunpowder Riverkeeper,* 807 F.3d 267, 274 (D.C. Cir. 2015); *see also Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1235-36 (D.C. Cir. 1996)

---

[13] Plaintiff, when addressing the Federal Defendants' mootness and redressability arguments, *see supra* pp. 11-31, do cite to several provisions of CONACT and its implementing regulations. Those citations however are solely for the purpose of establishing Federal Defendants' continuing control over the loan guarantee and the Court's ability to order meaningful relief. None of those citations or arguments offered by Plaintiff regarding those legal citations purport in any way to state a claim for a substantive violation of CONACT.

[14] *Lujan* goes on to hold that the plaintiffs in that case lacked Article III standing because they had failed to sufficiently establish an actual injury, 497 U.S. at 888-889, an argument the Federal Defendants do not make in this motion. *See* ECF No. 17-1, at 8, n.1 (questioning redressability, but not traceability or actual injury).

(aesthetic/recreational interests threatened by increased wildfire risk supported "prudential

standing" under NEPA). Federal Defendants cannot seriously dispute that the health,

environmental, and aesthetic concerns of Plaintiff's members, as clearly alleged in Plaintiff's

complaint, ECF No. 1, ¶ 8, are within NEPA's zone of interests as defined by the Supreme Court

and D.C. Circuit. Federal Defendants' zone of interest argument must therefore fail to the extent

it seeks to dismiss any of Plaintiff's NEPA claims.

2.      **Plaintiff Can Challenge the Loan Guarantee by Alleging that Federal Defendants
        Failed to Comply With NEPA when Deciding to Approve that Loan Guarantee**

        Federal Defendants' zone of interest arguments also fail to the extent that they more

narrowly seek to "dismiss any challenge to the loan guarantee itself under Rule 12(c)." ECF No.

17-1, at 14. Federal Defendants seem to be arguing that Plaintiff cannot challenge the loan

guarantee based on Plaintiff's "alleged deficiencies with the NEPA process and environmental

harms." *Id.* Indeed, this novel argument also appears to be the basis for Federal Defendants'

refusal to include the loan guarantee itself and other related loan documents in the administrative

record for this case. *See* Feb. 16, 2018 Joint Status Report, ECF No. 16, at 3-5; *see also generally*

Plaintiff's Motion to Compel the Complete Administrative Record (ECF No. 18). When a federal

agency decision is subject to NEPA's requirements, as the loan guarantee at issue clearly is,

Federal Defendants simply have no legal basis whatsoever to argue that a plaintiff cannot

challenge that agency decision under the APA solely because it violated NEPA's procedures.

Moreover, an agency's substantive decision that results from an illegal NEPA process violates

Section 706(2) of the APA because it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law" or "without observance of procedure required by law." 5

U.S.C. § 706(2)(A) and (D); *see, e.g.*, *Sierra Club v. FERC*, 867 F.3d 1357, 1367-68, 1379 (D.C.

Cir. 2017) (explaining that if NEPA process is deficient, "the agency action it undergirds is

Page 34: RESPONSE TO FEDERAL DEFENDANTS' 12(c) MOTION

arbitrary and capricious," and vacating FERC's substantive orders issued under Natural Gas Act because of NEPA violation).[15]

Federal Defendants' argument appears to be premised on their erroneous belief that the environmental review process required by NEPA is somehow separate and distinct from their decision-making process regarding their loan guarantee. That is not the law. "Congress did not enact NEPA, of course, so that an agency would contemplate the environmental impact of an action as an abstract exercise. Rather, Congress intended that the "hard look" be incorporated as part of the agency's process of deciding whether to pursue a particular federal action." *Baltimore Gas & Elec. Co.*, 462 U.S. at 100. NEPA regulations in fact specifically state that NEPA's purpose is to require federal agencies to consider environmental consequences when they make their substantive decisions, 40 C.F.R. § 1500.1(c), and Federal Defendants' NEPA regulations therefore require that "[t]he environmental documents, *i.e.*, the assessment, related correspondence… and the finding of no significant impact will be included with the approval documents which are assembled for review and clearance within the approving office." 7 C.F.R. § 1940.318(k) (2015).

