## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FOOD AND WATER WATCH**,<br>a non-profit corporation, | ) <br> ) <br> ) | Case No. 1:17-cv-01714-BAH |
| Plaintiff, | ) <br> ) | Hon. Beryl A. Howell |
| v. | ) <br> ) <br> ) | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, et al., | ) <br> ) <br> ) | **FEDERAL DEFENDANTS'**<br>**REPLY TO PLAINTIFF'S**<br>**OPPOSITION TO 12(c)** |
| Defendants. | ) <br> ) | **MOTION TO DISMISS** |
| | ) | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 1

        1.      The Loan Guarantee Process ................................................................ 2

        2.      Law and FSA Regulations and Their Applicability ............................. 3

III.    ARGUMENT ...................................................................................................... 6

        1.      Plaintiff's Claims are Moot ................................................................. 6

        2.      Plaintiff's Injuries are not Redressable ............................................... 9

        3.      The *Buffalo River* Case ..................................................................... 13

        4.      The Plaintiff Concedes it does not Challenge FSA's Compliance with the
                CONACT ......................................................................................... 15

IV.     CONCLUSION ................................................................................................ 16

## TABLE OF AUTHORITIESCases

*Airport Neighbors All., Inc. v. United States,*
   90 F.3d 426 (10th Cir. 1996) ..................................................................... 7

*Allen v. Wright,*
   468 U.S. 737 (1984)..................................................................... 9, 12

*Appalachian Voices v. Bodman,*
   587 F. Supp. 2d 79 (D.D.C. 2008).................................................... 9

*Ashley v. U.S. Dep't of Interior,*
   408 F.3d 997 (8th Cir. 2005) ........................................................ 14

*Buffalo River Watershed All. v. Dep't of Agric.,*
   No. 4:13-cv-450-DPM, 2014 WL 6837005 (E.D. Ark. Dec. 2, 2014) .............. 13, 14

*Byrd v. U.S. E.P.A.,*
   174 F.3d 239 (D.C. Cir. 1999)....................................................... 7

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States,*
   78 F. Supp. 3d 208 (D.D.C. 2015)................................................. 10, 11

*Dellums v. U.S. Nuclear Regulatory Comm'n,*
   863 F.2d 968 (D.C. Cir. 1988)....................................................... 9

*Fulani v. Brady,*
   935 F.2d 1324 (D.C. Cir. 1991)..................................................... 10, 13

*Knaust v. City of Kingston,*
   157 F.3d 86 (2d Cir. 1998) .......................................................... 6

*Lechliter v. Univ. of Del.,*
   No. 12-16-GMS, 2015 WL 12827782 n.7 (D. Del. Jan. 16, 2015) ................ 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   134 S. Ct. 1377 (2014)................................................................. 9

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992).................................................................... 9, 14

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990).................................................................... 11

*Nat'l Wrestling Coaches Ass'n v. Dep't of Education,*
   366 F.3d 930 (D.C. Cir. 2004)....................................................... 13

*Neighborhood Transp. Network, Inc. v. Pena,*
   42 F.3d 1169 (8th Cir. 1994) ........................................................ 6

*Ocean Advocates v. U.S. Army Corps of Engineers,*
   402 F.3d 846 (9th Cir. 2005) ........................................................ 7

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
  489 F.3d 1267 (D.C. Cir. 2007) ............................................................... 9, 10, 12

*Richland Park Homeowners Ass'n, Inc. v. Pierce*,
  671 F.2d 935 (5th Cir. 1982) ............................................................................ 6

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) ................................................................ 6, 7, 8, 9

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  277 F. App'x 170 (3d Cir. 2008) ....................................................................... 8

*Sierra Club v. U.S. Dep't of Energy*,
  825 F. Supp. 2d 142 (D.D.C. 2011) ........................................................... 12, 15

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ............................................................................................ 9

*St. John's United Church of Christ v. F.A.A.*,
  520 F.3d 460 (D.C. Cir. 2008) .............................................................. 10, 12, 14

*Talenti v. Clinton*,
  102 F.3d 573 (D.C. Cir. 1996) ...................................................... 9, 10, 11, 12, 14

*United Transp. Union v. Interstate Commerce Comm'n.*,
  891 F.2d 908 (D.C. Cir. 1989) ......................................................................... 10

## Statutes

7 U.S.C. § 1921 ...................................................................................................... 15

7 U.S.C. § 1983(4) .................................................................................................... 3

7 U.S.C. § 1998 ........................................................................................................ 4

