# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FOOD & WATER WATCH,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

        Defendants.

Civil Action No. 17-1714 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Food & Water Watch ("FWW"), has filed a nine-count complaint against three defendants, the United States Department of Agriculture ("USDA"), the Farm Service Agency ("FSA"), and Deanna Dunning, in her official capacity as an FSA Farm Loan Officer (collectively, "defendants"), under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–70, seeking an order and judgment setting aside an environmental assessment completed by the defendants in connection with a nonparty farm's "application for a guaranteed loan to construct and operate a poultry concentrated animal feeding operation," "[d]eclaring that Defendants violated NEPA by failing" to complete an adequate environmental impact statement in connection with the loan application, and "[e]njoining implementation of Defendants' loan guarantee."  Compl. ¶¶ 1, 5, ECF No. 1.  The defendants have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), contending that the plaintiff's claims are moot and that the plaintiff lacks standing, *see generally* Defs.' Mot. J. Pleadings ("Defs.' Mot."), ECF No. 17, while the plaintiff has moved to compel the complete Administrative Record ("AR"), *see generally* Pl.'s

Mot. Compel AR ("Pl.'s Mot. Compel"), ECF No. 18.[1]  For the reasons described below, the

plaintiff's claims are not moot and the plaintiff has standing to pursue this lawsuit.  Accordingly,

the defendants' motion is denied while the plaintiff's motion is granted.[2]

## I.     BACKGROUND

The statutory framework governing the plaintiff's claims is discussed first, followed by

the details of the loan and environmental assessment at issue in this case.

### A.     Statutory Framework

#### 1.     *NEPA Environmental Assessments*

The NEPA represents "a broad national commitment to protecting and promoting

environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)

(citing 42 U.S.C. § 4331), and was created, in part, for the purpose of "establish[ing] a set of

'action forcing' procedures requiring an environmental impact statement on any proposed major

Federal action which could significantly affect the quality of the environment," S. REP. NO. 94-

152, at 3 (1975).  To this end, the NEPA requires federal agencies, "to the fullest extent

possible," to prepare and include an Environmental Impact Statement ("EIS") in "every

recommendation or report on proposals for legislation and other major Federal actions

significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C); *see also*

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 15–16 (2008), and to consider a number of

factors, including "the environmental impact of the proposed action," "any adverse

---

[1]     In support of the plaintiff's motion to compel, the plaintiff offered a declaration with accompanying
exhibits.  *See generally* Decl. of Tarah Heinzen (FWW) ("Heinzen Decl."), ECF No. 19.  Although each exhibit and
submission from the parties has been reviewed, only those exhibits necessary to provide context for resolution of the
pending motions are cited herein.  Moreover, although the defendants' motion is styled as a "Motion to Dismiss the
Plaintiff's Complaint," Defs.' Mot. at 1, the defendants are seeking such dismissal pursuant to Federal Rule of Civil
Procedure 12(c) and thus seek "judgment on the pleadings" under that Rule, *id.  See also* FED. R. CIV. P. 12(c).
[2]     The defendants' claims essentially amount to an argument that the complaint should be dismissed, under
Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction.  Under either the Rule 12(b)(1) or
the Rule 12(c) standard, however, the defendants' motion would be dismissed for the reasons stated herein.

environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(i)–(iii). "The statutory requirement that a federal agency contemplating a major action prepare such an [EIS] serves NEPA's 'action-forcing' purpose in two important respects," *Robertson*, 490 U.S. at 349, by (1) "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision," *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 188 (D.C. Cir. 2013) (quoting *Robertson*, 490 U.S. at 349).

"The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to" the EIS requirement. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40 C.F.R. § 1500.3). Under these regulations, an agency may prepare "a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Id.* (citing 40 C.F.R. § 1501.4(a)–(b)). An EA is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Id.* (alterations in original) (quoting 40 C.F.R. § 1508.9(a)). If, after conducting an EA, the agency determines that an EIS is not required under the applicable regulations, "it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13). During this

process, the agency "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); *see also Robertson*, 490 U.S. at 349 (noting that this disclosure requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision").

All federal agencies are required to comply with the NEPA and the CEQ regulations, but the regulations "allow each agency flexibility in adapting its implementing procedures." 40 C.F.R. § 1507.1; *see also id.* § 1507.3(a) (requiring agencies to "adopt procedures to supplement these regulations"). At the time of the actions at issue in this lawsuit, the FSA had promulgated such regulations. *See* 7 C.F.R. §§ 1940.301–350 (2015).[3] Those FSA regulations require the preparation of an EA for "Class I" and "Class II" agency actions. *Id.* §§ 1940.311–312 (2015). "Class I" actions are "smaller scale approval actions," *id.* § 1940.311 (2015), including certain expansions of FHA housing projects, certain community and business grant programs, and certain farm programs, *id.* § 1940.311(a)–(c) (2015), and require a less rigorous EA, *id.* § 1940.311 (2015) ("The scope and level of detail of an assessment for a small-scale action, though, need only be sufficient to determine whether the potential impacts are substantial and further analysis is necessary."). "Class II" actions, by contrast, "are basically those which exceed the thresholds established for Class I actions and, consequently, have the potential for resulting in more varied and substantial environmental impacts." *Id.* § 1940.312 (2015). "A

---

[3] The FSA updated its regulations in August 2016, withdrawing the regulations previously codified at 7 C.F.R. §§ 1940.301–350 and replacing them with new regulations codified at 7 C.F.R. §§ 799.1–59. *See generally* FSA, Final Rule, Environmental Policies and Procedures; Compliance with the National Environmental Policy Act and Related Authorities, 81 Fed. Reg. 51,274 (Aug. 3, 2016). The new regulations do "not have retroactive effect," *id.* at 51,283, and accordingly, the regulations in effect at the time of the actions at issue in this lawsuit govern this case.

more detailed environmental assessment is, therefore, required for Class II actions in order to determine if the action requires an EIS." *Id.*

