# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FOOD & WATER WATCH,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

        Defendants.

Civil Action No. 17-1714 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff, Food & Water Watch ("FWW"), has brought suit against three defendants, the United States Department of Agriculture ("USDA"), the Farm Service Agency ("FSA"), and Deanna Dunning, in her official capacity as an FSA Farm Loan Officer (collectively, "defendants"), under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, challenging an environmental assessment completed by the defendants in connection with a "federal loan guarantee to construct and operate . . . a poultry concentrated animal feeding operation (CAFO)" owned and operated by a nonparty, "One More Haul Farm (OMH)." Am. Compl. ¶ 1, ECF No. 54. As relief, the plaintiff seeks to vacate and set aside the challenged environmental assessment and to enjoin the related loan guarantee. *Id.* at 38–39; *see also* Pl.'s Mot. Summ. J. & Mem. P. & A. ("Pl.'s Mem.") at 44, ECF No. 57 (requesting order directing the parties "to confer regarding appropriate remedies").

The parties have now cross-moved for summary judgment, *see* Pl.'s Mem.; Defs.' Combined Cross Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Defs.' Cross-Mot."), ECF No. 60, and the plaintiff also moves to strike a declaration submitted by the defendants, *see* Pl.'s Mot.

Strike Decl. William J. Rutter ("Pl.'s Mot. Strike"), ECF No. 61.  For the reasons described below, the plaintiff's motion for summary judgment is denied, the defendants' cross-motion is granted, and the plaintiff's motion to strike is denied as moot.

## I. BACKGROUND

The statutory framework governing the plaintiff's claims is discussed first, followed by the details of the loan guarantee and environmental assessment at issue in this case.

### A. Statutory Framework

#### 1. NEPA Environmental Assessments

NEPA represents "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331).  To this end, NEPA was created, in part, to "establish a set of 'action forcing' procedures requiring an environmental impact statement on any proposed major Federal action which could significantly affect the quality of the environment."  S. REP. NO. 94-152, at 3 (1975) (recounting NEPA's "three major purposes" as part of discussion recommending NEPA amendment).  Among these procedures, NEPA requires federal agencies, "to the fullest extent possible," to prepare and include an Environmental Impact Statement ("EIS") in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also Winter v. NRDC*, 555 U.S. 7, 15–16 (2008).[1]  As part of this process, an agency must consider multiple factors, including "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(i)–(iii).  "The statutory

---

[1]     "Human environment" has been "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment."  40 C.F.R. § 1508.14.

requirement that a federal agency contemplating a major action prepare such an [EIS] serves NEPA's 'action-forcing' purpose in two important respects," *Robertson*, 490 U.S. at 349, by (1) "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision," *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 188 (D.C. Cir. 2013) (quoting *Robertson*, 490 U.S. at 349).

Notably, NEPA is "'essentially procedural,'" intended only "to ensure 'fully informed and well-considered decision[s]' by federal agencies." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (alteration in original) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). In other words, NEPA "does not mandate particular results in order to accomplish its ends," *id.* at 1310 (internal quotation mark omitted) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)), and does not "require agencies to elevate environmental concerns over other appropriate considerations," *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)). Nor does NEPA necessarily require "the best decision." *Id.* (internal quotation mark omitted) (quoting *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012)); *see also Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) ("As a procedural statute, NEPA does not mandate any particular outcome."). Thus, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)).

"The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to" the EIS requirement. *Pub. Citizen*, 541 U.S. at 757 (citing 40 C.F.R. § 1500.3). Under these regulations, an agency may prepare "a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Id.* (citing 40 C.F.R. § 1501.4(a), (b)). An EA is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Id.* (alterations in original) (quoting 40 C.F.R. § 1508.9(a)). If, after conducting an EA, the agency determines that an EIS is not required under the applicable regulations, "it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

All federal agencies are required to comply with NEPA and with CEQ regulations, but the CEQ regulations "allow each agency flexibility in adapting its implementing procedures." 40 C.F.R. § 1507.1; *see also id.* § 1507.3(a) (requiring agencies to "adopt procedures to supplement these regulations"). At the time of the challenged agency action at issue here, FSA had promulgated such regulations. *See* 7 C.F.R. §§ 1940.301–350 (2015).[2] Those FSA regulations require the preparation of an EA for "Class I" and "Class II" agency actions. *Id.* §§ 1940.311–312. "Class I" actions are "smaller scale approval actions," *id.* § 1940.311, including certain

[2]     FSA updated its regulations in August 2016, withdrawing the regulations previously codified at 7 C.F.R. §§ 1940.301–350 and replacing them with new regulations codified at 7 C.F.R. §§ 799.1–59. *See generally* Compliance With the National Environmental Policy Act and Related Authorities, 81 Fed. Reg. 51,274 (Aug. 3, 2016). The new regulations do "not have retroactive effect," *id.* at 51,283, and accordingly, the regulations in effect prior to August 2016, when the FSA loan guarantee at issue was made, govern this case.

expansions of FHA housing projects, certain community and business grant programs, and certain farm programs, *id.* § 1940.311(a)–(c), and require a less rigorous EA, *id.* § 1940.311 ("The scope and level of detail of an assessment for a small-scale action . . . need only be sufficient to determine whether the potential impacts are substantial and further analysis is necessary."). "Class II" actions, by contrast, "are basically those which exceed the thresholds established for Class I actions and, consequently, have the potential for resulting in more varied and substantial environmental impacts." *Id.* § 1940.312. "A more detailed environmental assessment is, therefore, required for Class II actions in order to determine if the action requires an EIS." *Id.*

"Class II" actions include certain activities that "involve a livestock-holding facility or feedlot," *id.* § 1940.312(b)(1), such as "[f]inancial assistance for a livestock-holding facility or feedlot located in a sparsely populated farming area having a capacity as large or larger than," *inter alia*, "100,000 laying hens or broilers when [the] facility has unlimited continuous flow watering systems," *id.* § 1940.312(c)(9), as well as "[f]inancial assistance for a livestock-holding facility or feedlot which either could potentially violate a State water quality standard or is located near a town or collection of rural homes which could be impacted by the facility," *id.* § 1940.312(c)(10). When the financial assistance, such as a loan guarantee, includes mitigation measures to be taken in connection with the assistance, such measures "must be documented in the assessment . . . and placed in the offer of financial assistance as special conditions." *Id.* § 1940.318(g). In addition, FSA is responsible for "postapproval inspection and monitoring of approved projects" to "ensure that those measures which were identified in the preapproval stage and required to be undertaken in order to reduce adverse environmental impacts are effectively implemented." *Id.* § 1940.330(a).

## 2. FSA's Guaranteed Farm Loan Program

FSA, formerly known as the "Farmers Home Administration," oversees agricultural support programs including, as relevant here, the Guaranteed Farm Loan Program. *See* 7 C.F.R. §§ 762.101 *et seq.* Under this program, FSA guarantees a percentage of certain loans made to borrowers by qualified agricultural lenders for purposes including "[a]cquir[ing] or enlarg[ing] a farm"; "[m]ak[ing] capital improvements," such as "the construction, purchase, and improvement of a farm dwelling [or] service buildings and facilities that can be made fixtures to the real estate"; "[p]romot[ing] soil and water conservation and protection"; "[p]ay[ing] closing costs"; and "[r]efinancing indebtedness incurred for authorized . . . purposes." *Id.* § 762.121(b)(1)–(5). For any given loan, FSA's guarantee "will not exceed 90 percent based on the credit risk to the lender and the Agency both before and after the transaction," but the precise percentage of the guarantee is left to FSA. *Id.* § 762.129(a). To be eligible for an FSA loan guarantee, a borrower must certify that she is "unable to obtain sufficient credit elsewhere without a guarantee to finance actual needs at reasonable rates and terms." *Id.* § 762.120(h)(1).

Once FSA has guaranteed a loan, "[l]enders are responsible for servicing the entire loan in a reasonable and prudent manner, protecting and accounting for the collateral, and remaining the mortgagee or secured party of record." *Id.* § 762.140(a)(1). Lenders must also "[e]nsur[e] the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm." *Id.* § 762.140(b)(3). As noted, however, FSA stays involved, retaining responsibility for "post-approval inspection and monitoring of approved projects" to "ensure that those measures which were identified in the preapproval stage and required to be undertaken in order to reduce adverse environmental impacts are effectively implemented." *Id.* § 1940.330(a) (2015).

## B.      FSA's Loan Guarantee For The OMH CAFO

The plaintiff challenges the adequacy of the government's compliance with NEPA in connection with FSA guaranteeing a loan used to finance the construction and operation of nonparty OMH's CAFO.  The total loan at issue amounts to $1,217,000, *see* Administrative Record ("AR") Loan 126, of which FSA has guaranteed the maximum allowable 90 percent, *see* 7 C.F.R. § 762.129(a), or $1,095,300, AR Loan 119.[3]

The OMH CAFO is located on a 114.9-acre parcel of land in Caroline County, Maryland, within the Choptank River and Chesapeake Bay watersheds and near Watts Creek.  AR 504, 510–11.  This CAFO is made up of "four (4) broiler [(poultry)] houses and [an] associated manure structure."  AR 504.  MidAtlantic Farm Credit ("MAFC"), a qualified agricultural lender, *see* Revised Decl. William J. Rutter ("Revised Rutter Decl.") ¶ 2, ECF No. 64-1, submitted an application for the guarantee at issue through the Guaranteed Farm Loan Program on behalf of OMH's owner, *see* AR Loan 66, a woman who is a first-time farmer, *id.* at 56.[4]  The

---

[3]      The defendants initially filed a certified index of the administrative record on December 6, 2017, in accordance with Local Civil Rule 7(n), *see* Notice of Lodging of AR Index, ECF No. 14, but supplementation proved necessary, as detailed in this Court's opinion granting the plaintiff's motion for leave to amend its complaint, *see Food & Water Watch v. U.S. Dep't of Agric.* (*FWW II*), No. 17-cv-1714 (BAH), 2019 WL 2423833, at *2–3 (D.D.C. June 10, 2019); *see also* Notice of Lodging of Suppl. to AR Index, ECF No. 25.  On January 10, 2019, the defendants filed new certified indexes of the administrative record that "supersede and replace all prior lodged Administrative Record Indexes in this matter."  Notice of Lodging of AR Index at 1, ECF No. 38.  As certified, the administrative record consists of two parts, each separately paginated: the record for the environmental assessment, which consists of 1,097 pages, and the record for the guaranteed loan, which consists of 192 pages, for a total of 1,289 pages.  *See id.* at 1–2.  Consistent with Local Civil Rule 7(n), the portions of the administrative record cited or otherwise relied upon in the parties' briefing have been docketed in a joint appendix.  *See* J.A., ECF No. 67.  "AR" citations refer to the page numbers of the administrative record for the environmental assessment, and "AR Loan" citations refer to the page numbers of the administrative record for the guaranteed loan.

[4]      The defendants filed a declaration by William J. Rutter, MAFC's Senior Vice President and Chief Credit Officer, as an exhibit to their cross-motion for summary judgment, *see* Decl. William J. Rutter ("Rutter Decl."), ECF No. 60-2, and then subsequently filed a revised declaration by the same person ("Revised Rutter Declaration") as an attachment to their opposition to the plaintiff's motion to strike, *see* Revised Rutter Decl.; *see also* Defs.' Resp. Opp'n Pl.'s Mot. Strike at 2 n.1, ECF No. 64 (noting that the defendants attached a revised declaration).  The Revised Rutter Declaration differs from the original in three respects: (1) the revised declaration's introductory sentence contains the additional phrase "under penalty of perjury"; (2) the end of the revised declaration's first paragraph includes a sentence that reads: "The facts contained in this declaration are either within my personal knowledge or are based on information obtained from other persons and, to the best of my knowledge, are true and correct."; and (3) the revised declaration indicates its execution on October 15, 2019.  *Compare* Revised Rutter Decl. at 1–3, *with* Rutter Decl. at 1–3.  The Revised Rutter Declaration is relied upon in this Memorandum Opinion.

CAFO is now built and operating, and OMH's owner resides with her family on her farm, where she manages operations. AR 503; AR Loan 56.

The OMH CAFO houses up to 192,000 birds at one time and can rotate through 5.6 flocks each year, enabling production of more than 1,000,000 birds per annum. AR 223. Thus, the federal loan guarantee for the OMH CAFO qualified as a Class II action for which a complete EA was required. *See* 7 C.F.R. § 1940.312(c)(9), (10) (2015). Pursuant to NEPA and the corresponding regulations, FSA prepared a draft EA describing the environmental impacts of the proposed CAFO. In preparing the draft EA, FSA submitted the OMH CAFO's proposed plans to the state of Maryland for review through the Maryland Intergovernmental Review and Coordination process. AR 132. Maryland determined that the OMH CAFO would be consistent with the environmental plans, programs, and objectives of its state agencies and local governments, contingent on OMH obtaining relevant permits and complying with applicable regulations. *See* AR 132–33. The draft EA was then issued on April 24, 2015, AR 2, and made available for public comment through May 16, 2015, *see* AR 4, 24.