There is no dispute that Federal Defendants had to comply with NEPA's procedures before they could approve the loan guarantee at issue. Federal Defendants admit in their Motion to Dismiss that "[p]ursuant to applicable regulations, FSA is required to complete an environmental review prior to making a commitment to issue a loan guarantee. 7 C.F.R. §§

---

[15] At least one court has held that NEPA claims regarding a federal agency's loan guarantee decision were not ripe because, although the federal agency had completed an EIS regarding the proposed guarantee, it had not yet made a final decision to actually issue the guarantee. *Sierra Club v. U.S. Dept. of Energy,* 825 F. Supp. 2d 14, 155 (D.D.C. 2011). In this case, Federal Defendants have both completed their required NEPA analysis, the EA/FONSI, and made their final decision by approving the loan guarantee, and both the NEPA documents and the loan guarantee are ripe for a NEPA challenge under the APA.

1940.301-350.4(b)(2015)." ECF No. 17-1, at 2. Plaintiff's complaint sufficiently alleges that Federal Defendants' NEPA process for their disputed loan guarantee violated NEPA and the APA in at least nine different ways. ECF No. 1, ¶¶ 60-121 (Claims One through Nine). Plaintiff's Prayer for Relief then specifically asks the Court to vacate the deficient NEPA documents and the loan guarantee because of these APA/NEPA violations. *Id.* at 35, Prayer for Relief ¶ (a).

If Plaintiff can ultimately establish that any of its NEPA claims has merit, this Court can vacate Federal Defendants' substantive decision, the loan guarantee, because it violates Section 706(2) of the APA, as many federal courts have done in numerous, prior NEPA cases. *See, e.g.*, *Sierra Club v. FERC,* 867 F.3d at 1367-68, 1379 (vacating FERC's substantive orders under Natural Gas Act solely because of deficient EIS, a NEPA violation); *PEER v. Salazar*, 189 F. Supp. 3d 1, *2-6 (D.D.C. 2016) (vacating federal agency's substantive depredation orders issued in violation of NEPA); *In re Polar Bear ESA Listing*, 818 F. Supp. 2d 214, 238 (D.D.C. 2011) (vacating substantive ESA special rule because of NEPA violations); *Reed v. Salazar,* 744 F. Supp. 2d 98, 119 (D.D.C. 2010) (explaining that vacatur of substantive agency decision is default remedy for APA/NEPA violation); *Humane Society v. Johanns,* 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (vacatur of substantive agency decision is standard remedy for APA/NEPA violation); *Greater Yellowstone Coalition v. Bosworth,* 209 F. Supp. 2d 156, 163 (D.D.C. 2002) (vacating grazing permits because of NEPA violation); *Nebraska v. Rural Elec. Admin.,* No. CV76-L-242,1978 U.S. Dist Lexis 20440, *95 (D.NE 1978) (vacating loan guarantee because of NEPA violations); *see also Buffalo River Watershed Alliance,* 2014 WL 6837005, *6 (enjoining

payments under loan guarantee based on NEPA violations).[16] In light of this case law, any argument by Federal Defendants that Plaintiff's NEPA claims and environmental harms somehow make Plaintiff an "[un]suitable challenger to the Loan Guarantee" is simply meritless. Federal Defendants' request that "[t]he Court should dismiss any challenge to the Loan Guarantee itself under Rule 12(c)," ECF No. 17-1, at 14, therefore should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff urges the Court to deny Federal Defendants' motion and order the agencies to complete the administrative record pursuant to Plaintiff's Motion to Compel the Complete Administrative Record (ECF No. 18) filed concurrently with this Response so this case may proceed to summary judgment briefing as expeditiously as possible.


Respectfully submitted this 23rd day of March, 2018.

/s/ Kevin Cassidy
Kevin Cassidy, D.C. Bar No. MA0021
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
Telephone: (781) 659- 1696
Email: cassidy@lclark.edu

Tarah Heinzen, D.C. Bar No. 1019829
Food & Water Watch
1616 P St. NW, Suite 300
Washington, DC 20036
Telephone: (202) 683-2457

---

[16] Federal Defendants concede that if the Court upholds Plaintiff's NEPA claims, "this Court has the power to remand the EA/FONSI for reconsideration or further explanation and to vacate the loan guarantee." ECF No. 17-1, at 10. Of course Federal Defendants may have equitable defenses to such a request for vacatur, *see, e.g., PEER,* 189 F. Supp. 3d at 2-6 (recognizing but ultimately rejecting such equitable defenses to vacatur), but that does not change the fact that Plaintiff's legal challenge to the loan guarantee is within the zone of interest of their NEPA claims and alleged environmental harms.

Email: theinzen@fwwatch.org

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby CERTIFY that on the 23rd day of March, 2018, I filed the foregoing documents electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

        _/s/ Kevin Cassidy_____
        Kevin Cassidy
        Attorney for Plaintiff