## Regulations

7 C.F.R. § 762 ....................................................................................................... 15

7 C.F.R. § 762.101(e)(3) ...................................................................................... 3, 13

7 C.F.R. § 762.103 ................................................................................................... 3

7 C.F.R. § 762.110 ................................................................................................... 2

7 C.F.R. § 762.120(h) .......................................................................................... 2, 11

7 C.F.R. § 762.126 ................................................................................................... 2

7 C.F.R. § 762.128 ................................................................................................... 2

7 C.F.R. § 762.130(d)(2) .......................................................................................... 5

7 C.F.R. §§ 762.140-146 ...................................................................................... 3, 13

7 C.F.R. §§ 762.148-149 ........................................................................................... 3

7 C.F.R. § 799.45(c) ........................................................................................................... 5

7 C.F.R. §§ 1940.301–350 (2015) ...................................................................................... 2

7 C.F.R. § 1940.318(g) ....................................................................................................... 5

7 C.F.R. § 1970.6 ................................................................................................................ 5

33 C.F.R. § 330.5 ................................................................................................................ 7

40 C.F.R. § 1501.4(b) ......................................................................................................... 2

40 C.F.R. § 1501.4(e) .......................................................................................................... 2

## **Other Authorities**

U.S. Dep't of Agric., FSA Handbook, General Program Administration (2015),
    https://www.fsa.usda.gov/Internet/FSA_File/1-flp_r01_a160.pdf ............................... 3

U.S. Dep't of Agric., FSA Handbook, Guaranteed Loan Making and Servicing (2017),
    http://www.fsa.usda.gov/Internet/FSA_File/2-flp_r01_a41.pdf.................................. 2

# I.      INTRODUCTION

Plaintiff's Opposition to Defendants' Motion to Dismiss continues its effort to convert the Farm Service Agency ("FSA") into an environmental regulator. Plaintiff merely repeats the environmental harms alleged in its Complaint (which would be properly addressed by state environmental regulatory authorities) and then reiterates its demand that FSA intervene to change the manner in which the farm operates. Plaintiff supports this argument by providing out-of-context citations to law and regulations covering the loan guarantee application process and the default payment process. Plaintiff's interpretations, however, cannot overcome the law of this circuit which places a demanding burden on those seeking to control the actions of a third party not before the court. Plaintiff has not, and cannot meet that demanding burden and therefore cannot avoid the inescapable conclusion that its claims are moot and unredressable. Finally, Plaintiff's emphatic assertion that it does not bring any claim under the Consolidated Farm and Rural Development Act (the "CONACT") confirms that Plaintiff alleges purely environmental injuries that are not redressable through litigation against FSA now that operations are under way.

As detailed in Defendants' opening brief, the challenged loan guarantee ("Guarantee") was finalized in July 2015. Compl. ¶ 1. The poultry farm is fully constructed and operational. Compl. ¶ 47. Plaintiff's attempt, nearly three years after the approval of the Guarantee, to force FSA to step in as an environmental regulator fails. Plaintiff's claims must be dismissed in their entirety as moot and for a lack of redressability.

# II.     BACKGROUND

Plaintiff's brief mischaracterizes law, FSA regulations and the loan guarantee process. This section explains the guarantee process from application to approval and places the law and

regulations cited by Plaintiff in their proper context.

### 1.      The Loan Guarantee Process

The loan guarantee application process contains several discrete steps.  The process

begins with an application for a farm loan made by an applicant to a qualified private lender such

as a bank, farm credit association, or credit union.  If the lender determines, based on its own

internal criteria, that it cannot make the loan without additional risk reduction, it may apply to

FSA for a guarantee.  *See* 7 C.F.R. §§ 762.110, 762.120(h), 762.125 and 762.126.  Upon receipt,

FSA reviews the lender's guarantee application for completeness and eligibility.  *See* FSA

HANDBOOK, GUARANTEED LOAN MAKING AND SERVICING (2017) (hereinafter "2-FLP"),

http://www.fsa.usda.gov/Internet/FSA_File/2-flp_r01_a41.pdf, ¶ 95 C (before proceeding with

the application, FSA first determines "whether there are any obvious [eligibility] reasons the loan

cannot be guaranteed").  An FSA determination that the guarantee applicant is eligible for a

guarantee triggers the next step in the process, the FSA environmental review.  7 C.F.R. §§

1940.301–350 (2015); *see also* 7 C.F.R. § 762.128 (providing that lenders will assist in the

environmental review process by providing environmental information).  The environmental

review requires preparation of an Environmental Assessment ("EA") to determine if an