Class II actions include certain actions that "involve a livestock-holding facility or feedlot." *Id.* § 1940.312(b)(1) (2015). As relevant to the instant lawsuit, such actions include "[f]inancial assistance," such as loan guarantees, for "a livestock-holding facility or feedlot located in a sparsely populated farming area having a capacity as large or larger than," *inter alia*, "100,000 laying hens or broilers when [the] facility has unlimited continuous flow watering systems," *id.* § 1940.312(c)(9) (2015), as well as "[f]inancial assistance for a livestock-holding facility or feedlot which either could potentially violate a State water quality standard or is located near a town or collection of rural homes which could be impacted by the facility," *id.* § 1940.312(c)(10) (2015). If the EA for a loan guarantee includes environmental recommendations or mitigation measures to be taken in connection with the loan guarantee, such measures "must be documented in the assessment . . . and placed in the offer of financial assistance as special conditions." *Id.* § 1940.318(g) (2015). In addition, the FSA is responsible for "post-approval inspection and monitoring of approved projects" to "ensure that those measures which were identified in the preapproval stage and required to be undertaken in order to reduce adverse environmental impacts are effectively implemented." *Id.* § 1940.330(a) (2015).

## 2. *The FSA's Guaranteed Farm Loan Program*

The FSA, formerly known as the "Farmers Home Administration," oversees agricultural support programs including, as relevant here, the Guaranteed Farm Loan Program. *See* 7 C.F.R. § 762.101, *et seq.* Under this program, a borrower can apply to have the FSA guarantee a percentage of a loan made by a qualified agricultural lender for purposes including "[a]cquir[ing] or enlarg[ing] a farm"; "[m]ak[ing] capital improvements," such as "the construction, purchase, and improvement of a farm dwelling, service buildings and facilities that can be made fixtures to

5

the real estate"; "[p]romot[ing] soil and water conservation and protection"; "[p]ay[ing] closing costs"; and "[r]efinancing indebtedness incurred for authorized [farm ownership loan] and [operating loan] purposes." *Id.* § 762.121(b)(1)–(5). The FSA's guarantee "will not exceed 90 percent based on the credit risk to the lender and the Agency both before and after the transaction," *id.* § 762.129(a), but the precise percentage of the guarantee is left to the FSA, *id.* As part of their application for an FSA loan guarantee, borrowers must certify that they are "unable to obtain sufficient credit elsewhere without a guarantee to finance actual needs at reasonable rates and terms." *Id.* § 762.120(h)(1).

Once the FSA has guaranteed a loan, "[l]enders are responsible for servicing the entire loan in a reasonable and prudent manner, protecting and accounting for the collateral, and remaining the mortgagee or secured party of record." *Id.* § 762.140(a)(1). Lenders must also "[e]nsur[e] the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm." *Id.* § 762.140(b)(3). The FSA stays involved, however, and is responsible for "post-approval inspection and monitoring of approved projects" to "ensure that those measures which were identified in the preapproval stage and required to be undertaken in order to reduce adverse environmental impacts are effectively implemented." *Id.* § 1940.330(a) (2015).

### B. The FSA's Loan Guarantee for the One More Haul Farm Concentrated Animal Feeding Operation

This lawsuit arose from nonparty One More Haul farm's ("OMH's") application for an FSA-guaranteed loan "to construct and operate a poultry concentrated animal feeding operation," or "CAFO," in Caroline County, Maryland, on a 114.9-acre parcel of land. Compl. ¶¶ 1, 46. According to the Complaint, OMH applied for a loan guarantee through the Guaranteed Farm Loan Program in 2015 "in order to purchase land and construct and operate a poultry CAFO on

6

it, consisting of four broiler chicken houses, a manure structure, and a mortality composting structure." *Id.* ¶ 42. The OMH CAFO, which is now built and operating, "houses 192,000 birds at one time, and will have an average of 5.6 flocks per year, producing more than 1,000,000 birds and their waste each year." *Id.* ¶ 46. Accordingly, a federal loan guarantee for OMH's CAFO qualifies as a Class II action for which a complete EA is required. *See* 40 C.F.R. § 1940.312(c)(9)–(10) (2015); Defs.' Mem. Supp. Mot. J. Pleadings ("Defs.' Mem.") at 2, ECF No. 17-1 ("FSA is required to complete an environmental review prior to making a commitment to issue a loan guarantee.").

As required by the NEPA and the corresponding regulations, the FSA completed a draft EA describing the environmental impacts of the proposed CAFO, which was made available for public comment on May 22, 2015. *Id.* ¶ 43. On July 20, 2015, the plaintiff and one of its members submitted comments on the draft EA. *Id.* Two days later, on July 22, 2015, the FSA finalized the EA "with no substantive changes," and the loan guarantee was signed and approved the next day. *Id.*; *see also* Defs.' Answer ¶ 43, ECF No. 12. The total loan amounted to approximately $1,217,000, of which the FSA guaranteed the maximum 90 percent, or approximately $1,095,300. Compl. ¶ 42; *see also* 7 C.F.R. § 762.129(a).[4]

The plaintiff alleges that, during the EA process, "FSA initially failed to make many key documents available to Plaintiff and the public during the comment period" and that the plaintiff "was forced to file a Freedom of Information Act (FOIA) request to obtain them." Compl. ¶ 44. In addition, the plaintiff argues that the EA prepared for the OMH CAFO was inadequate, given its failure to address several environmental impacts. Specifically, the plaintiff contends that the EA failed to consider "the potential water quality impacts on the Corsica River due to the land

---

[4] The details of the approved loan, including the term of the loan and the remaining balance of the loan, remain unknown on the record before the Court.

application of waste from OMH," *id.* ¶ 52; "the unusual density of chicken production at the site, and the fact that it dramatically exceeds the average density of the region's numerous other broiler chicken CAFOs," *id.* ¶ 54; "the effects of OMH's water withdrawals," *id.* ¶ 55; the effect on the "27 migratory birds of concern [that] might be affected by the proposed project" or the "potential effects on biological resources," *id.* ¶ 56; the "air impacts" of the CAFO, *id.* ¶ 57; or the "cumulative impacts of th[e] proliferation and concentration" of CAFOs in the surrounding area, *id.* ¶ 59. The plaintiff also contends that the defendants failed to analyze OMH's Nutrient Management Plan, Stormwater Management Plan, and Conservation Plan, under which the CAFO was to operate. *Id.* ¶ 53.