On May 22, 2015, FSA issued a proposed final EA and FONSI, AR 267, which was also made available for public comment, through June 13, 2015, *see* AR 264, 269. FSA then contracted with a private environmental consulting firm, Environmental Civil Engineering, Ltd. ("ECE") to review the proposed final EA and FONSI. *See* AR 527, 881. ECE provided "recommendations and comments" on the proposed final EA and FONSI to FSA on July 16, 2015. AR 527. Shortly before FSA received ECE's recommendations and comments, on July 9, 2015, FSA extended the comment period for the proposed final EA and FONSI to July 20, 2015, AR 440, on which date the plaintiff submitted comments, *see* AR 385–397. On July 22, 2015,

FSA issued the final EA and FONSI, *see* AR 497–520, and then, the next day, approved the loan guarantee, AR Loan 126.

## C. Procedural History

After construction was complete and the OMH CAFO began operating, the plaintiff, a District of Columbia "non-profit corporation that champions healthy food and clean water for all by standing up to corporations that put profits before people and advocating for a democracy that improves people's lives and protects the environment," Am. Compl. ¶ 8, initiated this lawsuit, alleging violations of NEPA and the APA based on FSA's purported failure to conduct an adequate environmental assessment for the OMH CAFO, Compl. ¶¶ 60–121, ECF No. 1. The defendants—USDA, FSA, and an FSA farm loan officer—answered, *see* Answer, ECF No. 12, and then sought judgment on the pleadings, *see* Defs.' Mot. J. Pleadings, ECF No. 17. The defendants argued that the plaintiff's claims are (1) moot and (2) not redressable, "because they 'are based on a 2015 EA/FONSI for a poultry farm that is completely constructed and operational,' and because the FSA 'has no direct authority over the farm's operations' or 'legal authority over the project in question.'" *Food & Water Watch v. U.S. Dep't of Agric.* (*FWW I*), 325 F. Supp. 3d 39, 49 (D.D.C. 2018) (citations omitted) (first quoting Defs.' Mem. Supp. Mot. J. Pleadings at 7, ECF No. 17-1; and then quoting Defs.' Reply Supp. Mot. J. Pleadings at 7, ECF No. 23); *see id.* at 55.

The defendants' arguments were rejected because "the agency action at issue—the FSA's loan guarantee for the OMH CAFO—is ongoing," *id.* at 49, and "the statutes and regulations regarding FSA loan guarantees contemplate the agency's ongoing obligations and responsibilities in connection with a guarantee," *id.* at 50. "By virtue of the FSA's continuing guarantee of the OMH CAFO's loan, the FSA continues to exert some control over the CAFO

and maintain some involvement in the CAFO's ongoing operations." *Id.* at 55. Thus, although the OMH CAFO has been constructed, FSA "could still 'call for additional mitigation and monitoring, or could decide not to renew [the guarantee].'" *Id.* at 50 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 43 (D.C. Cir. 2015)). "Given that the FSA guarantees 90 percent of the OMH CAFO loan, the temporary withdrawal or revocation of that guarantee would put a substantial portion of the OMH CAFO's funding at risk." *Id.* at 55. Moreover, "[i]f, as a result of further environmental assessments, the FSA were to impose additional mitigation measures or conditions on its guarantee, the OMH CAFO would likely comply with those conditions, given that the CAFO would be 'unable to obtain sufficient credit elsewhere . . . at reasonable rates and terms.'" *Id.* at 55–56 (omission in original) (quoting 7 C.F.R. § 762.120(h)(1)). Consequently, the defendants failed to establish that the case is moot, while the plaintiff demonstrated that its injuries are redressable.

Although the parties had "addressed only redressability," the Court also analyzed the other elements of standing because "'[w]hen there is doubt about a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be.'" *Id.* at 53 (alteration in original) (quoting *Lee's Summit v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000)). After concluding that the remaining standing requirements were easily satisfied, *see id.* at 53–55, 57–58, the Court denied the defendants' motion for judgment on the pleadings, *id.* at 59.

At the same time that the defendants sought judgment on the pleadings, the plaintiff moved to supplement the administrative record, seeking to add documents related to the loan guarantee, including the loan guarantee itself. *See* Pl.'s Mot. Compel AR at 2, ECF No. 18. The defendants "agreed to provide the requested documents" subject to a protective order, *FWW I*, 325 F. Supp. 3d at 58, and the plaintiff's motion was therefore granted, *id.* at 59.

Upon receiving the complete administrative record, the plaintiff moved to amend its complaint. *See* Pl.'s Mot. Amend, ECF No. 42. Finding that the plaintiff's delay in seeking amendment was due to the defendants' belated completion of the administrative record and that the defendants' arguments as to futility of amendment were either legally unsupported or appropriate for resolution at a later stage, *see FWW II*, 2019 WL 2423833, at *4–8, the Court granted the plaintiff's motion, *id.* at *9.

At the Court's direction, the parties proposed a briefing schedule for dispositive motions, which proposed schedule was adopted. *See* Min. Order (June 19, 2019).[5] While summary judgment briefing was ongoing, the plaintiff moved to strike the declaration from William J. Rutter submitted in support of the defendants' cross-motion. *See* Pl.'s Mot. Strike. Briefing on both the plaintiff's motion to strike and the parties' cross-motions for summary judgment was completed in October 2019, with the AR joint appendix filed on November 12, 2019. The parties' cross-motions for summary judgment and the plaintiff's motion to strike are now ripe for resolution.

## II.    LEGAL STANDARD

NEPA lacks a specific statutory review provision and, consequently, challenges alleging NEPA violations are brought pursuant to the APA. *See Indian River Cty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 520 (D.C. Cir. 2019) (reviewing NEPA challenge brought pursuant to the APA). Under the APA, agency action must be held "unlawful and set aside" when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if the agency has relied on factors which

---

[5]    The parties also requested a hearing date for oral argument on their cross-motions for summary judgment, *see* Joint Proposed Briefing Schedule at 2, ECF No. 55, but given the voluminous record and thorough briefing, a hearing is unnecessary, *see* LCvR 7(f) (authorizing oral hearings at "the discretion of the Court").

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In APA cases involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (internal quotation mark omitted) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in APA case, that "determining the facts is generally the agency's responsibility, not ours").

## III.   DISCUSSION

The parties' cross-motions for summary judgment raise two primary issues. First, retreading old ground, the defendants contend that the plaintiff lacks standing because its injuries are not redressable. Second, the parties dispute whether FSA complied with NEPA when it approved the guarantee on the OMH CAFO loan.

Standing is addressed first, followed by consideration of the merits of the NEPA claims.

### A.   The Plaintiff Has Standing

For the second time in this litigation, the defendants challenge the plaintiff's standing, renewing a previously rejected argument as well as offering a new one. *See* Defs.' Mem. Supp. Defs.' Cross-Mot. ("Defs.' Opp'n") at 7–15, ECF No. 60-1; Defs.' Reply Supp. Defs.' Cross-

Mot. ("Defs.' Reply") at 1–8, ECF No. 66.  This standing challenge fares no better this second

time round.

### 1.  General Standing Principles

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of

the case-or-controversy requirement of Article III.'"  *Davis v. FEC*, 554 U.S. 724, 733 (2008)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Where, as here, an organization

claims representational standing on behalf of its members, the organization may bring suit so

long as "(1) at least one of its members would have standing to sue in his own right; (2) the

interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the

relief requested requires the member to participate in the lawsuit."  *Chesapeake Climate Action*

*Network v. EPA*, No. 15-1015, 2020 WL 1222690, at *6 (D.C. Cir. Mar. 13, 2020) (internal

quotation mark omitted) (quoting *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724

F.3d 243, 247 (D.C. Cir. 2013)).  Thus, organizational standing involves two distinct

determinations: first, whether the organization has put forward a member who "would have

standing to sue in his own right," and second, whether the organization itself fulfills the

remaining requirements for organizational standing.  *Id.* (quoting *Am. Trucking*, 724 F.3d at

247).

To establish constitutional standing of an organization's member, "a plaintiff must show

(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct

complained of,' and (3) a 'likel[lihood]' that the injury 'will be redressed by a favorable

decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (alteration in

original) (quoting *Lujan*, 504 U.S. at 560–61); *see also Narragansett Indian Tribal Historic*

*Pres. Office v. FERC*, 949 F.3d 8, 12 (D.C. Cir. 2020) (same).  "The party invoking federal

jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561; *see also Irregulators v. FCC*, No. 19-1085, 2020 WL 1222701, at *3 (D.C. Cir. Mar. 13, 2020) (same).

Of these standing elements, the defendants contest only redressability. *See* Defs.' Opp'n at 7.[6] "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (footnote omitted). In cases involving procedural violations such as this one, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability." *Lujan*, 504 U.S. at 572 n.7. The plaintiff does not need to "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiff['s] interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). "Rather, if the plaintiff[] can 'demonstrate a causal relationship between the final agency action and the alleged injuries,' the court will 'assume[] the causal relationship between the procedural defect and the final agency action.'" *Id.* (second alteration in original) (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)). Thus, for example, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered." *Lujan*, 504 U.S. at 572 n.7.

---

[6]     By challenging only redressability, the defendants appear to concede that the other requirements of standing are satisfied. A court, however, "has an independent obligation to ensure standing exists," *Chesapeake Climate Action Network*, 2020 WL 1222690, at *6, which obligation is satisfied here by the analysis of injury, causation, and organizational standing in the prior decision denying the defendants' motion for judgment on the pleadings, *see FWW I*, 325 F. Supp. 3d at 53–55, 57–58.

## 2. FSA Has Authority To Redress The Plaintiff's Claimed Injury

In pressing their standing challenge, the defendants first rehash the primary argument they presented in support of their prior motion for judgment on the pleadings, again contending that FSA does not have "the authority to modify the conditions of an already issued [loan] guarantee." Defs.' Opp'n at 9. Emphasizing the difference between a motion for summary judgment and a motion for judgment on the pleadings, they observe that a higher burden of proof applies at summary judgment, *i.e.*, the plaintiff must provide "specific facts—not mere allegations—that show a 'substantial probability' that . . . a favorable decision of this Court could redress [Plaintiff's] injury." *Id.* (omission and alteration in original) (internal quotation marks omitted) (quoting *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, 78 F. Supp. 3d 208, 216 (D.D.C. 2015)). The plaintiff, the defendants maintain, has failed to meet this burden with respect to whether FSA may alter the terms of the guarantee at this time.

This argument is easily dispatched. When this issue was previously considered, "the defendants concede[d] that 'this Court has the power to remand the EA/FONSI for reconsideration or further explanation and to vacate the loan guarantee.'" *FWW I*, 325 F. Supp. 3d at 55 (quoting Defs.' Mem. Supp. Mot. J. Pleadings at 10). The Court agreed, determining that "in response to a court order requiring the FSA to undertake additional environmental assessments, the FSA could revoke its guarantee or add conditions to its continuing guarantee of the loan, which could include requiring additional environmental restrictions or mitigating measures." *Id.* at 50 (citing 7 C.F.R. § 1940.318(g) (2015)). This was a conclusion of law, not of fact, and thus is not called into doubt by the higher burden of proof that applies at this stage of the litigation. To the contrary, given that the defendants' argument is essentially a request for reconsideration, the burden of persuasion rests on the defendants to show that the previous

determination was made in error. *Cf. Pigford v. Perdue*, 950 F.3d 886, 891 (D.C. Cir. 2020)

(explaining that a motion for reconsideration "is discretionary and need not be granted unless the

district court finds that there is an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice"). The defendants

have not presented a convincing case, and the prior reasoning stands. *See FWW I*, 325 F. Supp.

3d at 49–52, 55–57.[7]

Indeed, to accept the defendants' argument would be to permit agencies to self-immunize

their conduct from judicial scrutiny merely by acting quickly and then claiming their hands are

tied. As the D.C. Circuit has recognized and this Court previously observed, "[i]f the fact that

projects are built and operating were enough to make a case nonjusticiable, agencies and private

parties could merely ignore the requirements of NEPA . . . , build their structures before a case

gets to court, and then hide behind the mootness doctrine." *FWW I*, 325 F. Supp. 3d at 51–52

(alteration and omission in original) (internal quotation marks omitted) (quoting *Sierra Club*, 803

F.3d at 44). Similarly, an agency may not foreclose judicial review on redressability grounds

simply by enacting regulations designed to restrict an agency's statutorily granted authority, or,

worse, by putting terms into an agreement with a private party requiring the agency to adhere to

the agreement regardless of circumstances or unlawfulness of the agency action in entering into

the agreement in the first place. Those aggrieved by an agency's failure to comply with its legal

obligations are not so easily rendered remediless.