Environmental Impact Statement should be prepared.  *See* 40 C.F.R. § 1501.4(b).  If that EA

determines that the proposed project will not have a significant effect on the human environment

then FSA issues a Finding of No Significant Impact ("FONSI") and the environmental review is

complete.  40 C.F.R. § 1501.4(e); *see* 2-FLP ¶ 244 C ("If the NEPA environmental review

determines that there will be a significant impact to the environment, the application cannot be

approved.").  With a completed EA/FONSI, the processing of the lender's application can

proceed.  *See generally,* 7 C.F.R. § 762.110; 2-FLP Part 5 (providing the requirements for a

complete application).  Finally, the appropriate reviewing official at FSA reviews the lender's

application for eligibility, feasibility, and security and reviews the environmental analysis.

These reviews may require two distinct decisionmakers depending on the dollar amount of the

loan and the staffing configuration in a particular office.  At the end of the process, if all criteria

are satisfied, an official approves the issuance of the guarantee.  *See* 2-FLP ¶ 244 B (approving

officials' requirements); *see also*, FSA HANDBOOK, GENERAL PROGRAM ADMINISTRATION,

(2015) (hereinafter "1-FLP"), https://www.fsa.usda.gov/Internet/FSA_File/1-flp_r01_a160.pdf, ¶

29 D; *see also* 2-FLP ¶ 244 C (only applications with an articulable financial deficiency that

could not be resolved may be rejected).

2.      **Law and FSA Regulations and Their Applicability**

Plaintiff's citation to the CONACT and FSA regulations without context creates the

incorrect perception that through the guarantee to the lender, FSA maintains continuing control

over the farm's operation.  Although FSA maintains some loan servicing oversight

responsibilities regarding the financial aspects of the loan, which are memorialized at 7 C.F.R.

§§ 762.140–146, 148–149, FSA has no control over the farm's operations.  Moreover, all of the

FSA loan regulations cited by Plaintiff are regulations that control the actions of FSA and the

lender during the application process or in the event that the lender submits a loss claim to FSA.

*See* Pl. Opp. at 12–15.  Once the lender's application is approved, the lender and FSA have a

relationship that lasts only for as long as the lender chooses to maintain it.  *See* 7 C.F.R. §

762.101(e)(3) (the lender may cancel by providing written notice at any time that the guarantee is

no longer desirable).  The only party bound by the guarantee for the duration of the loan is the

United States.  *See* 7 C.F.R. § 762.103 (the "loan guarantee constitutes an obligation supported

by the full faith and credit of the United States.").  As with any loan, the borrower is obligated to

the lender for as long as it maintains an outstanding balance with that lender.

Plaintiff begins by quoting a CONACT provision allowing the Secretary of Agriculture to "require such provision for supervision of the borrower's operations as the Secretary shall deem necessary to achieve the objectives of the loan and protect the interests of the United States." 7 U.S.C. § 1983(4); Pl. Opp. at 12. This provision appears in the Administrative Provisions subchapter of the CONACT and refers to both loans made directly by FSA and loan guarantees. This provision is not a grant of authority for FSA to engage in environmental regulation over third parties that benefited from a loan guarantee, it is merely a general provision that gives the Secretary discretion as may be needed in carrying out FSA's direct lending and loan guarantee programs; indeed, the statute does not even specify that any "supervision" deemed necessary in a particular case be performed by FSA. Nothing in that section suggests that FSA may amend the terms of an approved loan guarantee by imposing after-the-fact environmental restrictions on the borrower's operations, or that in the absence of such terms FSA may police a borrower's operations simply because its lender has secured a guarantee.[1]

Next, Plaintiff recites the definition of the loan guarantee as evidence of continuing involvement and control by FSA, but nothing in that definition imparts legal authority to control operations at the farm after the guarantee is issued to the lender. Pl. Opp. at 12. As Plaintiff correctly notes, a loan guarantee is a "circumstance in which the Agency guarantees all or a

---

[1] Plaintiff cites a second, and largely irrelevant, catch-all provision from the Administrative Provisions subchapter of the CONACT in an attempt to bolster the first. Pl. Opp. at 13 *citing* 7 U.S.C. § 1998. This provision provides that the Secretary "shall ensure that farm loan guarantee programs carried out under this chapter are designed so as to be responsive to borrower and lender needs and to include provisions under reasonable terms and conditions for advances, before completion of the liquidation process, of guarantee proceeds on loans in default." *Id.* This provision compels the agency to be responsive to the needs of its clients, particularly as to advances and liquidations. Nothing here references ongoing environmental review or ongoing control over borrowers benefiting from loan guarantees.