### C. Litigation History

Plaintiff FWW, a District of Columbia "non-profit corporation that champions healthy food and clean water for all by standing up to corporations that put profits before people and advocating for a democracy that improves people's lives and protects the environment," *id.* ¶ 8, filed its complaint on August 23, 2017, alleging violations of the NEPA and the APA based on the defendants' failure to conduct an adequate EA and EIS for the OMH CAFO, *id.* ¶¶ 60–121. FWW "has thousands of members who reside in Maryland, including a member who resides next door to the OMH CAFO" and "lives in such close proximity to the CAFO that it is decreasing the enjoyment and privacy of her home and causing her concern over potential adverse health impacts." *Id.* ¶ 8. This member "owns property and lives in the area that is directly impacted by the CAFO's dust, dander, noise, smell, ventilation fans, truck traffic, manure storage facilities, and mortality composting area," and this proximity to the CAFO has subjected her to "loud noises at all hours of the day, bright lights that remain on all night, foul odors, and large numbers of flies in and around her residence." *Id.* In addition, she "is concerned that she and her visitors will experience adverse health effects from the CAFO's pollution," and she is "fearful to allow

family members with asthma to visit because they may be more susceptible to air pollution." *Id.*
Another FWW member "regularly fishes for bass in Watts Creek—which is in the vicinity of the
CAFO—and the downstream Choptank River"; "has invested significant time and resources into
creek stocking and restoration projects"; and "is concerned about the CAFO's likely water
pollution impacts and the general impacts of industrial development on the character and
aesthetic beauty of the areas where he fishes." *Id.*

In accord with the Scheduling Order proposed by the parties and entered by the Court,
*see* Minute Order (dated Nov. 13, 2017), on December 6, 2017, the defendants produced an
Administrative Record and filed an index of the Administrative Record with the Court, *see*
Notice of Lodging of AR Index ("AR Notice") at 1, ECF No. 14. Shortly thereafter, however,
the parties advised that "they ha[d] reached an impasse as to the documents that should be
included in the Administrative Record." Jt. Status Report (dated Feb. 16, 2018) at 2, ECF No.
16. The plaintiff contended that the Administrative Record was incomplete because it did not
include "records related to the Farm Service Agency's federal loan guarantee," *id.* at 3, including
"the loan guarantee application—which triggered FSA's NEPA analysis—and the loan guarantee
itself, which is the federal action Plaintiff challenges," *id.* at 4. The defendants, in turn, argued
that "the Complaint suffers from incurable jurisdictional defects" that "will obviate the need for
further litigation." *Id.* at 2. The Court accordingly set a briefing schedule for both the
defendants' motion for judgment on the pleadings and the plaintiff's motion to supplement the
Administrative Record, which motions are now ripe for review.

## II.  LEGAL STANDARD

### A.  Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment "[a]fter
the pleadings are closed—but early enough not to delay trial." FED. R. CIV. P. 12(c). A Rule

12(c) motion "shall be granted if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002) (internal quotation marks omitted); *see also Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987) (explaining that "Rule 12(c) requires that the movant show, at the close of the pleadings, that no material issue of fact remains to be solved, and that he or she is clearly entitled to judgment as a matter of law"), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006); *Noel v. Olds*, 149 F.2d 13, 14 (D.C. Cir. 1945) (noting that "if material questions of fact are presented by the pleadings, the remedy by motion for judgment on the pleadings under Rule 12(c) is not available"). In deciding a motion brought under Rule 12(c), a court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Moore v. United States*, 213 F.3d 705, 713 n.7 (D.C. Cir. 2000) (internal quotation marks omitted); *see also Schuchart v. La Taberna Del Alabardero, Inc.*, 365 F.3d 33, 34 (D.C. Cir. 2004) (noting that under Rule 12(c), facts "must be read in the light most favorable to the non-moving parties, . . . granting them all reasonable inferences").

A court may not consider "matters outside the pleadings" without converting the motion to one for summary judgment. FED. R. CIV. P. 12(d); *see also Stephens v. Kemp*, 469 U.S. 1043, 1057 (1984) (Brennan, J., dissenting from denial of certiorari) ("Rule 12(c), for example, provides that if a court considers matters outside the pleadings in determining whether to enter judgment, the motion shall be considered as one for summary judgment and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion." (internal quotation marks omitted)). Nevertheless, without triggering the conversion rule, a court may consider "documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013).

**B.      Motion to Supplement an Administrative Record**

Under the APA, "the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  "The record consists of the order involved, any findings or reports on which that order is based, and 'the pleadings, evidence, and other parts of the proceedings before the agency.'"  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (quoting FED. R. APP. P. 16(a)).  As the Supreme Court has explained, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).  Otherwise, the reviewing court would consider *de novo* material not included in the agency record and "reach its own conclusions based on such an inquiry."  *Id.* at 744.  Such a *de novo* inquiry is inconsistent with applying the arbitrary and capricious standard, where "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Hence, "[i]t is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made."  *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997); *see also Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984))); *Deukmejian v. NRC*, 751 F.2d 1287, 1325 (D.C. Cir. 1984) ("Were courts cavalierly to supplement the record, they would be

tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President."), *vac'd in part on other grounds*, 760 F.2d 1320 (D.C. Cir. 1985) (en banc). When "the record before the agency does not support the agency action, [ ] the agency has not considered all relevant factors, or [ ] the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light*, 470 U.S. at 744.