---

[7]     Presenting a variation of this argument, the defendants assert for the first time that "[b]asic contract law
principles prohibit FSA from changing the agreed-upon terms of its guaranteed loan documents with MAFC."
Defs.' Opp'n at 11. This argument fails, however, because the loan guarantee, by its own terms, is conditioned on
OMH "remain[ing] in compliance with all state and federal environmental regulations." AR Loan 134.

### 3. Third-Party Involvement Does Not Defeat Redressability Here

As to the second reason suggested for the plaintiff's lack of standing, the defendants contend that the plaintiff has not shown, in the event FSA modifies the loan guarantee, that OMH's lender "MAFC will . . . rescind, reduce, or otherwise modify its loan to OMH," Defs.' Opp'n at 9, nor, given that OMH has "already received the MAFC loan funds, constructed its facilities, and is currently operating," *id.* at 13, that "OMH will respond to . . . rescission, reduction, or modification by ceasing or changing its farming operations in a way that ameliorates Plaintiff's alleged injuries," *id.* at 9. To support these contentions, the defendants offer the declaration of MAFC's Senior Vice President and Chief Credit Officer William J. Rutter, who states that "[t]he [Farm Credit] Act and FSA regulations prohibit certain actions being taken (such as foreclosure of a lien on real estate) against 'eligible borrowers' who are current on their loan obligations . . . and are not in monetary default" and that "MAFC has not made a posting to foreclose on the real estate collateral made subject of the FSA-guaranteed loan at issue in [this case], and would not be able to do so in the absence of a monetary default, *e.g.*, under the [Farm Credit] Act or FCA regulation." Revised Rutter Decl. ¶¶ 11, 13. These statements, the defendants argue, "demonstrate[] that [MAFC] cannot foreclose on a borrower who is not in monetary default," Defs.' Reply at 7 (citing Revised Rutter Decl. ¶¶ 11–13), and thus OMH would be free to ignore any new conditions on the loan guarantee as long as it remained current on its loan payments, *see id.*[8]

The plaintiff disputes the defendants' description of MAFC's and OMH's legal obligations in the event FSA modifies the loan guarantee's conditions. According to the

---

[8] As noted, the plaintiff has moved to strike the Revised Rutter Declaration, *see* Pl.'s Mot. Strike, because (1) Rutter lacks sufficient personal knowledge to testify about the OMH CAFO loan; (2) Rutter's testimony is irrelevant and unhelpful such that exclusion is appropriate pursuant to Federal Rule of Evidence 702; (3) Rutter is not a qualified expert witness under Federal Rules of Evidence 702 and 703; and (4) Rutter offers impermissible

plaintiff, under applicable regulations, OMH will be "in default . . . when 30 days past due on a payment *or in violation of provisions of the loan documents*." Pl.'s Combined Reply Supp. Pl.'s Mot. Summ. J. & Opp'n Defs.' Cross-Mot. ("Pl.'s Opp'n") at 38 (emphasis in original) (internal quotation mark omitted) (quoting 7 C.F.R. § 762.143(a)), ECF No. 62. Critically, the plaintiff continues, here the loan guarantee's conditions have been incorporated into the loan itself. *See id.* at 38–39; *see also* AR Loan 121 ("[I]f the undersigned fails to perform or observe any of its . . . obligations under . . . any . . . agreement, instrument or other document . . . securing or otherwise relating to the loan indebtedness evidenced by this note, or any part thereof, this note shall be in default."). Thus, the plaintiff posits that if OMH's owner "were to ignore conditions or mitigation measures arising out of further NEPA analysis, she would be in default status on the loan." Pl.'s Opp'n at 39. In turn, MAFC would be "'responsible for resolution of the default' under its lender agreement," *id.* (quoting AR Loan 171), and obligated to "[e]nsure borrower compliance with the covenants and provisions provided in the note, loan agreement, security instruments, and any other agreements," *id.* at 38 n.14 (alteration in original) (internal quotation marks omitted) (quoting AR Loan 170); *see also* 7 C.F.R. § 762.140(b)(3) (requiring that a lender "[e]nsur[e] the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm"). MAFC would not be able to assign the guaranteed portion of the loan as long as the loan remained in default. *See* Pl.'s Opp'n at 39 (citing 7 C.F.R. § 762.160(a)(1)). Moreover, if the default could not "be cured after considering servicing options and mediation"—which would occur if OMH refused to comply with the new

---

legal opinions, *see id.* at 5–11; Pl.'s Reply Supp. Pl.'s Mot. Strike at 2–12, ECF No. 65. Since the defendants' standing argument fails even if the Revised Rutter Declaration is considered, the plaintiff's motion to strike is denied as moot.

conditions on the loan guarantee—MAFC would be required to "proceed with liquidation of the collateral." 7 C.F.R. § 762.149(b); *see* Pl.'s Opp'n at 39.

The defendants' response to these arguments is to continue to rely on the Revised Rutter Declaration, but that declaration does not do all the defendants say it does. Despite the defendants' assertions to the contrary, Rutter never states that MAFC may only "foreclose on a borrower who is . . . in *monetary* default." Defs.' Reply at 7 (emphasis added). Rather, Rutter claims that "[t]he [Farm Credit] Act and FSA regulations prohibit certain actions being taken (such as foreclosure of a lien on real estate) against 'eligible borrowers' who are current on their loan obligations with a Farm Credit System institution *and* not in monetary default," Revised Rutter Decl. ¶ 11 (emphasis added), thereby acknowledging that OMH's obligations under the loan extend beyond simply making timely payments. Similarly, when Rutter declares that MAFC "would not be able to" "ma[k]e a posting to foreclose" "in the absence of a monetary default," he uses the Latin abbreviation "*e.g.*," indicating that failure to make payments is but *one* potential cause of default and subsequent foreclosure on the OMH CAFO loan. *Id.* ¶ 13 ("MAFC has not made a posting to foreclose on the real estate collateral made subject of the FSA-guaranteed loan at issue in [this case], and would not be able to do so in the absence of a monetary default, *e.g.*, under the [Farm Credit] Act or FCA regulation.").

More importantly, even if the defendants' characterization of the Revised Rutter Declaration were accurate, neither the declaration nor the defendants provide any citation to legal or regulatory authority for the proposition that monetary default is the only event that would allow MAFC to foreclose on the loan, whereas the authorities on which the plaintiff rely directly refute that claim. Accordingly, if FSA adds new environmental-protection conditions to the loan guarantee, MAFC will be obligated to enforce them, and OMH will be required to comply with

them, or else default on the still-outstanding loan, *see* Pl.'s Opp'n at 32; Defs.' Reply at 6, which

OMH is unlikely to do, "given that the CAFO would be 'unable to obtain sufficient credit

elsewhere . . . at reasonable rates and terms,'" *FWW I*, 325 F. Supp. 3d at 56 (omission in

original) (quoting 7 C.F.R. § 762.120(h)(1)).[9]  In other words, any new environmental-protection

conditions added to the loan guarantee can be expected to be complied with, and the relaxed

redressability requirement for procedural violations is therefore satisfied.  The plaintiff has

standing to pursue its claims.[10]

## B.     The Plaintiff's NEPA Claims Fail

Turning to the merits of the plaintiff's NEPA-violation claims, a court's "role in

reviewing an agency's decision not to prepare an [Environmental Impact Statement] is a limited

one, designed primarily to ensure that no arguably significant consequences have been ignored."

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 930 (D.C. Cir. 2017) (alteration in

original) (internal quotation marks omitted) (quoting *Myersville Citizens for a Rural Cmty., Inc.*

*v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015)).  "[A court's] task in particular is to ensure that

the [agency], in finding no significant impact, (i) 'accurately identified the relevant

---

[9]        Notwithstanding that OMH cannot obtain sufficient credit elsewhere at reasonable rates and terms, the
defendants claim that "Plaintiff has not offered any facts showing that the guarantee is necessary for the Farm's
ongoing operations."  Defs.' Reply at 6.  The administrative record, however, makes clear that the guaranteed loan is
for "the construction *and* operation" of the OMH CAFO.  AR 503 (emphasis added).  Similarly, the defendants
analogize to *Chesapeake Climate Action Network*, *see* Defs.' Opp'n at 9–10; Defs.' Reply at 6–7, but their reliance
on that case is misplaced.  In *Chesapeake Climate Action Network*, the court determined that rescinding the loan
guarantee at issue there would not redress the plaintiffs' injuries because "the European banking crisis ha[d] eased
substantially" after the borrower completed its application for the loan guarantee, and thus "even in the absence of
[the guaranteed loan], [the borrower] would readily be able to support its current volume of business through its
unused and available financing."  78 F. Supp. 3d at 226 (internal quotation marks omitted) (quoting the defendants'
declaration).  Here, by contrast, the record provides no indication that without the guaranteed loan, the OMH CAFO
could continue to operate.
[10]       The defendants have also reasserted a mootness argument but concede that this argument rises and falls
with their standing argument.  *See* Defs.' Opp'n at 16 ("For the same reasons Plaintiff has failed to establish the
redressability necessary for standing, Plaintiff's challenge is also moot.").  Just as the defendants' standing argument
fails, so too does their argument for mootness.  *See also FWW I*, 325 F. Supp. 3d at 49–52 (determining that the
plaintiff's claims are not moot).

environmental concern,' (ii) took a 'hard look at the problem' in making its decision, (iii) has made 'a convincing case for its finding of no significant impact,' and (iv) 'has shown that even if there is an impact of true significance, an [Environmental Impact Statement] is unnecessary because changes and safeguards in the project sufficiently reduce the impact to a minimum.'" *Id.* (third alteration in original) (quoting *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011)).  Additionally, a court must determine whether the agency adequately "discuss[ed] 'reasonable alternatives to the proposed action' and compare[d] the respective environmental impacts of each."  *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (per curiam) (quoting *Myersville*, 783 F.3d at 1323).

Here, the plaintiff contends that FSA's final EA and FONSI were deficient in the following respects:  FSA (1) failed to take a sufficiently "hard look" at the environmental impacts of the OMH CAFO, (2) did not make a convincing case for its finding of no significant impact, (3) improperly relied on inadequate mitigation measures, (4) did not consider an adequate range of alternatives, and (5) failed to comply with relevant NEPA procedures.  These arguments depend in significant part on whether FSA's reliance on mitigation measures was proper, and thus that issue is addressed first.  The remaining issues are then considered sequentially.

### 1.    FSA Properly Relied On Mitigation Measures

In declining to prepare an EIS, an agency may base its decision on the existence of measures that will mitigate a project's environmental impacts.  *See, e.g.*, *Myersville*, 783 F.3d at 1322 ("To issue a FONSI and decline to prepare an EIS, an agency must have concluded that 'there would be no significant impact *or* have planned measures to mitigate such impacts.'" (emphasis added) (quoting *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C.

Cir. 2008))). Here, FSA relied heavily on the existence of mitigation measures found in the OMH CAFO's "facility design and operational plans," AR 514, such as the OMH CAFO's "Stormwater Management Plan," "Nutrient Management Plan," and "Conservation Plan," *see* AR 511–17.

The plaintiff raises two objections to this reliance. First, the plaintiff argues that the design and operational plans at issue were only in draft, not final, form at the time the final EA and FONSI were issued, and that FSA "may not base its determination of no significant impact on a cursory list of hypothetical mitigation measures that OMH was not obligated to implement as a condition of the loan guarantee." Pl.'s Opp'n at 21. Second, the plaintiff contends that "[w]hen an agency relies on mitigation measures to justify its decision not to prepare an EIS, it must 'convincingly establish[] that changes in the project sufficiently reduce [its impact] to a minimum,'" and FSA's reliance on draft plans failed to satisfy this standard. Pl.'s Mem. at 30 (second and third alterations in original) (quoting *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982)). Neither objection succeeds.

### *a.    FSA's Reliance On Draft Plans Was Appropriate*

As to the plaintiff's first objection, the plaintiff is correct that the OMH CAFO's design and operational plans were in draft form at the time FSA signed off on the project. The final EA itself makes this clear. FSA explained, for instance, that "[p]otential releases from facility operations will be managed by engineering controls and best management practices that *will* be outlined in a nutrient management plan and conservation plan," and that "[t]he facility design and operational plans *will* consider the necessary measures to ensure no significant impact to surface water quality." AR 513–14 (emphases added); *see also, e.g.*, AR 515 ("In barn

management practices to keep the facility clean and dry *will* be developed and implemented."
(emphasis added)).

The plaintiff is incorrect, however, that an agency may never rely on draft plans to support a finding of no significant impact.  As the Supreme Court has explained, "NEPA does not require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts."  *Robertson*, 490 U.S. at 359 (emphasis in original); *see also id.* at 352 ("There is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.").  Thus, in *Robertson*, the Supreme Court determined that an EIS was sufficient when it "outlined certain steps that might be taken to mitigate adverse effects . . . but indicated that these proposed steps [we]re merely conceptual and '[would] be made more specific as part of the design and implementation stages of the planning process.'"  490 U.S. at 339 (quoting the EIS).  Likewise, in *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010), the D.C. Circuit approved an agency's use of an "adaptive management plan" that merely "identifie[d] various *goals* for . . . mitigation of the [relevant] project's adverse impacts."  *Id.* at 506 (emphasis added); *see also id.* at 516 ("The plan outlines various performance *goals* for the Bureau to *strive for* . . . ." (emphases added)).  The D.C. Circuit rejected the argument that such tentative measures "violate NEPA's requirement to take a hard look at environmental impacts before actions are taken."  *Id.* at 517.