portion of payment of a debt obligation *to a lender.*" *Id. citing* 7 C.F.R. § 1970.6 (emphasis

added).  Defendants agree that a guaranteed loan carries with it an obligation on the part of the

United States to pay the debt to the lender in the event of default by the borrower.  But this

obligation to pay—if default occurs and if the lender properly serviced the loan—does not give

FSA ongoing legal authority for the life of the guarantee to place after-the-fact demands on the

operations of the borrower.[2]

Plaintiff similarly cannot demonstrate FSA's legal authority over the farm's operations

by quoting regulations that only apply during the application process or that were not in effect at

the time of the guarantee.  Plaintiff relies on a regulation that requires mitigations to be

documented and "placed in the offer of financial assistance as special conditions" to support its

assertion that FSA has continuing regulatory authority over the operation of the farm.  Pl. Opp. at

13–14 *citing* 7 C.F.R. § 1940.318(g) (2015).  This provision allows FSA to place certain

conditions, as needed, in the offer of assistance *before* the loan closes.  7 C.F.R. § 1940.318(g)

(2015).  This provision confers no ongoing authority to adjust or modify a loan guarantee that

has already been issued.  Similarly, Plaintiff relies on regulations enacted after the completion of

the EA/FONSI in this case that confer only limited authority to FSA to include *pre-closing*

modifications to the loan documents.  Pl. Opp. at 13–14 *citing* 7 C.F.R. § 799.45(c).  This

provision, while not relevant to this EA/FONSI, actually confirms the limits of FSA's authority

---

[2] Plaintiff also cites to a permissive FSA regulation in the context of approving the loan that allows FSA to attend inspections if FSA so chooses.  Pl. Opp. at 12–13 *citing* 7 C.F.R. § 762.130(d)(2).  This regulation directs the lender to notify FSA of any inspection and provides that the agency "*may* attend these field inspections." *Id.*  (emphasis added).  This regulation, like most of the relevant regulations, applies to activities by the lender and does not grant any continuing authority over the borrower.  Further, read in its entirety, this provision undermines any notion that FSA assumes any regulatory duties by virtue of attending these inspections by stating that they "do not relieve any other parties of their inspection responsibilities nor can these parties rely on Agency inspections for any purpose." *Id.*

to impose conditions to the pre-closing phase of the process.  *Id.*

In sum, when reviewed in context, the law and regulations relied on by Plaintiff control the relationship between FSA and the lender in the course of the application process or in the event of a default.  The regulations do not allow FSA to exercise continuing legal control over the third-party borrower after issuance of the loan guarantee.

## III.    ARGUMENT

Plaintiff's attempts to rewrite FSA regulations to clothe the agency with enforcement authority lack any statutory basis.  FSA maintains no ongoing control over the poultry farm and as such the Plaintiff's claims are moot and unredressable.

### 1.    Plaintiff's Claims are Moot

For Plaintiff to survive a mootness challenge based on the project's completion, Plaintiff must show that FSA maintains control over the project.  Plaintiff cannot demonstrate such ongoing control and thus its NEPA claims are moot.

Plaintiff attempts to side-step the consensus across circuits[3] that NEPA claims based on completed projects are moot by asserting that the Court here can "fashion an appropriate remedy."  Pl. Opp. at 15 *citing Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 43 (D.C. Cir. 2015).  For such a possibility here, however, FSA must have the ability to influence

---

[3] *See Lechliter v. Univ. of Del.*, No. 12-16-GMS, 2015 WL 12827782, at *4 n.7 (D. Del. Jan. 16, 2015) ("[J]urisdiction is lacking where plaintiffs seek after-the-fact evaluation of NEPA procedures for projects that are already completed."); *see also Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1171 (8th Cir. 1994) (dismissing NEPA claims as moot because construction was complete on two highway construction projects); *Knaust v. City of Kingston*, 157 F.3d 86, 88 (2d Cir. 1998) (dismissing NEPA claims as moot when the park project was completed and federal monies disbursed); *Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935, 941 (5th Cir. 1982) ("[T]he basic thrust of the NEPA legislation is to provide assistance for evaluating proposals for prospective federal action in the light of their future effect upon environmental factors, not to serve as a basis for after-the-fact critical evaluation subsequent to substantial completion of the construction.").