Supplementation of the administrative record is only appropriate in exceptional or "unusual" circumstances. *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) ("[W]e do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'" (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991))); *see also Am. Wildlands*, 530 F.3d at 1002. The D.C. Circuit has recognized three narrow instances in which supplementation of an administrative record may be appropriate before reaching the merits of an APA challenge to agency action: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information was needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *City of Dania Beach*, 628 F.3d at 590 (quoting *Am. Wildlands*, 530 F.3d at 1002). Underlying these exceptions, however, is the strong presumption that an agency has properly compiled the entire record of materials that it considered, either directly or indirectly, in making its decision. *See Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) ("Although an agency may not unilaterally determine what

constitutes the administrative record, the agency enjoys a presumption that it properly designated the administrative record absent clear evidence to the contrary.").

## III. DISCUSSION

The defendants have moved for judgment on the pleadings, arguing that the plaintiff's claims are moot and that the plaintiff lacks standing to bring this action. *See* Defs.' Mem. at 5–14. The plaintiff has also moved to supplement the Administrative Record. *See* Pl.'s Mot. Compel at 9–21. These issues are addressed in turn.

### A. The Plaintiff's Claims Are Not Moot

Under Article III of the United States Constitution, this Court "may only adjudicate actual, ongoing controversies." *District of Columbia v. Doe*, 611 F.3d 888, 894 (D.C. Cir. 2010) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). The mootness doctrine prohibits the court from deciding a case if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)); *see also Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 272 (D.C. Cir. 2015).

"A case becomes moot . . . 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012)). Yet, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 43 (D.C. Cir. 2015) (explaining that a case is not moot where "the court has the 'power to effectuate a partial remedy'" (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))); *Schnitzler v. United States*, 761 F.3d 33, 39 (D.C. Cir. 2014) (holding a plaintiff's "claim is not moot" where "he has not received all the

relief he sought"); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974))). A party's "'prospects of success' on [ ] a claim are 'not pertinent to the mootness inquiry.'" *Schnitzler*, 761 F.3d at 39 n.8 (quoting *Chafin*, 568 U.S. at 174).

The defendants contend that the plaintiff's claims are moot because they "are based on a 2015 EA/FONSI for a poultry farm that is completely constructed and operational," Def.'s Mem. at 7, and because the FSA "has no direct authority over the farm's operations" or "legal authority over the project in question," Defs.' Reply Supp. Mot. J. Pleadings ("Defs.' Reply") at 7, ECF No. 23. The plaintiff counters that these claims are not moot because "completed construction of the CAFO does not moot" the claims, Pls.' Opp'n Defs.' Mot. J. Pleadings ("Pl.'s Opp'n") at 15, ECF No. 20 (capitalization omitted), given that the defendants "have continuing authority, control and obligations related to the ongoing loan guarantee," *id.* at 11 (capitalization omitted). The plaintiff has the better arguments.

The defendants fail to acknowledge that the agency action at issue—the FSA's loan guarantee for the OMH CAFO—is ongoing. The facts in the complaint indicate that the FSA approved the loan guarantee on July 23, 2015, for the maximum 90 percent of the loan, or $1,095,300. Compl. ¶ 42. This guarantee continues today, and if the FSA were to revoke its guarantee, 90 percent of the loan would be left without a guarantor, potentially exposing the lender to substantial risk and jeopardizing the funding for the OMH CAFO. *See* Pl.'s Opp'n at 12–13. In addition, the statutes and regulations regarding FSA loan guarantees contemplate the agency's ongoing obligations and responsibilities in connection with a guarantee. For example,

the Secretary of Agriculture must "require [ ] an annual review of the credit history and business operation of the borrower," as well as "an annual review of the continued eligibility of the borrower for the loan," 7 U.S.C. § 1983(2)(A)–(B), and must also "require such provision for supervision of the borrower's operations as the Secretary shall deem necessary to achieve the objectives of the loan and protect the interests of the United States," *id.* § 1983(4).  Under the FSA's Guaranteed Farm Loan Program regulations, lenders must "notify the Agency of any scheduled inspections during construction and after the guarantee has been issued." 7 C.F.R. § 762.130(d)(2).  The FSA is also required to approve releases from liability upon an individual's withdrawal from the farming operation or upon liquidation, *id.* § 762.146(b)–(c), and must be notified of any interest rate changes, *id.* § 762.146(d)(5).  Moreover, under the FSA regulations in effect at the time of the loan guarantee at issue, the FSA was responsible for "post-approval inspection and monitoring of approved projects" to "ensure that those measures which were identified in the preapproval stage and required to be undertaken in order to reduce adverse environmental impacts are effectively implemented." *Id.* § 1940.330(a) (2015).  Thus, the FSA remains involved in the OMH CAFO through its ongoing guarantee of 90 percent of the loan and the responsibilities associated with that guarantee.

This continued involvement indicates that the plaintiff can be afforded effectual relief through a court order.  For example, in response to a court order requiring the FSA to undertake additional environmental assessments, the FSA could revoke its guarantee or add conditions to its continuing guarantee of the loan, which could include requiring additional environmental restrictions or mitigating measures. *See* 7 C.F.R. § 1940.318(g) (2015) (requiring that mitigation measures be included "in the offer of financial assistance as special conditions").  Indeed, the D.C. Circuit has relied on precisely this reasoning in concluding that a NEPA challenge to the

construction of an oil pipeline was not moot. *See Sierra Club*, 803 F.3d at 43. In that case, the intervenor-defendant pipeline company argued that the appeal was moot "because the agencies have already granted the various authorizations at issue and construction of the pipeline is now complete," *id.*, but the court rejected that argument "because an order wholly or partly enjoining operation of the pipeline, pending further analyses of the pipeline's environmental impact, would provide some degree of 'effectual relief,'" *id.* Notably, the agencies' continuing involvement in the pipeline at issue in *Sierra Club* is similar to the FSA's continuing involvement in the OMH CAFO: construction of the pipeline required easements, approvals, and permits from the Army Corps of Engineers and the Bureau of Indian Affairs, some of which required NEPA analyses. *See id.* at 35–36. Although the pipeline had been completed by the time of the appeal, the D.C. Circuit noted that the agencies could still "call for additional mitigation and monitoring, or could decide not to renew their respective authorizations," indicating that the appeal was not moot despite the completion of the project. *Id.* at 43. Although the defendants cite *Sierra Club*, *see* Defs.' Mem. at 6–7; Defs.' Reply at 6–8, they fail to grapple with these salient aspects of the decision that undermine their mootness argument.