Here, FSA had good reason to rely on plans that were not yet finalized.  The mitigation measures at issue were developed to comply with state regulatory requirements.  *See, e.g.*, AR 503 (explaining that the OMH CAFO's "environmental control and management strategies" will

be implemented "in accordance with environmental permitting requirements for the project");

AR 517 (noting that "the approved conservation plan devised for the CAFO operation . . . will be

on file with the Maryland Department of Agriculture (MDA) and Maryland Department of the

Environment (MDE)"). Accordingly, FSA deferred to the state regarding when finalization of

the plans should occur, and the state, in turn, could not finalize the plans until after the loan

guarantee was issued and sale of the land was complete. *See, e.g.*, AR 517 (explaining that "the

required environmental control plans" would "be finalized as part of the permitting process for

the facility"); AR Loan 134 ("Per the Class II EA the applicant must transfer the site plan into

her name, file a notice of intent with MDE, and file for the General Discharge Permit for

Stormwater Activity once the ownership transfer has taken place."). Given the state's timetable,

FSA's decision to rely on the draft plans and allow the sale to go forward, conditioned on the

finalization of the facility design and operational plans, *see* AR Loan 134, was reasonable. *Cf.*

*Theodore Roosevelt Conservation P'ship*, 616 F.3d at 517 ("Allowing adaptable mitigation

measures is a responsible decision in light of the inherent uncertainty of environmental impacts,

not a violation of NEPA. It is certainly not arbitrary or capricious.").

The plaintiff counters that FSA "was not bound by Maryland's regulatory process or

timeline for finalizing discharge permits," and "could have—and indeed should have—instead

conditioned the guarantee on the adoption and implementation of the specific mitigation

*measures* it deemed adequate to ensure no significant impact." Pl.'s Opp'n at 19–20 (emphasis

in original). Yet, "it would be inconsistent with NEPA's reliance on procedural mechanisms—as

opposed to substantive, result-based standards—to demand the presence of a fully developed

plan that will mitigate environmental harm before an agency can act." *Robertson*, 490 U.S. at

353. Thus, whether FSA *could* have demanded the finalization of the OMH CAFO's facility

design and operational plans before FSA issued the final EA and FONSI is irrelevant; NEPA did not *require* FSA to do so.

In sum, NEPA permits reliance on draft mitigation plans in appropriate circumstances, and here FSA acted reasonably in permitting the OMH CAFO's facility design and operational plans to be finalized in accordance with state procedures.  Thus, the plaintiff's first objection fails.

### b.      *FSA's Analysis Of The Mitigation Measures Was Sufficient*

The plaintiff also objects to FSA's mitigation analysis on the grounds that FSA failed to "convincingly establish[]" that the contemplated measures would adequately address the OMH CAFO's environmental impacts.  Pl.'s Mem. at 30 (alteration in original) (internal quotation mark omitted) (quoting *Cabinet Mountains Wilderness*, 685 F.2d at 682).  The final EA, the plaintiff claims, merely contained "'a perfunctory description or mere listing of mitigation measures, without supporting analytical data,'" and thus FSA failed to provide "the requisite detail necessary to ensure environmental consequences are fairly evaluated."  *Id.* at 31–32 (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)).  For the reasons explained below, the plaintiff's objection to FSA's mitigation analysis falls short.

### i.      <u>Applicable Standard Of Review</u>

At the outset, the parties dispute the appropriate standard applicable to review of FSA's mitigation analysis, which dispute turns, in their view, on whether FSA issued a "mitigated FONSI."  *See* Pl.'s Opp'n at 5–6, 20; Defs.' Reply at 13.  The plaintiff claims that "FONSIs that rely on mitigation measures—also known as mitigated FONSIs—require those measures be

documented in the EA with an analysis of their environmental impacts and potential effectiveness." Pl.'s Opp'n at 5. The defendants, for their part, do not contest that "mitigated FONSIs" are subject to heightened analysis, but maintain that here "FSA did not issue a 'mitigated FONSI.'" Defs.' Reply at 13. Instead, according to the defendants, "FSA relied—in part—on the measures required by the permits and plans to find that the [OMH CAFO] would not have any significant direct, indirect, or cumulative effects on the environment," and thus the "standards required of [mitigated FONSIs]" do not apply. *Id.* Despite the ink spilled by the parties about this dispute, the relevant law in this Circuit renders it beside the point.

The parties are correct that in some circuits whether an agency issued a "mitigated FONSI" or instead simply relied on "baseline" measures designed to mitigate a project's impacts carries legal consequences. *See, e.g.*, *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 698–99 (5th Cir. 2018) ("The [district] court's misplaced view that the Corps issued a 'mitigated FONSI' is an error of law that steered it in the wrong direction."); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587–88 (4th Cir. 2012) (collecting authorities that arguably support a "mitigation/baseline distinction," *id.* at 587 (citing *Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998) and *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7 (2d Cir. 1997))). In the D.C. Circuit, however, this is a distinction without a difference. The term "mitigated FONSI" appears in no D.C. Circuit case. To be sure, a few decisions of this Court have used the term, but only to recognize that when an agency issues a mitigated FONSI, the agency has concluded that "[w]ith the planned [mitigation measures], environmental impact will be insignificant." *TOMAC v. Norton*, No. Civ.A.01-0398 JR, 2005 WL 2375171, at *4 (D.D.C. Mar. 24, 2005), *aff'd*, 433 F.3d 852 (D.C. Cir. 2006); *see also Nat'l Parks Conservation Ass'n v. Semonite*, 311 F. Supp. 3d 350, 371 (D.D.C. 2018) (similar), *rev'd on other grounds*, 916 F.3d

1075 (D.C. Cir. 2019); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 113 (D.D.C. 2017) (similar); *Gov't of Manitoba v. Norton*, 398 F. Supp. 2d 41, 65 n.24 (D.D.C. 2005) (similar). This is not a special standard of review, but rather a statement of the obvious.

The plaintiff points to the D.C. Circuit's decision in *Cabinet Mountains* as requiring especially rigorous review of "mitigated FONSIs," *see* Pl.'s Opp'n at 6, but the plaintiff misreads that case. *Cabinet Mountains* stated that when an agency bases its FONSI on mitigation measures, the reviewing court must determine "whether the agency *convincingly* established that changes in the project sufficiently reduced [the project's impact] to a minimum." 685 F.2d at 682 (emphasis added). Yet, subsequent D.C. Circuit decisions have explained that, in the NEPA context, the word "convincing" does not impose a higher-than-normal standard. *See, e.g.*, *Sierra Club*, 661 F.3d at 1154 ("Although our decisions have frequently . . . repeated the phrase 'convincing case' . . . , our scope of review is in fact the usual one."). Indeed, *Cabinet Mountains* itself instructs that review of an agency's decision to forego preparation of an EIS must be deferential, pointing out that "NEPA's EIS requirement is governed by the rule of reason," 685 F.2d at 682, and that "the decision as to whether an EIS should be prepared is left to the agency's informed discretion," *id.* at 684. In keeping with such deference, subsequent to the *Cabinet Mountains* decision, the D.C. Circuit has reviewed FONSIs based on mitigation measures without employing a special standard of review. *See, e.g.*, *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (rejecting challenge to agency's reliance on mitigation measures and explaining simply that "[t]hough we can see how Petitioners may disagree with [the agency's determination that measures assessed in the EA will

mitigate the project's potential impact], their disagreement does not mean that [the agency] failed to consider the issue altogether, as they suggest").

Accordingly, the standard for determining whether FSA properly relied on mitigation measures simply does not depend on whether FSA's FONSI was technically a "mitigated" one.

### ii. FSA Discussed Mitigation Measures In Sufficient Detail To Ensure That Environmental Consequences Were Fairly Evaluated

In assessing whether an agency has shown that a project's environmental impacts are adequately addressed by mitigation measures, a court must ask—regardless of whether the FONSI is "mitigated"—whether the agency discussed the mitigation measures "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Indian River Cty.*, 945 F.3d at 522 (quoting *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017)). NEPA dos not, however, "require agencies to discuss any particular mitigation plans that they might put in place." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503 (internal quotation mark omitted) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991)). Here, the analysis in FSA's final EA satisfies the relevant standard.

Although the OMH CAFO's facility design and operational plans were not yet finished when FSA issued the final EA, substantial progress had been made toward their completion. *See* AR 545–79 (Storm Water Management Plan); AR 606–37 (General Discharge Permit for Animal Feeding Operations Material); AR 639–53 (Conservation Plan); AR 654–57 (Nutrient Management Plan); AR 863–65 (Site Plan). Thus, FSA was able to determine that the plans included specific features that would address the CAFO's environmental impacts. Then, in the final EA, FSA explained how such features would do so. *See, e.g.*, AR 511 ("Potential surface water impacts will be controlled by the implementation of design features of the facility such as

manure handling and composting in covered structures, concrete pads in handling areas, and the use of Best Management Practices (BMPs).”); *id.* (“In accordance with regulatory requirements, any solid waste including construction, demolition, and land clearing debris will be properly disposed of at a permitted solid waste acceptance facility, or recycled if possible.”); AR 515 (“Design features will include the proper sizing of manure storage areas to ensure sufficient capacity, installation of roofs and covers to prevent infiltration of rainwater, stabilized surfaces to cover areas where manure will be handled, and a properly designed and operated ventilation system.”). Such explanations fulfilled FSA’s NEPA obligations.

The plaintiff complains that in some instances, FSA pointed to mitigation measures that, while under consideration, were not actually in the draft plans at the time the final EA was issued. *See* Pl.’s Mem. at 31–32. For instance, the final EA provides a list of nine “engineering controls and best management practices” to address the OMH CAFO’s impact on surface water quality, such as “[p]reventing direct contact of confined animals with waters of the United States,” and indicates that the OMH CAFO’s facility design and operational plans “can include” and “will consider” these measures. AR 514. The plaintiff argues that FSA’s analysis of such features cannot support the agency’s finding of no significant impact, *see* Pl.’s Mem. at 31–32, but the plaintiff fails to acknowledge that “NEPA does *not* impose a duty on agencies ‘to include . . . a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action.’” *Mayo*, 875 F.3d at 16 (emphasis in original) (quoting *Robertson*, 490 U.S. at 353). Rather, NEPA requires only that an agency “incorporate enough mitigation measures to provide a reasonably complete discussion of mitigation.” *Defs. of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 149 (D.D.C. 2010), *aff’d*, 651 F.3d 112 (D.C. Cir. 2011). FSA’s discussion of measures that would be “consider[ed],” AR 514, for the OMH CAFO’s facility

design and operational plans met that standard. Indeed, in similar circumstances, the D.C. Circuit has upheld an agency's decision to use a "list of specific protective measures that [a] review team is to *consider*," with "exact application of mitigation measures [to] be determined on a site-specific basis." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 516 (emphasis added).

Moreover, FSA's analysis of measures that could be implemented was informed by the regulatory scheme governing CAFOs in Maryland. As previously noted, the OMH CAFO's facility design and operational plans were developed to comply with state regulatory requirements. *See, e.g.*, AR 517 (noting that "[m]itigation measures will be implemented by the operator in accordance with the required environmental control plans that will be finalized as part of the permitting process for the facility"). In other words, FSA knew what substantive requirements the OMH CAFO's plans would have to satisfy before they could be finalized. Further, FSA conditioned the loan guarantee on state approval of the plans, *see* AR Loan 134, in keeping with Supreme Court precedent. *See Robertson*, 490 U.S. at 346 (determining that the Forest Service satisfied NEPA when it "conditioned issuance of [a] special use permit on execution of an agreement between the Forest Service, the State of Washington, and Okanogan County concerning mitigation"). Thus, FSA could rely on its analysis of measures that might be added to the plans, knowing that the final plans would incorporate either those measures themselves or alternatives that were at least as effective.

The plaintiff's remaining concerns about the adequacy of FSA's consideration of the OMH CAFO's mitigation measures are easily resolved. FSA did not err by approving the final EA despite acknowledging that the OMH CAFO's Conservation Plan did not yet "meet necessary requirements." Pl.'s Mem. at 32. The loan guarantee was conditioned on such

requirements being met. AR Loan 134. Nor did FSA violate its own regulations that were in place at the time the final EA was issued, which required that "[m]itigation measures which will be taken . . . be documented in the assessment . . . and include an analysis of their environmental impacts and potential effectiveness." 7 C.F.R. § 1940.318(g) (2015); *see* Pl.'s Mem. at 32. This burden was no greater than FSA's baseline obligation under NEPA to "discuss possible mitigation measures" in "'sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503 (quoting *Robertson*, 490 U.S. at 352).