the operation of the farm.  *Sierra Club*, 803 F.3d at 43 (noting a distinction from a typical

mootness case because "[t]he agencies could call for additional mitigation and monitoring, or

could decide not to renew their respective authorizations").  As discussed above, no such legal

authority exists here.  If FSA were to "call for additional mitigation" there would be no legal

authority for it to enforce such a request; FSA cannot impose such a requirement on a loan

guarantee already issued to a lender and it has no direct authority over the farm's operations.  In

contrast, all of the cases upon which Plaintiff relies include an agency that retains some manner

of actionable legal authority over the project in question.  *See e.g., Byrd v. U.S. E.P.A.*, 174 F.3d

239, 244 (D.C. Cir. 1999) (declining to find mootness where concrete action by EPA could

provide a partial remedy to Plaintiff's claim); *Airport Neighbors All., Inc. v. United States*, 90

F.3d 426, 429 (10th Cir. 1996) (a partially constructed runway project was not moot because the

FAA maintained control over the project); *Ocean Advocates v. U.S. Army Corps of Engineers*,

402 F.3d 846, 871 (9th Cir. 2005) (where the Army Corps of Engineers had issued a permit over

which it had authority to include additional conditions, relief was still available even though the

project had been constructed).

   Nor is Plaintiff's attempt to distinguish *Sierra Club v. U.S. Army Corps of Engineers*

successful.  803 F.3d at42–45.  There, the challenged pipeline was indeed completely

constructed, but the court held that relief was still available because the agencies maintained

authority and control over it.  *Id.* at 43.  The court supported this assertion of ongoing authority

by citing directly to an Army Corps of Engineers regulation granting it the authority to modify,

suspend, or revoke nationwide permits.  *Id.* at 43 ("the agencies could call for additional

mitigation and monitoring, or could decide not to renew their respective authorizations" pursuant

to 33 C.F.R. § 330.5).  Further, the court in *Sierra Club* adopts the reasoning of a Third Circuit

court and notes that a situation where the agency retains ongoing control is distinct from one where a limited asserted interest in a completed project prevents "any meaningful relief." *Id.* at 44 *citing Sierra Club v. U.S. Army Corps of Engineers*, 277 F. App'x 170, 173 (3d Cir. 2008) (where a filled wetland could not be restored no meaningful relief was available and thus the case was moot).

Here, Plaintiff seeks precisely the relief that the District of Columbia Circuit *Sierra Club* case acknowledges is unavailable in this type of situation.  As a threshold matter, there is no regulation or statute that allows FSA to assert control over the operation of the farm. Additionally, the project is complete and like the wetland in the Third Circuit's *Sierra Club* case, here the funds have been disbursed; the farm is built and completely operational; and additional environmental review by FSA cannot unwind those completed activities.  *See Sierra Club*, 277 F. App'x at, 173 ("Plaintiffs do not ask that the existing structures be removed, and redressing Plaintiffs' alleged procedural harms under . . . NEPA . . . would not conceivably restore any wetlands . . . .").

Nor does Plaintiff's allegation that it continues to suffer injury and has an opportunity to receive relief save the claim from mootness.  While such relief may conceivably be available from the Maryland state environmental regulatory authorities, what Plaintiff does not explain is how *FSA* could provide that relief.  *See Sierra Club*, 803 F.3d at 43 (relief the court can grant must "provide some degree of 'effectual relief'").  As Defendants have stated repeatedly, FSA has no legal authority to demand action (or inaction) by the farm and thus no ability to provide effective relief.  FSA's only link to the farm is a third party connection through the Guarantee issued to the lender.  That Guarantee was executed nearly three years ago; the funds it guarantees have been disbursed; and those funds have been spent by the borrower to build and bring the

poultry farm into full operation.  The challenged project is complete and the challenged agency

maintains no legal authority over that project.  Plaintiff's NEPA claims are moot and must be

dismissed.  *Id.* at 43–44.

### 2.    Plaintiff's Injuries are Not Redressable

As discussed in Defendants' opening brief, Article III standing requires a plaintiff to

show that a favorable decision is likely to redress its alleged injury.  *See Lujan v. Defs. of

Wildlife*, 504 U.S. 555, 561 (1992).  "Mere speculation" that an order or favorable ruling may

improve the situation is insufficient.  *Talenti v. Clinton*, 102 F.3d 573, 576–77 (D.C. Cir. 1996);

*Allen v. Wright*, 468 U.S. 737, 751 (1984) ("relief from the injury must be 'likely' to follow from

a favorable decision) (*citing Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)),

*abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct.

1377 (2014).  For a plaintiff to demonstrate redressability when the plaintiff is not the subject of

the challenged government action is "substantially more difficult."  *Talenti*, 102 F.3d at 577.