Similarly, the plaintiff correctly points to *Buffalo River Watershed Alliance v. Department of Agriculture*, No. 13-cv-450, 2014 WL 6837005 (E.D. Ark. Dec. 2, 2014), a case with similar facts to the pending lawsuit, that relied on the same reasoning to find that the plaintiffs had established a redressable injury. In *Buffalo River*, the plaintiffs alleged that the FSA and the Small Business Administration had conducted an inadequate environmental review in guaranteeing loans for a pig CAFO. *Id.* at *1. The court concluded that the agencies could "still take the hard look at [the CAFO's] environmental consequences that they should have in the beginning," *id.* at *3, and noted that "if that hard look requires the Agencies to put conditions

on their guaranties, then it's likely that [the CAFO] will comply with those conditions," *id.* Similar relief could be awarded in this case.

The defendants cite several cases in support of their argument that completion of the CAFO renders the plaintiff's claims moot, but these cases are distinguishable. In *Lechliter v. University of Delaware*, No. 12-cv-16, 2015 WL 12827782 (D. Del. Jan. 16, 2015), the court found that the plaintiffs' challenge to the construction and operation of wind turbines was moot because "the wind turbine is already fully constructed and operational," "the majority of the [Department of Energy's] funding (more than 95 percent) has been spent," and "the [Department's] involvement in the project is finished." *Id.* at *4 n.7. Here, by contrast, the FSA continues to guarantee 90 percent of the loan used to construct and operate the OMH CAFO, and thus the FSA's involvement in the project is ongoing. Similarly, in *Neighborhood Transportation Network, Inc. v. Pena*, 42 F.3d 1169 (8th Cir. 1994), the plaintiffs sought to enjoin a highway construction project known as the "3HOV" project, *id.* at 1171, but the court concluded that the case was moot because "[c]onstruction on the 3HOV project is now finished" and "[a]n order enjoining defendants from further construction on the 3HOV project would serve no purpose and afford plaintiffs no relief," *id.* at 1172. As discussed above, however, relief could be afforded in this case because the FSA's loan guarantee is still ongoing. The FSA could revoke its guarantee pending further environmental analysis or could impose additional conditions on its guarantee, thereby affording the plaintiff some measure of relief. *See also Native Ecosystems Council v. Krueger*, 649 F. App'x 614, 615 (Mem.) (9th Cir. 2016); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 871 (9th Cir. 2005); *One Thousand Friends of Ia. v. Mineta*, 364 F.3d 890, 893 (8th Cir. 2004); *Airport Neighbors All., Inc. v.*

*United States*, 90 F.3d 426, 429 (10th Cir. 1996); *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1525 n.3 (10th Cir. 1993).

The defendants' arguments also must be rejected as a prudential matter. Accepting the defendants' broad argument that "NEPA claims based on completed projects are moot," Defs.' Reply at 6, would strip potential plaintiffs of the ability to pursue NEPA claims for projects that are competed before a case makes its way through the judicial system. Such a conclusion might even incentivize agencies and private parties to speed through construction projects to avoid NEPA challenges. As the D.C. Circuit has recognized, "[i]f the fact that projects are built and operating were enough to make a case nonjusticiable, agencies and private parties could merely ignore the requirements of NEPA . . . , build their structures before a case gets to court, and then hide behind the mootness doctrine." *Sierra Club*, 803 F.3d at 44 (internal quotation marks and alterations omitted). Rather, courts should look to whether a court order could "provide some degree of 'effectual relief.'" *Id.* at 43 (quoting *Church of Scientology*, 506 U.S. at 12–13). The plaintiff in this case challenges not only the construction of the OMH CAFO but also its continued operation, *see* Compl. ¶ 1, and accordingly, a court order requiring FSA to reevaluate its guarantee, conduct additional environmental assessments, or add conditions to the guarantee could provide the plaintiff with the desired relief, *see Sierra Club*, 803 F.3d at 44 ("Even assuming claims 'relating to the *construction* of' the pipeline were moot, 'we may still consider whether [the agencies] complied with NEPA by adequately addressing the environmental impacts resulting from the enhanced *use* of' it." (emphasis and alteration in original) (quoting *Airport Neighbors All.*, 90 F.3d at 429)). Thus, the court still has the "power to effectuate a partial remedy" in this case, *Church of Scientology*, 506 U.S. at 13, and the plaintiff's claims are not moot.

### B. The Plaintiff Has Standing to Pursue Its Claims

The defendants next contend that the plaintiff lacks standing because "its alleged injury cannot be redressed by any action FSA can take." Defs.' Mem. at 7.[5] Again, the defendants' argument is misplaced.

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. FEC*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Where, as here, organizations claim representational standing on behalf of their members, the organizations may bring suit so long as (1) "at least one of their members would otherwise have standing to sue in his or her own right"; (2) "the interests they seek to protect are germane to their organizations' purposes"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Air All. Houston v. EPA*, No. 17-1155, 2018 WL 4000490, at *5 (D.C. Cir. Aug. 17, 2018) (quoting *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014)). Thus, the Court's organizational standing analysis involves two distinct determinations: first, whether the organization has put forward members who "would otherwise have standing to sue in their own right," and second, whether the organization itself fulfills the remaining requirements for organizational standing. *Id.* (quoting *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007)). These two determinations are taken in turn.

---

[5] The defendants also argue that the plaintiff lacks standing to pursue its NEPA claims "because it falls outside the 'zone of interests' regulated by" the Consolidated Farm and Rural Development Act ("CONACT"), 7 U.S.C. § 1921, *et seq.*, given that the "Plaintiff is not an intended beneficiary of the CONACT or its implementing regulations because Plaintiff is neither an agricultural lender nor a farm loan applicant." Defs.' Mem. at 11–12. The plaintiff does not allege any claims under the CONACT, however, and does not cite to that law anywhere in its complaint. *See* Pls.' Opp'n at 31–33. Thus, the defendants now agree that "the Court need not adjudicate whether Plaintiff falls within the zone of interest of the CONACT," Defs.' Reply at 16, and that issue will not be addressed.