Finally, the plaintiff urges that this Court follow the Ninth Circuit's decision in *National Parks & Conservation Association*, *see* Pl.'s Mem. at 31–32; Pl.'s Opp'n at 20, but that non-binding case is inapposite. *National Parks* concerned an EA in which the National Park Service ("NPS") relied on mitigation measures in support of a finding of no significant impact but acknowledged "uncertainty . . . as to whether the mitigation measures would work." 241 F.3d at 734. For instance, NPS's EA stated that the measures "*could* mitigate some potential [environmental] effects," *id.* (emphasis in original) (internal quotation marks omitted) (quoting the EA), not that they *would* do so. The Ninth Circuit determined that given the doubts about the measures' effectiveness, NPS failed "to demonstrate that the mitigation measures would render the environmental impact so minor as to not warrant an EIS." *Id.* at 735. Here, by contrast, FSA's uncertainty pertained to *which* specific measures would be in the final plans, not *whether* the measures would be effective. Thus, *National Parks* does not undermine the conclusion that FSA discussed mitigation measures in sufficient detail to ensure that environmental impacts were fairly evaluated.

For these reasons, FSA's reliance on mitigation measures was proper in this instance.

### 2. FSA Took A "Hard Look" At The OMH CAFO's Environmental Impacts

NEPA "requir[es] federal agencies to take a 'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Sierra Club*, 803 F.3d at 37. "The definition of 'hard look' may be 'imprecise,'" but the D.C. Circuit has made clear that "an agency has taken a 'hard look' at the environmental impacts of a proposed action if 'the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and . . . the agency's decision is fully informed and well-considered.'" *Myersville*, 783 F.3d at 1324–25 (omission in original) (internal quotation marks omitted) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)). In evaluating whether an agency has taken a "hard look," as when evaluating all parts of an agency's NEPA analysis, courts must be "mindful that our role is not to 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor. Rather, it is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Indian River Cty.*, 945 F.3d at 527 (internal quotation marks omitted) (quoting *WildEarth Guardians*, 738 F.3d at 308).

The plaintiff asserts that FSA failed to take a "hard look" at the OMH CAFO's impacts (1) on surface water and groundwater, (2) on air quality, (3) on biological resources, and (4) cumulatively. Each claim is addressed in turn.

#### a. Surface Water And Groundwater Impacts

With respect to water impacts, the plaintiff raises two arguments as to why FSA's analysis of the OMH CAFO's impacts was insufficient. First, the plaintiff maintains that FSA "impermissibly abdicated its responsibility to conduct its own analysis of the direct water pollution impacts from the facility, instead relying entirely" on standards set by the United States Environmental Protection Agency ("EPA") and state agencies. Pl.'s Opp'n at 11. Second, the

plaintiff asserts that FSA "ignored known indirect water pollution impacts entirely by failing to address the pollution resulting from off-site disposal of the facility's enormous quantities of waste and failing to address the 'non-point' source pollution resulting from runoff due to precipitation." *Id.* at 10–11. Both arguments fail.

####     i.     FSA Properly Relied On Federal And State Standards

In analyzing the OMH CAFO's impacts on surface water and groundwater, FSA looked to standards set by EPA and by state agencies for guidance. For example, FSA evaluated the OMH CAFO's surface water impacts in light of the Upper Choptank watershed's "Total Maximum Daily Load (TMDL) . . . written and approved by [EPA]," AR 510, which is "essentially a 'pollution diet' that identifies the maximum amount of a pollutant the waterway can receive and still meet water quality standards," AR 729; *see also* AR 727 (explaining that the Upper Choptank TMDL is "designed to ensure that all pollution control measures needed to fully restore the [Chesapeake] Bay and its tidal rivers are in place by 2025, with at least 60 percent of the actions completed by 2017"). Similarly, FSA's determination that the OMH CAFO would not have a significant impact on the quantity of groundwater available in the area was informed by the fact that "planned groundwater use for the project was calculated at a volume less than the amount where a [state] groundwater allocation permit is required." AR 508.

The plaintiff claims that this use of EPA and state standards was improper. In support, the plaintiff cites *Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission*, 449 F.2d 1109 (D.C. Cir. 1971). *See* Pl.'s Opp'n at 16. There, the D.C. Circuit struck down a rule promulgated by the now-defunct U.S. Atomic Energy Commission requiring the Commission to defer to "environmental quality standards and requirements . . . established by authorized Federal, State, and regional agencies" and to treat "[c]ertification by the

appropriate agency that there is reasonable assurance that [an] applicant for [a] permit or license will observe such standards and requirements [as] dispositive" as to whether a project would have "a significant, adverse effect on the environment" for purposes of NEPA. *Calvert Cliffs'*, 449 F.2d at 1122 (quoting 10 C.F.R. § 50, App. D, at 249 (1971)). Additionally, the plaintiff cites *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), where the D.C. Circuit confirmed that "the existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis." Pl.'s Opp'n at 16 (internal quotation marks omitted) (quoting *Sierra Club*, 867 F.3d at 1375). The plaintiff argues that FSA did exactly what these cases forbid: "abdicate[d] its NEPA responsibilities by claiming it is beholden to the expertise of other permitting agencies." Pl.'s Mem. at 25.

The plaintiff reads too much into *Calvert Cliffs'* and *Sierra Club*, and too little into FSA's analysis of the OMH CAFO's environmental impacts. While an agency may not "impermissibly delegate[] its obligations under NEPA to independently review" a project's environmental impacts, *City of Oberlin v. FERC*, 937 F.3d 599, 610 (D.C. Cir. 2019), an agency may "reference [another agency's] standards as a component of its [NEPA] review" and "consider[ another agency's] regulations in an appropriate fashion," *id.* at 610–11. *Sierra Club* itself makes this clear. In a portion of that opinion the plaintiff ignores, the Circuit held that the Federal Energy Regulatory Commission ("FERC") "appropriately relied on EPA's national ambient air quality standards (NAAQS) as a standard of comparison for air-quality impacts." *Sierra Club*, 867 F.3d at 1370 n.7. Other decisions of the D.C. Circuit have similarly upheld agency NEPA analyses that evaluated a project's environmental impacts in light of standards and requirements established by other agencies. *See, e.g.*, *City of Oberlin*, 937 F.3d at 610 (rejecting challenge to NEPA analysis that explained how applicant's "compliance with [another agency's] standards

would address the specific safety concerns that commenters raised"); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956–57 (D.C. Cir. 2016) (concluding that FERC satisfied NEPA by determining that "currently-required measures for all ships entering U.S. waters" and "new rules and discharge standards approved by the Coast Guard" would adequately address energy project's identified environmental impacts (internal quotation mark omitted) (quoting *Dominion Cove Point LNG, LP*, 148 F.E.R.C. ¶ 61,244 at P 128 (2014))).

Here, FSA did not, as in *Calvert Cliffs'*, simply defer to other agencies, but rather, as in *Sierra Club*, *City of Oberlin*, and *EarthReports*, used other agencies' standards and requirements to evaluate the significance of the OMH CAFO's impacts. For instance, to assess the OMH CAFO's impact on groundwater quantity, FSA, in conjunction with the Maryland Department of the Environment's Water Management Administration, determined that the annual average water demand for the OMH CAFO was less than 10,000 gallons per day ("gpd"), *see* AR 693, and used the threshold for determining whether a state groundwater allocation permit is necessary, which is 10,000 gpd, as a critical point of comparison, *see* AR 508. *Cf. Sierra Club*, 867 F.3d at 1370 n.7 ("By presenting the project's expected emissions levels and the NAAQS standards side-by-side, the EIS enabled decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard."). Doing so satisfied NEPA's "hard look" requirement.[11]

### ii. FSA Was Not Required To Analyze Potential Impacts From Off-Site Manure Disposal And Agricultural Runoff

The plaintiff also contends that FSA failed to take a "hard look" at the OMH CAFO's *indirect* surface water and groundwater impacts. "An agency conducting a NEPA review must

---

[11] The plaintiff also reiterates its argument that FSA improperly relied on mitigation measures. *See* Pl.'s Mem. at 24–25. That argument fails for the reasons stated *supra*, in Part III.B.1.

consider not only the direct effects, but also the indirect environmental effects, of the project under consideration." *Sierra Club*, 867 F.3d at 1371 (emphasis omitted). "Indirect effects are those that 'are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.'" *Birckhead*, 925 F.3d at 516 (quoting 40 C.F.R. § 1508.8(b)). "Effects are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club*, 867 F.3d at 1371 (alteration in original) (quoting *EarthReports*, 828 F.3d at 955).

Here, two types of indirect surface water and groundwater effects not analyzed by FSA are at issue. First, FSA declined to analyze the impacts caused by off-site disposal of the OMH CAFO's manure. Although "off-site disposal of [the OMH CAFO's] manure is certain," Defs.' Reply at 19, the defendants maintain that the "ultimate site of [manure] application is unknown," *id.*, because "the buyers are unknown until the manure is sold," Defs.' Opp'n at 36 n.6. Due to this uncertainty, the defendants contend, the precise impacts of off-site manure disposal are not reasonably foreseeable, and FSA was not required to consider them. *See* Defs.' Reply at 19.

The plaintiff rejoins that to the extent FSA lacked relevant information, it should have cured that deficiency, as "[n]othing barred FSA from requiring information from OMH CAFO about the farmers who would purchase the manure." Pl.'s Opp'n at 12. Some support for this argument is found in *Birckhead*, a case not cited by the parties but that is nonetheless relevant. In *Birckhead*, the D.C. Circuit assessed whether FERC properly "declined to consider greenhouse-gas emissions and other environmental impacts related to downstream gas consumption" that would result from a new natural gas compression facility, 925 F.3d at 518 (emphasis omitted), when the agency claimed it "lack[ed] . . . information about the destination and end use of the gas in question," *id.* at 519. Admonishing FERC for not seeking the

information from the project applicant, the Circuit expressed "skeptic[ism] of any suggestion that a project applicant would be unwilling or unable to obtain [the relevant information] if the Commission were to ask for such data as part of the certificate application process." *Id.* at 520. Yet, "[d]espite [the Circuit's] misgivings regarding the Commission's decidedly less-than-dogged efforts to obtain the [relevant] information," the Circuit ultimately upheld the Commission's decision, as the petitioners "failed to raise this record-development issue in the proceedings before the Commission," depriving the Circuit of jurisdiction under the relevant statute. *Id.* (citing 15 U.S.C. § 717r(b)).

Though *Birckhead* bolsters the plaintiff's contention that FSA should have demanded more information about where the OMH CAFO would dispose of its manure, the defendants nevertheless have the better argument in this instance. *Birckhead* did not affirmatively hold that FERC violated NEPA by declining to ask an applicant for more information. In fact, when the D.C. Circuit discussed the *upstream* impacts of the compression facility at issue, the Circuit did not identify any jurisdictional obstacles to review of that decision, yet still declined to set aside the Commission's similar refusal to seek out additional information. *See id.* at 518 (explaining that "although we are dubious of the Commission's assertion that asking [the applicant] to provide additional information about the origin of the gas would be futile," "[w]e are . . . left with no basis for concluding that the Commission acted arbitrarily or capriciously or otherwise violated NEPA in declining to consider the environmental impacts of upstream gas production").

Further, and more importantly, here the information available to FSA indicated that the location of manure disposal would be genuinely unknowable prior to sale. The record shows that OMH's owner had multiple "contacts for [manure] sales," and that "there [was] a strong market" for manure sales in the OMH CAFO's region. AR Loan 8. Thus, the OMH CAFO had a wide

range of choices for disposing of manure, and no apparent reason to limit its options by committing to a single disposal site (or even a small handful of them). *Cf. Birckhead*, 925 F.3d at 517 (upholding FERC's determination that upstream impacts were not foreseeable in part because petitioners "identified no record evidence that would help the Commission predict the number and location of any additional wells that would be drilled as a result of production demand created by the Project"). Under these facts, FSA did not act arbitrarily and capriciously in concluding that the location of the CAFO's manure disposal was not reasonably foreseeable.

Second, FSA also opted not to discuss potential agricultural runoff from the OMH CAFO, including runoff that could occur by infiltration to groundwater and subsequent groundwater discharge to surface water. Citing a May 9, 2015 email from the Maryland Department of the Environment ("May 9th email"), the defendants claim that OMH CAFO was "designed such that there will be no discharge from the operation to waters of the State," Defs.' Opp'n at 35 n.5 (quoting AR 292), and thus runoff from the OMH CAFO was not reasonably foreseeable. The plaintiff, however, contends that the defendants take the statement from the May 9th email out of context, as "this [email] is referencing the Clean Water Act permit the CAFO is required to obtain, which only regulates *point source* discharges." Pl.'s Opp'n at 13 (emphasis in original).[12] According to the plaintiff, "CAFOs, such as OMH, are in fact authorized to, and designed to, discharge both point and non-point source pollution from the facility and land application areas under certain circumstances," *id.*, as evidenced by the OMH

---

[12] The Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, "require[s] that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013). The Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged" but not "agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14).