When the plaintiff seeks to change the behavior of the defendant to alter behavior of a third party

not before the court, the defendant must have the ability to control that third party.  Stated

differently, "when numerous third parties and independent variables lead to an injury, the

complainant has the burden of showing that but for the particular governmental action he is

challenging, the injury would abate."  *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d

968, 980 (D.C. Cir. 1988) (citations omitted).  Failure to sufficiently allege the elements of

standing is fatal because "even at the pleading stage, a party must make factual allegations

showing that the relief it seeks will be likely to redress its injury."  *Renal Physicians Ass'n v.

U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007); *see also

Appalachian Voices v. Bodman*, 587 F. Supp. 2d 79, 88 (D.D.C. 2008).  An allegation of injury

or of redressability that is too speculative will not "suffice to invoke the federal judicial power."
*United Transp. Union v. Interstate Commerce Comm'n.*, 891 F.2d 908, 911 (D.C. Cir. 1989)
(citations omitted).  To demonstrate that relief is available through a specific action the
defendant can be ordered to take is a high hurdle for plaintiff to clear, and where the defendant
lacks control over the third party, the court is powerless to provide a remedy.  *Fulani v. Brady*,
935 F.2d 1324, 1330–31 (D.C. Cir. 1991); *Talenti*, 102 F.3d at 577 ("In such cases, the court's
ability to redress the injury 'depends on the unfettered choices made by independent actors not
before the courts and whose exercise of broad and legitimate discretion the courts cannot
presume either to control or to predict.'").

Plaintiff does not meet the difficult standard of demonstrating that an order from this
Court would alter the conduct of the third-party farm.  Plaintiff repeats several times in its brief
that the "operation" of the farm is the source of its injuries.  *See e.g.,* Pl. Opp. at 20; *see id.* at 2
("Plaintiff's injuries are caused by the construction *and continued operation* of the CAFO.")
(emphasis in original).  What Plaintiff seeks is modifications in the manner in which the farm
operates.  The farm, however, is a third-party not before this Court.  Thus, for any order by this
Court to effectuate relief, FSA must have the ability to exercise control over the farm.  *See
Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*, 78 F. Supp. 3d 208,
225 (D.D.C. 2015).  (plaintiffs "must provide some basis for finding that the 'nonagency
activity' that affects them … 'will be altered or affected by the agency activity they seek to
overturn.'") (*citing St. John's United Church of Christ v. F.A.A.*, 520 F.3d 460, 463 (D.C. Cir.
2008)); *Renal Physicians Ass'n*, 489 F.3d at 1275 ("[T]o establish redressability . . . we require[]
that the facts alleged be sufficient to demonstrate a substantial likelihood that the third party
directly injuring the plaintiff would cease doing so as a result of the relief . . .  sought.").  While

the Court has the authority to set aside the FSA's Guarantee, the impact of that action on the *operation* of the farm—which is the source of Plaintiff's injuries—is entirely speculative.  Where the impact of the relief sought by a plaintiff has no more than a speculative impact on the plaintiff's injury, plaintiff falls short of the redressability showing needed to establish standing. *See Talenti*, 102 F.3d at 577; *Chesapeake Climate Action Network*, 78 F. Supp. 3d at 225 ("As Defendants point out, however, the members' hopes or beliefs that an order rescinding the guarantee would redress their injuries, however genuine, do not constitute "specific facts" showing redressability.)  The injuries alleged by Plaintiff cannot be redressed by any relief this Court might award.[4]

Plaintiff cites the FSA requirement that a borrower must be unable to obtain sufficient credit elsewhere to qualify for a guarantee in support of its claim that "it is likely that vacating the loan guarantee would result in the withdrawal of the loan."  Pl. Opp. at 23 *citing* 7 C.F.R. § 762.120(h) (regulation providing the test for credit).  But this regulation only applies to the applicant *before* a loan is issued; it is irrelevant to the ongoing operation of the farm.  Plaintiff does not explain how a loan applicant's creditworthiness and eligibility at the time of application provides authority for the agency to impose new and unspecified environmental mitigations on a third party borrower after a guarantee has been issued to the lender.  *Chesapeake Climate Action Network*, 78 F. Supp. 3d at 227 ("As the D.C. Circuit Court explained in *Renal Physicians*, there are cases where "governmental action is a substantial contributing factor in bringing about a