1. ***At Least One of the Plaintiff's Members Would Have Standing to Sue in His or Her Own Right***

To establish Article III standing as an individual, a claimant must show: (1) that he or she has suffered an "injury in fact" that is (a) "concrete and particularized" and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that it is "likely," as opposed to merely speculative, that the injury will be "redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014); *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

These traditional standing requirements differ slightly where, as here, the plaintiff seeks to enforce procedural, rather than substantive, rights. *See Mendoza*, 754 F.3d at 1010. "When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest." *Id.* (citing *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)). Once the plaintiff has shown a "concrete interest" that is more than "a mere general interest in the alleged procedural violation common to all members of the public," *id.* (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664), "the normal standards for immediacy and redressability are relaxed," *id.* (citing *Lujan*, 504 U.S. at 572 n.7). Thus, the plaintiff "need not demonstrate that but for the procedural violation the agency action would have been different," *id.* (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)), and does not need to "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiff's interest," *id.* "Rather, if the plaintiff[ ] can 'demonstrate a causal relationship between the final agency action and the alleged injuries,' the court will 'assume[ ] the causal relationship between the procedural defect and the final agency action.'" *Id.* (alteration in original) (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1160).

The defendants "do not believe the Complaint demonstrates that Plaintiff has alleged a sufficiently concrete injury that is traceable to FSA." Defs.' Mem. at 8 n.1. Nonetheless, because the defendants believe that "even in the event that Plaintiff could meet those requirements, the claims cannot be redressed by any action the Agency can take," *id.*, they focus only on redressability and do not discuss injury in fact or causation. The plaintiff thus "limits its response to the challenge raised in the government's motion" and similarly addressed only redressability. Pl.'s Opp'n at 21 n.7. The law is well established, however, that "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," *Lujan*, 504 U.S. at 561, and that "[w]hen there is doubt about a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be," *Lee's Summit, Mo. v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000). Accordingly, injury in fact and causation are addressed first, followed by redressability.

a)      *Injury in Fact and Causation*

The Supreme Court has explained that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (finding affidavits from environmental groups' members "attesting to those members' aesthetic interests in the land . . . and specific plans to visit the area regularly for recreational purposes" sufficient to support Article III standing). Moreover, as discussed above, plaintiffs alleging procedural violations need only establish that "the agency action threatens their concrete interest," *Mendoza*, 754 F.3d at 1010 (citing *Fla. Audubon Soc'y*, 94 F.3d at 664), and

that this concrete interest is more than "a mere general interest in the alleged procedural violation common to all members of the public," *id.* (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664).

The plaintiff has established an injury in fact "with the manner and degree of evidence required" at this stage in the litigation. *Lujan*, 504 U.S. at 561. The complaint describes two of the plaintiff's members who are harmed by the ongoing operation of the OMH CAFO. One member lives next door to the OMH CAFO and has been subjected to "loud noises at all hours of the day, bright lights that remain on all night, foul odors, and large numbers of flies in and around her residence," such that she is now "concerned that she and her visitors will experience adverse health effects from the CAFO's pollution" and is "fearful to allow family members with asthma to visit because they may be more susceptible to air pollution." Compl. ¶ 8. A second member "regularly fishes for bass in Watts Creek—which is in the vicinity of the CAFO—and the downstream Choptank River." *Id.* This member "has invested significant time and resources into creek stocking and restoration projects" and "is concerned about the CAFO's likely water pollution impacts and the general impacts of industrial development on the character and aesthetic beauty of the areas where he fishes." *Id.* These harms affect the recreational and aesthetic interests of the plaintiff's members and are concrete enough to be more than "a mere general interest in the alleged procedural violation common to all members of the public," *Mendoza*, 754 F.3d at 1010 (citing *Fla. Audubon Soc'y*, 94 F.3d at 664), such that these interests are sufficient to establish an injury in fact. *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").

Moreover, the injury in fact alleged by the plaintiff through its members is traceable to and caused by the defendants' actions. Under the relaxed procedural standing requirements, the court "assumes the causal relationship between the procedural defect and the final agency action," but the plaintiff "must still demonstrate a causal relationship between the final agency action and the alleged injuries." *Ctr. for Law & Educ.*, 396 F.3d at 1160. Here, the alleged procedural defect is "an inadequate EA/FONSI describing the environmental impacts of the CAFO," Compl. ¶ 43, which led to the final agency action of "approv[ing] the loan guarantee," *id.* This final agency action resulted in the FSA guaranteeing 90 percent of the loan "for the purpose of constructing and operating a poultry farm on the designated parcel of real estate." Defs.' Mem. at 4 (citing Compl. ¶¶ 42–43). A loan for the OMH CAFO would have been unlikely without this guarantee, given that an applicant for an FSA loan guarantee must certify that the applicant is "unable to obtain sufficient credit elsewhere without a guarantee to finance actual needs at reasonable rates and terms." 7 C.F.R. § 762.120(h)(1). Since the applicant would be unable to obtain sufficient credit elsewhere, the lack of an FSA guarantee likely would mean no loan, and no loan would mean no CAFO. This causal link is sufficient to establish a causal relationship between the final agency action—the loan guarantee—and the plaintiff's claimed injuries.

b)      *Redressability*

The defendants focus on redressability, arguing that "[b]ecause the remedy sought by the Plaintiff will not redress Plaintiff's injuries, the Plaintiff lacks standing, and its claims should be dismissed." Defs.' Mem. at 8. The plaintiff, in turn, argues that, "[f]or many of the same reasons that this case is not moot, an order from this Court vacating or otherwise enjoining the loan guarantee 'at least until alleged NEPA deficiencies are cured' will redress Plaintiff's injuries." Pl.'s Opp'n at 21. The plaintiff, again, has the better argument.