CAFO's Nutrient Management Plan and Conservation Plan, which purport merely to "*minimize the potential for nutrient loss or runoff,*" *id.* at 14 (emphasis in original) (internal quotation mark omitted) (quoting AR 51).

The record supports the defendants' claim that the OMH CAFO was designed to prevent discharge of both point and nonpoint source pollution into state waters, even though, in making their argument, the defendants cite the wrong part of the administrative record. In the May 9th email, the representative of the Maryland Department of the Environment states that "[t]he *information provided* notes that the proposed project has been designed such that there will be no discharge from the operation to waters of the State." AR 292 (emphasis added). Thus, rather than determine the meaning of this statement in the May 9th email, the more probative inquiry is what the "information provided"—merely summarized in the May 9th email—shows about the design of the OMH CAFO.

The "information provided" is found in an April 15, 2015 FSA letter ("April 15th letter"), which the parties do not address. *See id.* (April 15, 2015 email from FSA to Maryland Department of the Environment) ("While I have been waiting for a response back from an original letter that was sent on March 9, 2015 regarding a federal consistency determination for a proposed poultry operation, new information has come to light and we have revised the consistency determination from the original that was sent over. Please see the attached letter and let me know if you have any questions."); AR 124–27 (FSA's April 15, 2015 letter); *see also* AR 128–31 (FSA's March 9, 2015 letter). The April 15th letter matches the statement found in the May 9th email, but adds the critical detail of *which* design document addresses agricultural runoff. The letter states: "The *stormwater and sediment erosion control plan* that will be approved by the Caroline Soil Conservation District has been designed so there will be no

discharge from this operation to the waters of the state."  AR 124 (emphasis added); *see also* AR

125 ("The design of the *Stormwater Management Plan* has been designed in accordance with the

Model Standard Plan for Poultry House Site Development on Maryland's Eastern Shore and is

designed so there will be no discharge to the waters of the State." (emphasis added)); AR 126

("The *stormwater management plan* for this operation was designed in accordance with the

Model Standard Plan for Poultry House Site Development on Maryland's Eastern Shore and so

there will be no discharge into waters of the State." (emphasis added)).

The April 9th letter thus reveals that the plaintiff's bases for claiming that the OMH

CAFO discharges nonpoint source pollution are contradicted by the record.  The OMH CAFO

was designed to prevent discharge to the waters of the state not, as the plaintiff maintains, to

obtain a Clean Water Act permit, but to obtain approval from the Caroline Soil Conservation

District.  AR 124.  Moreover, while the OMH CAFO's Nutrient Management Plan and

Conservation Plan merely "minimize[d] the potential for nutrient loss or runoff," AR 51, the

*Stormwater Management Plan* ensured elimination of such discharge entirely, AR 124–26.

Accordingly, environmental effects due to agricultural runoff were not reasonably foreseeable,

both as to surface water and groundwater, *see* MD. CODE ANN., ENVIR. § 5-101(l)(1) (West)

(defining "Waters of the State" to include "[b]oth surface and underground waters"), and FSA

did not violate NEPA by declining to try to identify and evaluate such effects.

### b.    *Air Impacts*

The plaintiff also challenges the sufficiency of FSA's analysis of the OMH CAFO's

impacts on air quality.  Specifically, the plaintiff claims that FSA (1) failed to sufficiently

analyze the effects of "dust and odor emissions from the 'generation and handling of poultry

litter, and the management of mortalities,'" Pl.'s Mem. at 29 (quoting AR 512), (2) ignored the

potential air-quality impacts from increased motor traffic associated with the CAFO and from the CAFO's use of ammonia, *id.* at 28–30, and (3) did not comply with its own regulations pertaining to air-quality analysis, *id.* at 28–29. These arguments miss their marks.

### i. FSA Sufficiently Considered Emissions Related To Poultry Litter And Mortality Management

The plaintiff's critique of FSA's consideration of emissions related to poultry litter and mortality management amounts to nothing more than a restatement of the plaintiff's argument that the agency improperly relied on mitigation measures. *See* Pl.'s Mem. at 29 ("Instead of identifying and analyzing these impacts, the EA merely stated that OMH would control odor and dust 'by developing and following practices that will be outlined in the Nutrient Management Plan [NMP] and Conservation Plan.'" (quoting AR 512)). Such reliance was proper for the reasons explained *supra*, in Part III.B.1.[13] Indeed, in the air-quality context, the OMH CAFO's mitigation measures were especially robust, extending beyond what was required by applicable state and federal regulations. *See* AR Loan 134 ("[The applicant] also must establish a vegetative barrier around the poultry houses to reduce the odor and dust *and* comply with all state and environmental regulations during construction and during operations." (emphasis added)). The plaintiff's complaint on this score thus fails.

### ii. FSA Was Not Required To Analyze The Potential Impacts From Increased Motor Traffic During Operation And From Use Of Ammonia

The plaintiff also complains that FSA ignored the "truck traffic to ship and receive birds, manure, feed, and other materials in support of the CAFO's ongoing operations," Pl.'s Mem. at

---

[13] The plaintiff attempts to distinguish FSA's reliance on mitigation measures in the air-quality context by arguing that the OMH CAFO's Nutrient Management Plan "focused on water pollution" and thus did not "adequately mitigate air quality impacts." Pl.'s Mem. at 29. Yet, FSA explained that odor and dust would be addressed by "the Nutrient Management Plan *and* Conservation Plan," AR 512 (emphasis added), and the plaintiff does not dispute that measures in the Conservation Plan were designed to mitigate air-quality impacts.

28, and "failed to ever mention or discuss the impacts of ammonia, a pollutant associated with poultry operations," *id.* at 30.

The record refutes the notion that FSA overlooked the effects of motor vehicle traffic. The final EA states: "Motor vehicle traffic will increase slightly during the construction phase; *however, this will only be for a short period of time*." AR 512 (emphasis added). Thus, FSA "unquestionably did consider," *Minisink*, 762 F.3d at 109, whether the OMH CAFO would produce increased motor vehicle traffic, as well as when increased traffic would occur. "It just disagreed with [the plaintiff's] position that" increased traffic during operations "was sufficiently certain to require its environmental effects be taken into account in connection with the [project]." *Id.* That conclusion is entitled to deference. *See id.*; *see also Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) ("Given the lengthy process of consultation with the localities affected, the documentation by the responsible officials of the effects in general, and the officials' plausible thesis as to the project's role in regional development, we find that the officials made a sufficiently convincing case for dispensing with an EIS in which to explore in detail the likelihood and scope of these effects.").

As to the plaintiff's claim that the OMH CAFO's use of ammonia produces significant environmental effects, FSA addressed the possibility of emissions—which necessarily included emissions associated with use of ammonia—and determined that they would be mitigated by measures found in the OMH CAFO's facility design and operational plans. *See, e.g.*, AR 512. Thus, FSA "considered this argument, too, and based on its assessment of the evidence, it again disagreed with [the plaintiff]." *Minisink*, 762 F.3d at 110. No further analysis of ammonia was required.

### iii. FSA Complied With Its Regulations Pertaining To Air-Quality Analysis

Finally, the plaintiff argues that in three ways FSA failed to comply with its own regulations pertaining to air-quality analysis in effect at the time the agency guaranteed the OMH CAFO loan. To start, the plaintiff says that FSA's regulations required an assessment of six separate air-quality factors, only one of which FSA actually addressed. *See* Pl.'s Mem. at 28 (citing 7 C.F.R. pt. 1940, subpt. G, ex. H(IV)(1) (2015)). The errors in this claim are twofold. First, FSA in fact considered more than one of the six factors the plaintiff cites. For instance, the plaintiff states that FSA did not address "the CAFO's consistency with Maryland's air quality implementation plan," *id.*, but the record reveals that FSA received a "Federal Consistency Determination" from the Maryland Department of Natural Resources and the Maryland Department of Environment concluding the OMH CAFO complied with applicable state environmental policies and requirements, *see* AR 133. Second, the factors that FSA did not address were simply inapplicable to the OMH CAFO. For example, FSA did not address "existing topographical or meteorological conditions that may affect the dispersal of emissions," Pl.'s Mem. at 28, because it determined that emissions would be controlled by measures in the Nutrient Management Plan and Conservation Plan, *see* AR 512.

Next, the plaintiff alleges that FSA failed to "[d]iscuss how [air-quality] impacts resulting from the project . . . will affect nearby residents and users of the project area and surrounding areas." Pl.'s Mem. at 29 (first alteration in original) (internal quotation marks omitted) (quoting 7 C.F.R. pt. 1940, subpt. G, ex. H(IV)(7) (2015)). Yet, once again, FSA was not required to address impacts that did not exist, and thus to the extent that FSA determined that the OMH CAFO would not materially affect air and water quality, FSA satisfied this regulation.

Moreover, FSA *did* expressly address the OMH CAFO's effects on the surrounding community, and determined that the OMH CAFO "[would] not adversely impact nearby residents."  AR 509.

Third and last, the plaintiff maintains that FSA "stat[ed] that the agency would 'be reviewing [air-quality] issues [raised by commentators] with the experts and permitting agencies for their expert opinion' and would respond with the findings," but "[d]espite this promise, the July EA did not identify the results of any expert consultation regarding air quality concerns, nor does the air quality section mention any expert consultation."  Pl.'s Mem. at 29 (quoting AR 236, 247).  The plaintiff overlooks, however, that the applicable FSA regulation required only that the agency "*[c]ite* any contacts with appropriate experts and agencies," 7 C.F.R. pt. 1940, subpt. G, ex. H(IV)(1) (2015) (emphasis added), not that FSA *make* such contacts. The plaintiff does not claim that such contacts occurred, *see* Pl.'s Mem. at 29–30, and though the better practice would have been for FSA to follow through on its stated intent, FSA had no obligation to report contacts that never occurred.

Accordingly, FSA's analysis of the OMH CAFO's air-quality impacts met the agency's NEPA obligations.

### c. *Impact On Biological Resources*

The plaintiff asserts that FSA "fail[ed] to take any look, much less the 'hard look' required by NEPA, at potential impacts on all relevant biological resources" because, with respect to migratory birds, FSA "improperly narrowed its analysis" to just birds listed on the federal endangered-species list.  Pl.'s Mem. at 44.  According to the plaintiff, although the United States Fish and Wildlife Service ("FWS") notified FSA "that no [Endangered Species Act]-listed species or critical habitat were found within the vicinity of the CAFO," it identified for FSA "27 migratory Birds of Conservation Concern that may be affected by the [OMH

CAFO]," *id.* at 43, and told FSA that it "should identify potential or existing projected-related impacts to migratory birds and their habitat and develop and implement conservation measures that avoid, minimize, or compensate for these impacts," *id.* (quoting AR 165).  Yet, the plaintiff says, "[d]espite this clear directive, FSA failed to discuss the CAFO-related impacts to birds of conservation concern."  *Id.*

The plaintiff's argument disregards that it was FSA's prerogative, as the agency preparing the EA and issuing the loan guarantee, to determine which wildlife resources required consideration, not FWS's.  As the D.C. Circuit has explained, "[t]he NEPA process involves an almost endless series of judgment calls, and the line-drawing decisions necessitated by the NEPA process are vested in the agencies, not the courts."  *WildEarth Guardians*, 738 F.3d at 312 (internal quotation marks omitted) (quoting *Duncan's Point Lot Owners Ass'n Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008)).  FSA's decision to limit its analysis of impacts on migratory birds to federally threatened or endangered species is entitled to deference, and in light of FWS's notice that no such species would be affected, *see* AR 507, FSA's determination that the OMH CAFO would not significantly impact biological resources was reasonable.

### d.  *Cumulative Impacts*

Notwithstanding that FSA took a "hard look" at the OMH CAFO's effects on surface water quality, groundwater quality and quantity, air quality, and biological resources, the plaintiff claims that FSA did not adequately consider the OMH CAFO's *cumulative* environmental impacts.  "A 'cumulative impact' is 'the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions.'" *TOMAC*, 433 F.3d at 864 (omission in original) (quoting 40 C.F.R. § 1508.7)).  "[A] meaningful

cumulative impact analysis must identify (1) the area in which the effects of the proposed project

will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other

actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected

to have impacts in the same area; (4) the impacts or expected impacts from these other actions;

and (5) the overall impact that can be expected if the individual impacts are allowed to

accumulate." *Del. Riverkeeper Network*, 753 F.3d at 1319 (internal quotation marks omitted)

(quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

The plaintiff argues that FSA erred by (1) improperly limiting the geographic scope of its

cumulative-impact analysis, (2) failing to identify and consider other past, present, and

reasonably foreseeable actions in the OMH CAFO's area, and (3) providing a cumulative-impact

analysis that was conclusory. *See* Pl.'s Mem. at 9–16; Pl.'s Opp'n at 1–5. The geographic-scope

issue is addressed first, and then the plaintiff's remaining two arguments are considered together.