---

[4] A recurring theme in Plaintiff's Complaint and in its redressability and mootness arguments are suggestions that FSA is responsible for the proliferation of farms throughout the State of Maryland.  *See e.g.*, Compl. ¶¶ 48–51; Pl. Opp. at 15, 22.  To the extent these statements assert a programmatic challenge to the loan guarantee program, such challenges are not permissible under the Administrative Procedure Act.  *See generally Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).

specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces." 489 F.3d at 1278.") *Sierra Club*, 825 F. Supp. 2d at 150-51 (injunctive relief  not warranted where there was "some evidence that [power company] would not have gone forward with the [] project had DOE not initially provided funding" but "the relevant question is what effect an order from this Court would have *now*") (emphasis in original); *see also Allen*, 468 U.S. at 753 n. 19 (distinguishing between causation, which looks at the relationship between the alleged unlawful conduct and the injury, and redressability, which concerns the relationship between the injury and the requested relief).

The connection between this regulation and actions that the lender or the borrower may, or may not take, in response to a judicial order invalidating the Guarantee is speculative at best. *See Talenti*, 102 F.3d at 576–77 ("[M]ere speculation" that an order or favorable ruling may improve the situation is insufficient.); *see St. John's*, 520 F.3d at 463 (finding it "entirely conjectural whether the nonagency activity that affects petitioners will be altered or affected by the agency activity they seek to overturn.").  For example, in the event FSA withdrew the Guarantee, any effect on the loan would be entirely dependent on the lender's response.  The lender could opt to ignore the lack of a guarantee and simply administer the loan for its remaining term in a manner consistent with the existing loan terms.  Or, given that the farm has now been constructed and has been presumably paying on the loan for three years, the lender might be inclined to renegotiate the terms of the loan with the borrower.  Under either scenario, the operations to which Plaintiff traces its injury would not change.  Nor is there any certainty that if the Court invalidated the Guarantee and FSA sought to issue a new guarantee with additional environmental mitigations that the new guarantee would be accepted by the lender or the borrower.  The lender could choose to abandon the Guarantee, per 7 C.F.R. § 762.101(e)(3),

if it determined that additional environmental requirements might imperil the borrower's ability to repay the balance. Similarly, the borrower could decline to accept new conditions and seek additional or replacement financing elsewhere. In sum, there is no basis for Plaintiff's speculation that it is "likely" that invalidating the Guarantee and requiring additional NEPA analysis will redress Plaintiff's injuries.[5] *Nat'l Wrestling Coaches Ass'n v. Dep't. of Education*, 366 F.3d 930, 938 (D.C. Cir. 2014)("[T]he Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries."). And because FSA can ensure no specific outcome, an order from the Court here cannot redress Plaintiff's harms. *See id.; Fulani*, 935 F.2d at 1330–31.

Because remand of the EA/FONSI or invalidation of the Guarantee will have no direct effect on the ongoing operations of the farm, and any change in those operations rests on unadorned speculation about the choices of a party not before the Court, Plaintiff's injuries are not redressable and its claims must be dismissed.

## 3.    The *Buffalo River* Case

Plaintiff relies heavily throughout its brief on a case from the Eastern District of Arkansas to support its contentions that its claims are redressable and not moot. *Buffalo River Watershed All. v. Dep't of Agric.*, No. 4:13-cv-450-DPM, 2014 WL 6837005 (E.D. Ark. Dec. 2, 2014). The *Buffalo River* decision is not supported by reasoning or law, is contrary to the law of this Circuit and has no binding authority here.

In *Buffalo River*, two federal agencies, the Small Business Administration and FSA,

---

[5] Significantly, it is the lender that commits, when accepting the guarantee, to ensure that the farm operates consistent with all applicable laws. 7 C.F.R. § 762.140 (lender is responsible for, among other things, "[e]nsuring the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm").

provided two separate guarantees for two loans from a lender for borrower C&H Hog Farms.  *Id.* at \*1–2.  The Small Business Administration did not conduct any environmental review before issuing its guarantee.  *Id.*  FSA completed an EA/FONSI prior to issuing its guarantee, but that EA/FONSI failed to consider an endangered species and the proximity of the farm to a nearby national river.  *Id.* at \*1–2.

The *Buffalo River* court made an unsupported conclusion that the injuries plaintiffs alleged were redressable.  *Id.* \*3–4.  This conclusion is not based on any laws or regulations and instead cites to one case, *Ashley v. U.S. Dep't of Interior* 408 F.3d 997 (8th Cir. 2005), with no supporting reasoning.  *Id.*  The *Ashely* holding, however, undermines *Buffalo River* because the court in *Ashely* dismissed the claims there as unredressable in part because the plaintiffs sought to "change the defendant's i.e. the government's behavior *only as a means* to alter the conduct of a third party . . . not before the court, who is the direct source of the plaintiff's injury." *Id.* at 1001 (internal punctuation omitted) (emphasis in original).