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663–64 (footnote omitted). As discussed above, the redressability requirement is relaxed in cases involving procedural violations, such that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. The plaintiff in such a case does not need to "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiff's interest." *Mendoza*, 754 F.3d at 1010. "Rather, if the plaintiff[ ] can 'demonstrate a causal relationship between the final agency action and the alleged injuries,' the court will 'assume the causal relationship between the procedural defect and the final agency action.'" *Id.* (alteration omitted) (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1160). Thus, for example, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan*, 504 U.S. at 572 n.7.

The plaintiff satisfies the relaxed redressability requirement for procedural violations. By virtue of the FSA's continuing guarantee of the OMH CAFO's loan, the FSA continues to exert some control over the CAFO and maintain some involvement in the CAFO's ongoing operations. If, for example, a court order directed the FSA to withdraw its loan guarantee pending further environmental assessments or to conduct a supplemental environmental assessment and impose additional conditions on its guarantee, the plaintiff's alleged injury would, in some measure, be redressed. Indeed, the defendants concede that "this Court has the power to remand the

EA/FONSI for reconsideration or further explanation and to vacate the loan guarantee," Defs.'
Mem. at 10, but they argue that "neither of those actions would prevent the continuing operation
of the poultry farm," *id.* The plaintiff has established, however, that "an order enjoining
payments on the loan guarantee until NEPA compliance was achieved would redress Plaintiff's
procedural rights because the CAFO would be unlikely to risk losing the federal guarantee [by]
ignoring its NEPA obligations." Pl.'s Opp'n at 24. Given that the FSA guarantees 90 percent of
the OMH CAFO loan, the temporary withdrawal or revocation of that guarantee would put a
substantial portion of the OMH CAFO's funding at risk. If, as a result of further environmental
assessments, the FSA were to impose additional mitigation measures or conditions on its
guarantee, the OMH CAFO would likely comply with those conditions, given that the CAFO
would be "unable to obtain sufficient credit elsewhere . . . at reasonable rates and terms." 7
C.F.R. § 762.120(h)(1). Thus, the plaintiff's injury would likely be redressable by a court order
requiring a reevaluation of the FSA's loan guarantee pending further environmental assessments.

　　The defendants nevertheless contend that, despite the relaxed redressability standard for
procedural violations, "[d]emonstrating redressability is substantially more difficult when the
plaintiff is not subject to the challenged government action" and "[w]hen the plaintiff seeks to
change the behavior of the defendant only as a means to alter the conduct of a third party." 
Defs.' Mem. at 8 (internal quotation marks omitted). In cases where "the necessary elements of
causation and redressability . . . hinge on the independent choices of the regulated third party, 'it
becomes the burden of the plaintiff to adduce facts showing that those choices have been or will
be made in such manner as to produce causation and permit redressability of injury.'" *Nat'l
Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*,
504 U.S. at 562)). In this case, however, the plaintiff has offered more than "mere 'unadorned

speculation' as to the existence of a relationship between the challenged government action and the third-party conduct.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)). The plaintiff's members' injuries derive from the construction and ongoing operation of the OMH CAFO, *see* Compl. ¶¶ 1, 8, 48, and, given the borrower's inability to "obtain sufficient credit elsewhere," 7 C.F.R. § 762.120(h)(1), that construction and operation was made possible by the FSA's guarantee of 90 percent of the loan. While the defendants accuse the plaintiff of attempting to "convert the [FSA] into an environmental regulator," Defs.' Reply at 1, the gravamen of the plaintiff's complaint is that the FSA must comport with the NEPA. Given that the FSA must follow NEPA guidelines in issuing a loan guarantee and has continuing control over the loan guarantee that makes the continued operation of the CAFO possible, the relaxed redressability requirement is satisfied.

The defendants cite *Center for Biological Diversity v. U.S. Department of Housing & Urban Development*, 541 F. Supp. 2d 1091 (D. Ariz. 2008), as an example in support of their third-party argument. *See* Defs.' Mem. at 10–11. As the plaintiff notes, however, "[t]his is a curious case to cite for the argument that this Court should dismiss this case for lack of standing" since the plaintiffs in that case "had standing to challenge the agencies' loan guarantees." Pl.'s Opp'n at 28. The plaintiffs in that case challenged the defendants' compliance with the Endangered Species Act in connection with providing loan guarantees and other financial assistance for residential and commercial development projects around a conservation area. *Ctr. for Biological Diversity*, 541 F. Supp. 2d at 1093–94. The district court first concluded that "the Plaintiffs have standing to bring their claims" because "it is likely, not merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 1095 (citing *Lujan*, 504 U.S. at 560). On the merits, however, the court noted that because the defendant agencies' actions "stop[ped]

at approval based on the financial status and needs of the applicant" and did not have "any ongoing effect beyond simply approving a person or entity for financial assistance," *id.* at 1099, their actions did not amount to "major federal action" that is subject to the Endangered Species Act, *id.* at 1100. Notably, the instant case does not involve a determination of whether the FSA's loan guarantee was a "major federal action"—rather, the parties agree that the loan guarantee required an environmental assessment. *See* Defs.' Answer ¶ 21; Defs.' Mem. at 2. At issue is instead whether the plaintiff's injury is redressable by an order of this Court. Here, unlike in *Center for Biological Diversity*, the FSA remains involved in the project at issue, and given the FSA's continuing guarantee of 90 percent of the loan supporting the OMH CAFO's ongoing operations, the plaintiff has established that "it is likely, not merely speculative, that the injury will be redressed by a favorable decision." *Ctr. for Biological Diversity*, 541 F. Supp. 2d at 1095.