### i.   FSA's Decision To Limit Its Analysis Of Cumulative Impacts To Caroline County Was Reasonable

In its cumulative-impact analysis, FSA stated that it assessed "the possible cumulative

impacts the [OMH CAFO] may present in the Caroline County area." AR 516. The plaintiff,

however, disputes this proposition, and asserts that, in actuality, FSA "restrict[ed] [its analysis]

to 'the subject property.'" Pl's Mem. at 11 (quoting AR 516). Further, the plaintiff maintains

that even if FSA in fact evaluated the OMH CAFO's impacts in Caroline County, that scope of

review was still "plainly inadequate for a cumulative effects analysis," as "the Chesapeake Bay

watershed would have been [the] lawful geographic scope for the CAFO." *Id.* Each contention

is taken in turn.

First, the plaintiff is wrong about the scope of FSA's analysis. As the final EA clearly

stated, FSA assessed the OMH CAFO's cumulative impacts in the entire "Caroline County

area." AR 516.  The plaintiff focuses instead on a subsequent sentence in the cumulative-impact

analysis, which relays that "[t]o the knowledge of the preparer, there has not been any past

activity *associated with the subject property*."  Pl.'s Opp'n at 2 (emphasis in original) (quoting

AR 516).  Yet, "[i]n ensuring an agency's compliance with NEPA, the Court is not strictly

confined to the portion of an environmental assessment labeled 'cumulative impacts analysis,' or

even to the four corners of the EA or EIS more broadly."  *Ctr. for Biological Diversity v. Blank*,

933 F. Supp. 2d 125, 151 (D.D.C. 2013); *see also, e.g.*, *Ctr. for Envtl. Law & Policy v. U.S.

Bureau of Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011) ("Although this evidence is not

presented in the cumulative effects section of the EA, it would impermissibly elevate form over

substance to hold that [the agency] must replicate its entire analysis under the heading of

cumulative effects.").  The sentence to which the plaintiff points is, if anything, merely a

"flyspeck" in FSA's analysis, since other portions of the final EA, as well as the administrative

record as a whole, confirm what FSA said: it "review[ed] . . . the possible cumulative impacts the

[OMH CAFO] may present in the Caroline County area."  AR 516; *see, e.g.*, AR 509 (assessing

the project's socioeconomic impact in Caroline County); AR 510–11 (assessing the project's

impact on the Upper Choptank, Chesapeake Bay, and Watts Creek); AR 512–13 (assessing the

project's impact on local motor vehicle traffic and air quality); AR 516 ("Based on the review of

information provided by U.S. Fish and Wildlife Service, SHPO, MDE, MDT, MDNR, NRCS,

Caroline County Soil Conservation District and various websites, it does not appear that this

project will have an adverse impact on the Caroline County environment . . . .").

     Second, FSA's choice of Caroline County for its cumulative-impact analysis was

reasonable.  As the Supreme Court has recognized, "practical considerations of feasibility might

well necessitate restricting the scope of comprehensive statements," *Kleppe v. Sierra Club*, 427

U.S. 390, 414 (1976), and, although the appropriate scope of a cumulative-impact analysis is a project-specific inquiry, the D.C. Circuit has previously upheld an agency's decision to conduct cumulative-impact analysis at the county level, *see Sierra Club*, 827 F.3d at 49–50.  Here, given the absence of evidence that the OMH CAFO would produce significant environmental impacts *anywhere*—inside Caroline County or otherwise—limiting the cumulative-impact analysis to Caroline County was not arbitrary.  *See id.* at 50 (deeming that broader cumulative-impact analysis was not required where there was "scant record evidence identifying any reasonably foreseeable and proximate effects" in the larger geographic region proposed by the petitioners).  Indeed, the plaintiff essentially concedes that the OMH CAFO's impacts were geographically limited.  The only areas beyond Caroline Country that the plaintiff claims required consideration are "the Upper Choptank River and Chesapeake Bay watersheds and . . . Watts Creek," Pl.'s Mem. at 12; Pl.'s Opp'n at 2 (same), which FSA *did* address, *see* AR 510–11.[14]  FSA thus considered an appropriate geographic scope in its cumulative-impact analysis.

## ii.     FSA's Cumulative-Impact Analysis Was Sufficient

FSA determined that the OMH CAFO would produce no significant cumulative impacts because "[a]ny minor localized negative impacts the creation of this poultry operation may have on the human environment [would] be minimized by the proper implementation and adherence with the provisions of the approved conservation plan devised for the CAFO operation . . . ,  as well as compliance with applicable State and County permitting processes and setback requirements."  AR 517.  The plaintiff believes that FSA was obligated to provide more analysis than this, and points to a number of factors that it claims FSA failed to assess.  *See* Pl.'s Mem. at 12–14; Pl.'s Opp'n at 4–5. The defendants, for their part, agree that FSA did not address at least

---

[14]     The plaintiff also claims, for the second time, that FSA was required to consider the effects of off-site manure disposal, Pl.'s Mem. at 12, but the plaintiff is wrong for the reasons set forth *supra*, in Part III.B.2.a.ii.

some of the factors that the plaintiff identifies, *see, e.g.*, Defs.' Opp'n at 22 (acknowledging that

FSA did not analyze the effects of "future poultry farms within the area"), but argue that, as was

stated in the final EA, FSA reasonably determined that the OMH CAFO would produce "no

significant cumulative impacts" because it concluded that "the Farm's direct and indirect impacts

will not be significant," Defs.' Reply at 13. Thus, if the defendants are correct, the sufficiency of

FSA's cumulative-impact analysis boils down to a single question: Did FSA satisfy its

obligation to analyze cumulative effects by determining that the OMH CAFO itself would have

no significant impact?[15]

The D.C. Circuit's decision in *Minisink* answers this question in the affirmative. There,

the Circuit reviewed FERC's assessment of a natural gas compressor station's environmental

impacts, and approved FERC's decision to ignore in its cumulative-impact analysis "the

potential construction of a lateral pipeline from the Minisink compressor to a proposed power

plant operated by CPV Valley LLC." *Minisink*, 762 F.3d at 112–13. The Circuit reasoned that

"because the Minisink Project *itself* was expected to have minimal impacts, no significant

*cumulative* impacts were expected to flow from the possible development of the CPV Valley

power plant." *Id.* at 113 (emphases in original); *see also Sierra Club*, 827 F.3d at 50

(recognizing that *Minisink* upheld "cumulative-impact analysis finding 'no significant

*cumulative* impacts were expected' where the '[p]roject *itself* was expected to have minimal

impacts'" (alteration and emphases in original) (quoting *Minisink*, 762 F.3d at 113)). This case

is no different. FSA reasonably concluded that, in light of measures in the OMH CAFO's

facility design and operational plans, the OMH CAFO would have no significant direct or

---

[15]     Again, the plaintiff attempts to inject into the analysis the question of whether FSA properly relied on mitigation measures in determining that the OMH CAFO would have no significant impact. *See* Pl.'s Opp'n at 5–6. That issue has already been addressed at length *supra*, in Part III.B.1.

indirect environmental impacts, and therefore FSA's further conclusion that the OMH CAFO

would lead to no significant cumulative impacts was reasonable as well.

* * *

In sum, FSA took a "hard look" at the OMH CAFO's environmental impacts. This

fulfilled FSA's NEPA obligation.

### 3. FSA Did Not Need To Prepare An EIS

As the foregoing analysis illustrates, FSA reasonably determined that the OMH CAFO

would not significantly affect the environment. Nevertheless, the plaintiff maintains that FSA

was still required to prepare an EIS, because "a substantial dispute exists as to the [OMH

CAFO's] . . . health impacts upon nearby residents." Pl.'s Mem. at 41–42. This last-ditch effort

to undermine FSA's finding of no significant impact fares no better than the plaintiff's other

arguments.[16]

In support of its claim that a dispute exists concerning the OMH CAFO's health impacts,

the plaintiff cites a letter, written by researchers at Johns Hopkins University and submitted to

FSA by the plaintiff during the notice-and-comment process, highlighting "[h]uman health

concerns associated with exposures to contaminants produced by CAFOs [such as] the spread of

infectious diseases, asthma, bronchitis, allergic reactions, thyroid problems, and neurological

impairments." *Id.* at 42 (citing AR 407–08). The researchers conclude that "[t]he level of

---

[16]     Initially, the plaintiff also argued that an EIS was required because "[t]he CAFO has highly controversial impacts," Pl.'s Mem. at 41, as illustrated by an email in which FSA acknowledged "the controversy in the surrounding counties with poultry house construction and the special environmental interest groups," *id.* (internal quotation mark omitted) (quoting AR Loan 100). The plaintiff did not press this argument, however, after the defendants pointed out that "for there to be a 'controversy' sufficient to establish that the impacts of the proposed action are significant, 'certainly something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter'"; rather, controversy exists when "'scientific or other evidence . . . reveals flaws in the methods or data relied upon by the agency in reaching its conclusions.'" Defs.' Opp'n at 25 (quoting *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 33 (D.D.C. 2016)). What remains of the plaintiff's "highly controversial" argument collapses into the plaintiff's health-impacts argument. *See* Pl.'s Opp'n at 30 (contending that FSA failed to discuss the "controversy surrounding public health").

human health risk associated with industrial broiler production can be reasonably assumed to increase as concentration of production within a geographic area increases and more pollution, pathogens, and manure are generated." AR 403.

The Court has no reason to doubt the opinion of the researchers at Johns Hopkins University that CAFOs produce byproducts that, with sufficient exposure, can adversely affect human health. Nonetheless, that conclusion does not establish that the OMH CAFO, in particular, was reasonably likely to adversely impact human health. To the contrary, the researchers acknowledge that the presence of these health impacts is tied to "concentration" of "pollution, pathogens, and manure." *Id.* Thus, by concluding that byproducts of the OMH CAFO, such as emissions and manure, would be adequately controlled by measures in the OMH CAFO's facility design and operational plans, FSA implicitly and reasonably concluded that the OMH CAFO's potential health impacts would be mitigated as well. *See Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003) ("If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health.").

For this reason, as well as the reasons articulated above, FSA was not required to prepare an EIS.

### 4. FSA Reasonably Considered Alternatives

The plaintiff also claims that FSA did not fulfill its obligation under NEPA to consider reasonable alternatives. *See* Pl.'s Mem. at 16–21; Pl.'s Opp'n at 6–10. Courts "evaluat[e] an agency's choice of 'reasonable alternatives' in light of the objectives of the federal action," *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999), applying a two-part test. First,

courts determine "whether the agency has reasonably identified and defined its objectives," *id.*, affording "considerable deference to the agency's expertise and policy-making role," *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73 (internal quotation marks omitted) (quoting *Slater*, 198 F.3d at 867). Second, courts consider "whether a particular alternative is reasonable in light of these objectives." *Slater*, 198 F.3d at 867. "An alternative is 'reasonable' if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (alteration in original) (quoting *Slater*, 198 F.3d at 867). Thus, the agency's "purpose and need for action . . . will determine the range of alternatives and provide a basis for the selection of an alternative in a decision." *Id.* at 72–73 (internal quotation mark omitted) (quoting 43 C.F.R. § 46.420(a)(2)); *see also Citizens Against Burlington*, 938 F.2d at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives.").

An agency's choice of and among alternatives does not take place in a vacuum but in the context of authorizing statutes, which reflect legislative purposes and intent regarding agency action. *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73. As the D.C. Circuit has explained, "[t]he agency should . . . 'always consider the views of Congress' to the extent they are discernible from the agency's statutory authorization and other directives." *Id.* (quoting *Citizens Against Burlington*, 938 F.2d at 196). "[A]n alternative is properly excluded from consideration . . . if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" *Slater*, 198 F.3d at 867 (quoting *Citizens Against Burlington*, 938 F.2d at 195); *see also* 43 C.F.R. § 46.420(b) (defining "reasonable alternatives" as "alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action").

"Importantly, [courts] review both an agency's definition of its objectives and its selection of alternatives under a 'rule of reason.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73. Courts "generally defer to the agency's reasonable definition of objectives" "as long as the agency 'look[s] hard at the factors relevant to the definition of purpose.'" *Id.* (alteration in original) (quoting *Citizens Against Burlington*, 938 F.2d at 196). Further, "if the agency's objectives are reasonable, [courts] will uphold the agency's selection of alternatives that are reasonable in light of those objectives." *Grunewald*, 776 F.3d at 904 (internal quotation marks omitted) (quoting *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73); *see also id.* at 903 ("In reviewing an agency's selection of alternatives, we owe 'considerable deference to the agency's expertise and policy-making role.'" (quoting *Slater*, 198 F.3d at 867)). When the federal agency is asked merely to approve or support a plan proposed by an applicant, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 575 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994)); *see also, e.g.*, *Citizens Against Burlington*, 938 F.2d at 196 ("When an agency is asked to sanction a specific plan, the agency should take into account the needs and goals of the parties involved in the application." (citation omitted)).