The holding of *Buffalo River* is inconsistent with controlling D.C. Circuit precedent.  The law of this Circuit provides "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" *Lujan v. Defs. of Wildlife*, 504 U.S. at 561; *see Talenti*, 102 F.3d at 576–77; *St. John's United Church*, 520 F.3d at 463 (dismissing petition where petitioners had "not shown a 'substantial probability' that Chicago would scrap the O'Hare project if the court vacated the $29.3 million grant.").  The Court in *Buffalo River* does not point to a single FSA regulation or statute to supports its holding.  *See Buffalo River*, 2014 WL 6837005, at \*3–4.  In failing to make the necessary legal inquiry, the *Buffalo River* court reaches a decision inconsistent with the law of this Circuit, which requires that Plaintiff demonstrate that the relief sought is likely to redress the injury.  *See Sierra Club*, 825 F. Supp. 2d at 151

(plaintiffs' standing doubtful where plaintiffs failed to show that relief sought "would imperil the project").  If the court there had made even a cursory inquiry into the scope of FSA's regulations and enabling statutes it would have identified that, contrary to its holding, FSA does not have ongoing authority over the farm.[6]

Therefore, Plaintiff's reliance on this case is misplaced and it does not save Plaintiff's claims from dismal for mootness and lack of redressability.

### 4.     The Plaintiff Concedes it does not Challenge FSA's Compliance with the CONACT

Plaintiff clarifies in its Opposition that it does not attempt, directly or indirectly, to bring claims asserting that FSA issued the Guarantee at issue in violation of the CONACT, 7 U.S.C. § 1921 *et seq.*, or its implementing regulations, 7 C.F.R. § 762 *et seq.  See* Pl. Opp. at 31–37.  Prior to receiving Plaintiff's Opposition this was less than clear from Plaintiff's Complaint, *see e.g.* ¶¶ 4, 5.c, 45, and from statements in Plaintiff's Motion to Compel which suggest that the loan documents are somehow necessary for this Court to review Plaintiff's NEPA claims.  *See* ECF No. 18 at 14–21 (as discussed above, the loan guarantee process is enabled by specific regulations, the NEPA process similarly is governed by its own unique regulations).  Plaintiff's clarification in its Opposition is appreciated.  Because Plaintiff does not challenge FSA's compliance with the CONACT in issuing the Guarantee, and does not seek to use NEPA to inquire into financial concerns beyond the scope of its self-limited claim as to whether FSA has

---

[6] Plaintiff's reliance on *Buffalo River* is further undermined by the EA issued on remand in that case.  The agencies, FSA and the Small Business Administration, jointly issued a revised EA to comply with the court's order that by its own terms acknowledges that vacating the loan guarantee would not cause cessation of operations at C&H Farms.  The EA notes that in the event the guarantee were withdrawn, the lender "Farm Credit Services of Western Arkansas, would be free to continue their financial relationship without Federal guarantees and C&H Hog Farms could continue its operations in compliance with its NPDES General Permit."  *Buffalo River*, 4:13-cv-00450-DPM, ECF. No. 81-1 at 2.  The court subsequently adopted the revised EA.  *Id.* at ECF No. 82.

conducted an appropriate environmental analysis under NEPA, the Court need not adjudicate

whether Plaintiff falls within the zone of interest of the CONACT.

## IV.         CONCLUSION

For the foregoing reasons, Plaintiff's claims are moot and lack redressability because

there is no remedy this Court can offer.  Further, the Plaintiff's clarification that it brings no

challenges to the Guarantee under the CONACT obviate the need for the Court to adjudicate

matters under that statute.  Defendants therefore respectfully request the Court grant their motion

to dismiss Plaintiff's Complaint in its entirety under Rule 12(c).

Respectfully submitted on this 13th day of April, 2018.


JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division


*/s/ Lila C. Jones*
LILA C. JONES (NM 148098)
Trial Attorney
Natural Resources Section
601 D Street, NW
Washington, D.C. 20004
Phone: (202) 514-9859
Fax:  (202) 305-0506
NM Bar No. 148098
lila.jones@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 13th day of April, 2018, I filed the foregoing documents electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/  *Lila C. Jones*
Lila C. Jones
Attorney for Defendants