The defendant also attempts to distinguish *Buffalo River*, a case with substantially similar facts to the pending case, arguing that *Buffalo River* "is not supported by reasoning or law, is contrary to the law of this Circuit and has no binding authority here." Defs.' Reply at 13. Although that case is not binding, it is persuasive. To recap, in *Buffalo River*, the plaintiffs claimed that the FSA and the Small Business Administration violated the NEPA by guaranteeing loans for a pig CAFO without conducting adequate EAs. *Buffalo River*, 2014 WL 6837005, at *1. Regarding redressability, the court took note of "the federal Agencies' ongoing role in monitoring any conditions placed on their guaranties," *id.* at *3 (citing 7 C.F.R. § 1940.330), and explained that "[t]he Agencies can still take the hard look at [the CAFO's] environmental consequences that they should have in the beginning," *id.* Thus, "[g]iven the essentialness of the federal Agencies' guaranties and their continuing authority to monitor compliance with any conditions placed on those guaranties," the court found it "likely that more environmental review

will change how [the CAFO] operates its farm." *Id.* at *4. The defendants contend that *Buffalo River* "is inconsistent with controlling D.C. Circuit precedent" and that "[t]he law of this Circuit provides it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Defs.' Reply at 14 (internal quotation marks omitted). That is precisely the standard used in *Buffalo River*, however—the court found it "likely that more environmental review" would change the ways in which the CAFO operated. *Buffalo River*, 2014 WL 6837005, at *4. *Buffalo River* is therefore persuasive in this case, and for similar reasons, the plaintiff here has shown that "[m]ore study of [the OMH CAFO's] environmental consequences, and any resulting conditions on reinstated guarantees, will likely redress [the plaintiff's] injuries." *Id.* Accordingly, the plaintiff has shown injury in fact, causation, and redressability, and has therefore established that at least one of its members would have standing in his or her own right.

### 2. *The Plaintiff Satisfies the Remaining Requirements for Organizational Standing*

The remaining requirements for organizational standing are easily satisfied in this case. The interest that the plaintiff seeks to protect—an interest in remedying the environmental harms caused by the OMH CAFO—is germane to the plaintiff's purpose of "champion[ing] healthy food and clean water for all" and "reduc[ing] CAFO pollution." Compl. ¶ 8. Finally, neither the claims asserted nor the injunctive relief requested would require the participation of the individual members. Thus, the plaintiff meets the requirements for organizational standing, and the defendants' motion for judgment on the pleadings is denied.

### C. The Plaintiff's Motion to Compel the Complete Administrative Record

The plaintiff has moved to compel the complete Administrative Record, contending that the defendants have "refuse[d] to include in the administrative record any documents related to the loan guarantee, including the loan guarantee itself, other than those documents also related to

FSA's NEPA analysis." Pl.'s Mot. Compel at 2. According to the plaintiff, "[t]he loan-related records are critical to evaluating the legality of both of the interrelated federal actions challenged—the loan guarantee approval and the final EA/FONSI for the loan guarantee—and Plaintiff has concrete evidence that these records were before the agency decision makers." *Id.* at 9. In addition, the plaintiff notes that the defendants have "included such documents in the administrative record in a recent, similarly situated case." *Id.* (referring to *Buffalo River*, 2014 WL 6837005).

The defendants previously refused to include the loan-related documents in the Administrative Record, *see* Jt. Status Report at 2–3; Pl.'s Mot. Compel at 3–6. After asking for an extension of time to respond to the plaintiff's motion, the defendants filed a one-page response explaining that they now "agree to provide the Court and the Plaintiff with the financial documents considered by FSA in issuing the guarantee." Defs.' Opp'n Pl.'s Mot. Compel AR ("Defs.' Opp'n Mot. Compel") at 1, ECF No. 22. Although the defendants "do not believe the financial record documents are necessary for judicial review of this case" because the plaintiff "challenges only whether FSA completed an appropriate environmental analysis under NEPA and does not dispute the FSA's financial analysis," *id.*, the defendants have agreed to provide the requested documents "provided that the parties can agree to a protective order that ensures the safety and careful protection of the sensitive financial and personal information contained in the documents," *id.* Accordingly, the plaintiff's motion to compel the complete Administrative Record will be granted, and the defendants shall supplement the Administrative Record with the final loan guarantee and any other loan and loan-guarantee-related documents, including internal and external correspondence, in the possession of the defendants at the time the FSA made its decision to guarantee the OMH CAFO's loan, including, but not limited to, documents

previously disclosed to the plaintiff through any FOIA requests and that have been specifically identified for the government in correspondence.[6] The defendants shall also produce a privilege log identifying and justifying any claims of privilege for materials that continue to be withheld and for any redactions to materials that are included in the Administrative Record. If any portions of this completed Administrative Record contain financial information that the defendants believe should be protected from public dissemination, the defendants may seek appropriate protective measures.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion for judgment on the pleadings is denied and the plaintiff's motion to compel the complete administrative record is granted. An appropriate Order accompanies this Memorandum Opinion.

Date: September 7, 2018

_____
BERYL A. HOWELL
Chief Judge

---

[6]     Regardless of the defendants' cooperation, the plaintiff has satisfied the legal requirements for supplementation of the Administrative Record. The plaintiff's motion explains that "[d]efendant Deanna Dunning was the FSA Farm Loan Officer who was responsible for both reviewing farm loan guarantee applications *and* preparing the environmental assessments," Pl.'s Mot. Compel at 14 (emphasis in original), and thus that "the environmental analysis documents and the loan guarantee application documents are part of one combined agency decision-making process," *id.* These documents were therefore "actually before the decisionmakers," *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012) (internal quotation marks omitted), given that Dunning "was responsible for both the loan guarantee process and the related EA process" and regularly communicated with the lender regarding "various EA documentation necessary to complete the loan guarantee application, including a site plan, documentation showing approval of storm water and erosion control plans, and an approved comprehensive nutrient management plan." Pl.'s Mot. Compel at 16–17 (citing Heinzen Decl., Ex. E, Letter from Deanna Dunning (FSA) to Cara Sylvester (MidAtlantic Farm Credit) (dated Jan. 8, 2015) at 1–2, ECF No. 19-5). Accordingly, even without the defendants' change in position during briefing on the pending motions, the plaintiff has established that the loan-related documents are "background information [ ] needed 'to determine whether the agency considered all the relevant factors," *City of Dania Beach*, 628 F.3d at 590 (quoting *Am. Wildlands*, 530 F.3d at 1002), such that the plaintiff's motion should be granted.