Here, FSA defined the relevant objective as "allow[ing] the [applicant] to generate adequate income from the farming operation to retire debt and provide a standard of living acceptable to the area." AR 504. With that objective in mind, FSA evaluated four options in addition to the plan proposed by OMH's owner: (1) taking no action, (2) moving the CAFO to a different part of the chosen property, (3) relocating the CAFO to an entirely different property,

and (4) engaging in a different form of agricultural production. AR 505–06. FSA deemed these alternatives to be inferior to the applicant's plan. The first was inconsistent with the purpose of the project. AR 505. The second was dismissed as likely to produce *greater* environmental impacts than the applicant's proposal. AR 506. The third was not feasible because the applicant had already "entered into a contract to purchase the 114.90 acre tract and invested capital into the development and approval of the site plan and applicable permits." *Id.* The last would produce too low a rate of return to "justify the . . . costs of purchasing equipment, supplies, etc." *Id.* Accordingly, FSA opted to proceed with the OMH owner's plan.

The plaintiff argues that this analysis was built on a flawed foundation because FSA defined the relevant objective too narrowly. *See* Pl.'s Mem. at 17–18. Yet, as FSA noted in the final EA, "[t]he purpose of the FSA Farm Loan Program is to establish, improve, expand, transition, and strengthen farms." AR 504; *see also, e.g.*, 7 U.S.C. § 1921 (finding that FSA loan guarantees should be used "to provide for . . . effective credit services to farmers"). The goal of "allow[ing] the applicant to generate the farm income required to support their family and debt service," AR 505, certainly accorded with that programmatic purpose. Moreover, FSA was required to account for the OMH owner's preferences, for an agency must not "determine for the applicant what the goals of the applicant's proposal should be." *City of Grapevine*, 17 F.3d at 1506. The record reveals that OMH's owner spent years attempting to identify a suitable location for the CAFO, *see* AR Loan 5–7, and, prior to requesting the loan guarantee, had "entered into the contract to buy the farm and obtained the site plan and applicable permits with the expense even though there was no guarantee the loan would be approved," *id.* at 56. For FSA to have overridden the OMH owner's goals in these circumstances would have been especially inappropriate.

The plaintiff claims that the site and design of the OMH CAFO represented not the desires of OMH's owner, but the preferences of the Allen Harim corporation, the "integrator" who supports the OMH CAFO and brings the OMH CAFO's chickens to market. Pl.'s Opp'n at 9; *see* AR 504–05. "Allen Harim is not the applicant," the plaintiff says, "and its preferences warrant no weight from FSA." Pl.'s Opp'n at 9. The plaintiff, however, draws an illusory distinction. OMH's owner decided that her best economic option was to produce integrated poultry for Allen Harim, and this was her prerogative. FSA was not entitled to second-guess that decision, arbitrarily determine what OMH's owner "actually" wanted as opposed to what was "forced" upon her by the integrator, or fundamentally reshape the OMH CAFO in a way that would prevent OMH from being able to work with Allen Harim. Rather, FSA was obligated to "account [for] the needs and goals of the [applicant]," *Citizens Against Burlington*, 938 F.2d at 196, which FSA appropriately did here.

The plaintiff further contends that FSA failed to consider alternative *designs* for the OMH CAFO that would have produced fewer environmental impacts. *See* Pl.'s Mem. at 20; Pl.'s Opp'n at 8. Although the plaintiff is correct that FSA did not evaluate any alternative designs in the section of the final EA labeled "Alternatives," *see* AR 505–06, the agency did not in fact overlook the possibility of alternative designs. To the contrary, FSA explained: "Alternative designs are not feasible in that every integrator has a specific set of plans and specifications that producers must use to ensure placement of birds." AR 505.

Implicitly conceding that alternative designs were not truly ignored, the plaintiff criticizes the sufficiency of this alternative-designs analysis. *See* Pl.'s Opp'n at 9. The plaintiff, however, once again fails to account for FSA's obligation to consider the needs and goals of OMH's owner. In *City of Grapevine*, for instance, the D.C. Circuit held that when assessing the

environmental impacts of a proposed expansion of the Dallas/Fort Worth International ("DFW")

Airport, the Federal Aviation Administration ("FAA") appropriately declined to evaluate

alternatives that would have added runways at an off-site location rather than at the airport itself.

*See* 17 F.3d at 1506.  The Circuit determined that excluding such alternatives from the NEPA

analysis was appropriate because "the purpose of the project was to meet increased demand at

the DFW Airport," a purpose which had been properly defined based in part on "the economic

goals of the project's sponsor."  *Id.*  So, too, here, alternative designs would have prevented the

OMH CAFO from being able to produce integrated poultry for Allen Harim, undermining the

economic goals of both the FSA Loan Program and the applicant.  *See* AR 505 (explaining that

the applicant's proposal "makes it economically feasible for Allens [sic] Harim to provide birds,

and more likely that the applicant will retain the contract with the integrator").  For that reason,

FSA did not err in determining that changing the design of the OMH CAFO was not a reasonable

alternative.

In sum, FSA adopted an objective that aligned with the purpose of the FSA Farm Loan

Program and the preferences of OMH's owner, and then evaluated reasonable alternatives to the

owner's proposal but found them lacking.  In so doing, FSA satisfied NEPA.

### 5.     FSA Sufficiently Complied With Applicable Procedures

In its final attempt to establish that FSA violated NEPA, the plaintiff claims that the

agency failed to comply with a laundry list of basic procedural requirements governing

preparation of EAs and FONSIs.  Specifically, the plaintiff argues that FSA (1) did not prepare a

FONSI, (2) issued an insufficient FONSI, (3) never published the final EA and FONSI for notice

and comment, (4) failed to ensure appropriate officials signed the final EA and FONSI, (5)

withheld underlying NEPA documents from the public, (6) omitted the plaintiff's comments

from the final EA, (7) issued the final EA without considering the plaintiff's comments, and (8) improperly deferred to a consultant's determination that the OMH CAFO would have no significant environmental impact. *See* Pl.'s Mem. at 33–40; Pl.'s Opp'n at 21–27. These arguments are unavailing.

The plaintiff begins by alleging that FSA did not issue a FONSI. Pl.'s Mem. at 33–35. A FONSI, though, is simply a document "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. The final EA did this, systematically examining each of the OMH CAFO's potential environmental impacts. *See* AR 507 (biological resources and water resources); AR 508 (cultural resources); AR 509 (socioeconomics, environmental justice, important land resources, and wilderness areas); AR 510 (coastal barriers); AR 513 (surface water quality); AR 514 (soil resources); AR 515 (air quality); AR 516 (coastal zone management areas and cumulative impacts). No more was required.

Second, the plaintiff argues, in the alternative, that the final EA was an insufficient FONSI "because it failed to make a convincing case or provide a reasonable explanation to support FSA's decision." Pl.'s Mem. at 35. This is nothing more than a reiteration of the plaintiff's substantive arguments, which need not be further addressed.

Third, the plaintiff claims that FSA never published the final EA and FONSI for notice and comment. Pl.'s Mem. at 37. This contention is simply not supported by the record. FSA issued the proposed final EA and FONSI on May 22, 2015, AR 267, and published notice of availability of the proposed final EA and FONSI for public review in *The Star Democrat* on May 27, 2015, May 28, 2015, and May 29, 2015, AR 264–66. Then, on July 9, 2015, FSA extended the deadline to submit comments on the proposed final EA and FONSI to July 20, 2015, AR 440,

on which date the plaintiff itself provided comments on the proposed final EA and FONSI, AR 385.

Fourth, the plaintiff complains that the final EA and FONSI are unsigned by FSA's preparer and concurring official. Pl.'s Mem. at 39. Yet, the plaintiff points to nothing in NEPA or in the CEQ implementing regulations that requires such signatures. *Cf. Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1116 (11th Cir. 2013) ("[T]he EIS is '[a]t the heart of NEPA,' rather than the [record of decision], which is merely a means of documenting the agency's final decision on a proposed action that required an EIS." (second alteration in original) (citation omitted) (quoting *Pub. Citizen,* 541 U.S. at 757)).

Fifth, the plaintiff contends that FSA withheld underling NEPA documents from the public in violation of 40 C.F.R. § 1506.6(f) and 40 C.F.R. § 1500.1(b). Pl.'s Mem. at 38. 40 C.F.R. § 1506.6(f) requires that an agency "[m]ake . . . underlying documents available to the public pursuant to the provisions of the Freedom of Information Act [("FOIA")]," *id.*, while 40 C.F.R. § 1500.1(b) provides that an agency "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," *id.* Here, FSA provided the relevant documents in response to a FOIA request and extended the final comment period to ensure that public input could be informed by those documents. AR 440. Thus, no violation occurred.[17]

Sixth, the plaintiff says that its comments were omitted from the final EA. Pl.'s Mem. at 38. This complaint, however, does not constitute a violation of NEPA or CEQ regulations.

---

[17] The plaintiff claims that because of this alleged violation and other "rampant procedural errors," "Plaintiff was unable to submit fully informed comments." Pl.'s Opp'n at 26. Putting aside that the plaintiff has not established that FSA committed procedural errors—let alone "rampant" ones—the plaintiff's contention that it could not submit fully informed comments is belied by plaintiff's claim elsewhere that it "provided extensive comments to FSA." Pl.'s Mem. at 38.

Seventh, the plaintiff believes that FSA did not consider the plaintiff's comments, because the final EA was issued "less than 48 hours" after those comments were submitted. *Id.* The plaintiff's belief is purely speculative, relying solely on the proposition that the agency could not have adequately evaluated the plaintiff's concerns within two days of receiving them. In reality, two days was ample time, given that FSA had already spent months considering the OMH CAFO's potential environmental consequences, *see, e.g.*, AR 701 (December 2014 email reflecting consultation with FWS), and given that the plaintiff's concerns about the OMH CAFO were not novel, *see* AR 385–97.

Finally, the plaintiff maintains that FSA improperly "rel[ied] on [a] consultant's report" rather than "make [its] own independent evaluations and conclusions." Pl.'s Mem. at 39. Quite the opposite, the environmental consulting firm's review informed and confirmed FSA's own analysis, which is well documented in the final EA. Agencies are to be commended when they go the extra mile in conducting a NEPA review, not criticized.[18]

---

[18] The plaintiff also argues that FSA violated its own regulations—which, as noted, were in place in 2015 but have since been withdrawn—by failing to include the plaintiff's comments in the final EA and by not having appropriate officials sign the final EA, even though NEPA and CEQ regulations impose no such requirements. *See* Pl.'s Mem. at 38–39 (citing 7 C.F.R. §§ 1940.316, 1940.318(k) (2015)). Even assuming the plaintiff is correct that these FSA actions violated agency regulations then in effect, these actions do not overcome the harmless error rule applicable to review of agency action. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule." (internal quotation marks omitted) (quoting *PDK Labs., Inc. v. U.S. Drug Enforcement Admin*., 362 F.3d 786, 799 (D.C. Cir. 2004))). The APA expressly provides that "in reviewing agency action, 'due account shall be taken of the rule of prejudicial error,'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (quoting 5 U.S.C. § 706), because "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration," *Confederated Tribes of the Grand Ronde Cmty. v. Jewell¸* 830 F.3d 552, 568 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *PDK Labs.*, 362 F.3d at 799). The prejudicial error rule applies in the NEPA context when an agency "engaged in significant environmental analysis before reaching a decision but failed to comply *precisely* with NEPA procedures." *Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 534 (D.C. Cir. 2018) (emphasis in original) (internal quotation mark omitted) (quoting *Nevada*, 457 F.3d at 90). Here, though relevant officials may have failed to sign the final EA, the document itself demonstrates that FSA thoroughly evaluated all potential environmental considerations before guaranteeing the OMH CAFO loan. Moreover, although the plaintiff's comments were not included in the final EA, the plaintiff fails to explain how this omission could have affected FSA's analysis, let alone changed the ultimate outcome. *Cf. Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 217 (D.C. Cir. 2013) (holding that any "technical error" in the timing of the release of an environmental assessment was harmless when the agency completed the assessment "before authorizing any"

* * *

The plaintiff raised a litany of complaints, but quantity is no substitute for quality. FSA took a "hard look" at the OMH CAFO's potential environmental impacts, properly relied on measures designed to mitigate those impacts, reasonably determined that an EIS was not required, considered an adequate range of alternatives, and sufficiently complied with relevant procedural requirements. Accordingly, the defendants are entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Summary Judgment, ECF No. 57, and Motion to Strike, ECF No. 61, are denied, and the defendants' Cross-Motion for Summary Judgment, ECF No. 60, is granted.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: March 26, 2020

_____
BERYL A. HOWELL
Chief Judge

---

operations). Even if FSA may have failed to dot an "i" and cross a "t," these shortcomings are insignificant and do not undermine the conclusion that NEPA's procedural requirements were satisfied.